1   JAMES R. McGUIRE (CA SBN 189275)
    JMcGuire@mofo.com
2   GREGORY P. DRESSER (CA SBN 136532)
    GDresser@mofo.com
3   RITA F. LIN (CA SBN 236220)
    RLin@mofo.com
4   AARON D. JONES (CA SBN 248246)
    AJones@mofo.com
5   MORRISON & FOERSTER LLP
    425 Market Street
6   San Francisco, California  94105-2482
    Telephone: 415.268.7000
7   Facsimile: 415.268.7522

8   JON W. DAVIDSON (CA SBN 89301)
    JDavidson@lambdalegal.org
9   SUSAN L. SOMMER (pro hac vice)
    Ssommer@lambdalegal.org
10  TARA L. BORELLI (CA SBN 216961)
    TBorelli@lambdalegal.org
11  LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
    3325 Wilshire Boulevard, Suite 1300
12  Los Angeles, California  90010-1729
    Telephone: 213.382.7600
13  Facsimile: 213.351.6050

14  Attorneys for Plaintiff
    KAREN GOLINSKI
15

16              UNITED STATES DISTRICT COURT

17              NORTHERN DISTRICT OF CALIFORNIA

18                 SAN FRANCISCO DIVISION

19

20  KAREN GOLINSKI,                          Case No.      3:10-cv-0257-JSW

21              Plaintiff,                    **PLAINTIFF'S MEMORANDUM OF
                                             POINTS AND AUTHORITIES IN
22        v.                                  OPPOSITION TO DEFENDANTS' AND
                                             BIPARTISAN LEGAL ADVISORY
23  UNITED STATES OFFICE OF PERSONNEL         GROUP'S MOTIONS TO DISMISS**
    MANAGEMENT, and JOHN BERRY, Director
24  of the United States Office of Personnel
    Management, in his official capacity,
25
                Defendants.
26

27

28

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 2

    A.    The Passage of DOMA in 1996 ............................................................................ 2

    B.    Ms. Golinski's Attempt to Enroll Her Spouse in Her Health Plan ....................... 3

    C.    The Ninth Circuit's Employment Dispute Resolution Process. ............................. 4

ARGUMENT ........................................................................................................................... 5

I.    NEITHER *BAKER V. NELSON* NOR *ADAMS V. HOWERTON*, DECIDED
    MANY YEARS BEFORE DOMA WAS ENACTED, PRE-DETERMINED
    WHETHER DOMA WOULD PASS CONSTITUTIONAL SCRUTINY. ....................... 5

II.    DOMA IS SUBJECT TO HEIGHTENED SCRUTINY. ................................................. 8

    A.    The Courts Should Carefully Scrutinize Discrimination Based on Sexual
        Orientation Classifications. .................................................................................... 8

        1.    Lesbians and Gay Men Have Experienced a History of
            Discrimination. ........................................................................................ 10

        2.    Sexual Orientation Is Unrelated to the Ability to Contribute to
            Society. ..................................................................................................... 11

        3.    Lesbians and Gay Men Remain a Politically Vulnerable Minority. ......... 12

        4.    Sexual Orientation Is a Defining and Immutable Characteristic. .............. 14

    B.    DOMA's Discrimination Based on Ms. Golinski's Sex Requires
        Heightened Scrutiny. ............................................................................................. 15

    C.    DOMA Burdens Ms. Golinski's Fundamental Liberty to Sustain an
        Intimate Family Relationship, Triggering Heightened Scrutiny on That
        Basis as Well. ........................................................................................................ 16

III.    DOMA FAILS HEIGHTENED SCRUTINY. ............................................................... 18

IV.    EVEN IF ONLY RATIONAL BASIS REVIEW APPLIED, DOMA WOULD
    FAIL THAT LEVEL OF SCRUTINY AS WELL. ........................................................ 18

    A.    This Case Would Warrant Particularly Careful and Searching Rational
        Basis Review. ........................................................................................................ 18

    B.    The Interests Asserted by Congress Cannot Support DOMA. ............................. 19

        1.    DOMA Does Not Promote Heterosexual Marriage. ................................. 20

        2.    DOMA Does Not Encourage Responsible Procreation and Child-
            Rearing. ................................................................................................... 24

        3.    BLAG Does Not Defend DOMA as Advancing an Interest in
            "Traditional Notions of Morality" or Preserving Resources. .................. 27

V.    ASSESSING WHETHER A STATUTE UNCONSTITUTIONALLY
    DISCRIMINATES AGAINST A VULNERABLE MINORITY GROUP IS AT
    THE CORE OF THE JUDICIAL FUNCTION. ............................................................ 27

VI.    OPM VIOLATES FEHBA BY BLOCKING EQUAL ACCESS TO SPOUSAL
    HEALTH COVERAGE. ................................................................................................ 28

CONCLUSION ................................................................................................................ 30

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**CASES**

*Able v. United States*
    155 F.3d 628 (2d Cir. 1988) ................................................................................................9

*Adams v. Howerton,*
    673 F.2d 1036 (9th Cir. 1982) .....................................................................................5, 7, 8

*Agostini v. Felton,*
    521 U.S. 203 (1997) ...........................................................................................................7

*Ankenbrandt v. Richards,*
    504 U.S. 689 (1992) .........................................................................................................21

*Baehr v. Lewin,*
    852 P.2d 44 (Haw. 1993) .................................................................................................16

*Baker v. Nelson,*
    409 U.S. 810 (1972) .................................................................................................5, 6, 7

*Bd. of Trs. of the Univ. of Ala. v. Garrett,*
    531 U.S. 356 (2001) .........................................................................................................21

*Ben-Shalom v. Marsh,*
    881 F.2d 454 (7th Cir. 1989) .............................................................................................9

*Carver v. Lehman,*
    558 F.3d 869 (9th Cir. 2009) ...........................................................................................30

*Christian Legal Soc'y v. Martinez,*
    130 S. Ct. 2971 (2010) ......................................................................................................9

*Citizens for Equal Protection v. Bruning,*
    455 F.3d 859 (8th Cir. 2006) .......................................................................................9, 22

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985) ....................................................................................................passim

*Cleveland Bd. of Educ. v. LaFleur,*
    414 U.S. 632 (1974) .........................................................................................................18

*Colin v. Orange Unified Sch. Dist.,*
    83 F. Supp. 2d 1135 (C.D. Cal. 2000) .............................................................................15

*Commonwealth of Mass. v. U.S. Dep't of Health & Human Servs.,*
    698 F. Supp. 2d 234 (D. Mass. 2011) ..........................................................................7, 22

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Cook v. Gates,*
  528 F.3d 42 (1st Cir. 2008) ..................................................................... 9

*Cruzan by Cruzan v. Dir., Mo. Dep't of Health,*
  497 U.S. 261 (1990) ............................................................................ 28

*DeSylva v. Ballentine,*
  351 U.S. 570 (1956) ............................................................................ 21

*Dragovich v. United States Dep't of Treasury,*
  2011 U.S. Dist. LEXIS 4859 (N.D. Cal. Jan. 18, 2011).............................*passim*

*Eisenstadt v. Baird,*
  405 U.S. 438 (1972) ....................................................................... 19, 27

*Elk Grove United Sch. Dist. v. Newdow,*
  542 U.S. 1 (2004) ............................................................................... 21

*Flores v. Morgan Hill Unified Sch. Dist.,*
  324 F.3d 1130 (9th Cir. 2003) .............................................................. 10

*Frontiero v. Richardson,*
  411 U.S. 677 (1973) (plurality opinion)......................................... 7, 12, 13

*Gill v. Office of Pers. Mgmt.,*
  699 F. Supp. 2d 374 (D. Mass. 2010)......................................................*passim*

*Hebbe v. Pliler,*
  611 F.3d 1202 (9th Cir. 2010) .............................................................. 11

*Heller v. Doe,*
  509 U.S. 312 (1993) ....................................................................... 19, 23

*Hernandez-Montiel v. INS,*
  225 F.3d 1084 (9th Cir. 2000), *overruled on other grounds, Thomas v. Gonzales,*
  409 F.3d 1177 (9th Cir. 2005)............................................................... 15

*Hicks v. Miranda,*
  422 U.S. 332 (1975) ............................................................................. 7

*High Tech Gays v. Def. Indus. Sec. Clearance Office,*
  668 F. Supp. 1361 (N.D. Cal. 1987)....................................................... 11

*High Tech Gays* v. *Def. Indus. Sec. Clearance Office,*
  909 F.2d 375 (9th Cir. 1990) ................................................................ 12

**TABLE OF AUTHORITIES**
(*Continued*)

**Page(s)**

*High Tech Gays v. Def. Ind. Sec. Clearance Office,*
   895 F.2d 563 (9th Cir. 1990) ................................................................*passim*

*Holmes v. Cal. Army Nat'l Guard,*
   124 F.3d 1126 (9th Cir. 1997) ................................................................ 10

*In the Matter of Karen Golinski,*
   587 F.3d 901 (9th Cir. EDR Op. 2009) .............................................. 4, 5

*In re Balas,*
   2011 Bankr. LEXIS 2157 (C.D. Cal. Bankr. Jun. 13, 2011) ........................ 1, 20, 24

*In re Levenson,*
   560 F.3d 1145 (9th Cir. EDR Op. 2009) .................................... 16, 20

*In re Levenson,*
   587 F.3d 925 (9th Cir. 2009) .............................................................. 20

*In re Mark Anthony Constr.,*
   886 F.2d 1101 (9th Cir. 1989) .......................................................... 30

*In re Marriage Cases,*
   43 Cal. 4th 757 (Cal. 2008) .................................... 10, 13, 16, 17

*Jama v. Immigration & Customs Enforcement,*
   543 U.S. 335 (2005) ........................................................................ 29

*J.E.B. v. Ala. ex rel. T.B.,*
   511 U.S. 127 (1994) ........................................................................ 16

*Johnson v. Johnson,*
   385 F.3d 503 (5th Cir. 2004) .............................................................. 9

*Kelo v. City of New London,*
   545 U.S. 469 (2005) ........................................................................ 19

*Kerrigan v. Comm'r of Pub. Health,*
   289 Conn. 135 (Conn. 2008) .......................................................... 10

*Korematsu v. United States,*
   323 U.S. 214 (1944) ........................................................................ 12

*Lawrence v. Texas,*
   539 U.S. 558 (2003) ................................................................*passim*

**TABLE OF AUTHORITIES**
*(Continued)*

**Page(s)**

*Lazy Y Ranch LTD v. Behrens*,
   546 F.3d 580 (9th Cir. 2008) ...................................................................................... 25

*Lofton v. Sec'y of Dep't of Children & Fam. Servs.*,
   358 F.3d 804 (11th Cir. 2004) ...................................................................................... 9

*Loving v. Virginia*,
   388 U.S. 1 (1967) ............................................................................................. 16, 17

*Mandel v. Bradley*,
   432 U.S. 173 (1977) (per curiam) ................................................................................ 6

*Marbury v. Madison*,
   1 Cranch 137 (1803) ................................................................................................ 28

*McLaughlin v. Florida*,
   379 U.S. 184 (1964) ................................................................................................. 16

*Miller v. Gammie*,
   335 F.3d 889 (9th Cir. 2003) (en banc) ......................................................................... 9

*Moore v. City of E. Cleveland*,
   431 U.S. 494 (1977) ................................................................................................. 17

*Mutschler v. Peoples Nat'l Bank*,
   607 F.2d 274 (9th Cir. 1979) ..................................................................................... 30

*Perry v. Proposition 8 Official Proponents*,
   587 F.3d 947 (9th Cir. 2009) ..................................................................................... 10

*Perry v. Schwarzenegger*,
   704 F. Supp. 2d 921 (N.D. Cal. 2010) .................................................................... passim

*Perry v. Sindermann*,
   408 U.S. 593 (1972) ................................................................................................. 18

*Philips v. Perry*,
   106 F.3d 1420 (9th Cir. 1997) .................................................................................... 10

*Plyler v. Doe*,
   457 U.S. 202 (1982) ..................................................................................... 15, 18, 27

*Ramadan v. Gonzales*,
   479 F.3d 646 (9th Cir. 2007) ..................................................................................... 30

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Rich v. Sec'y of the Army*,
735 F.2d 1220 (10th Cir. 1984) ........................................................................... 9

*Richardson v. Ramirez*,
418 U.S. 24 (1974) ............................................................................................... 6

*Roberts v. United States Jaycees*,
468 U.S. 609 (1984) ........................................................................................... 17

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
490 U.S. 477 (1989) ............................................................................................. 7

*Romer v. Evans*,
517 U.S. 620 (1996) ...................................................................................*passim*

*Rowland v. Mad River Local Sch. Dist.*,
470 U.S. 1009 (1985) ......................................................................................... 10

*Scarbrough v. Morgan Cnty. Bd. of Educ.*,
470 F.3d 250 (6th Cir. 2006) ............................................................................... 9

*Shapiro v. Thompson*,
394 U.S. 618 (1969) ........................................................................................... 18

*Sosna v. Iowa*,
419 U.S. 393 (1975) ........................................................................................... 21

*Steffan v. Perry*,
41 F.3d 677 (D.C. Cir. 1994) ............................................................................... 9

*Tenet v. Doe*,
544 U.S. 1 (2005) ................................................................................................. 7

*United States Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973) ................................................................................ 18, 19, 21

*United States v. Lopez*,
514 U.S. 549 (1995) ........................................................................................... 21

*United States v. Morrison*,
529 U.S. 598 (2000) ........................................................................................... 21

*United States v. Richardson*,
418 U.S. 166 (1974) ........................................................................................... 28

**TABLE OF AUTHORITIES**
*(Continued)*

**Page(s)**

*United States v. Virginia*,
518 U.S. 515 (1996) ...................................................................................... 16, 18

*Varnum v. Brien*,
763 N.W.2d 862 (Iowa 2009) ...................................................................... 10, 24

*Veney v. Wyche*,
293 F.3d 726 (4th Cir. 2002) ............................................................................... 9

*Washington v. Confederated Bands & Tribes*,
439 U.S. 463 (1979) ............................................................................................ 6

*Watkins v. United States Army*,
875 F.2d 699 (9th Cir. 1989) ..................................................... 10, 11, 14, 15

*Weinberger v. Wiesenfeld*,
420 U.S. 636 (1975) .......................................................................................... 19

*Wells Fargo Bank N.A. v. Boutris*,
419 F.3d 949 (9th Cir. 2005) ........................................................................... 30

*Williams v. Illinois*,
399 U.S. 235 (1970) .......................................................................................... 23

*Witt v. Dep't of Air Force*,
527 F.3d 806 (9th Cir. 2008) ......................................................................... 8, 17

*Woodward v. United States*,
871 F.2d 1068 (Fed. Cir. 1989) .......................................................................... 9

**STATUTES, REGULATIONS, & LEGISLATIVE MATERIALS**

1 U.S.C.
§ 7 .................................................................................................................. 2, 29

5 U.S.C.
§ 8901(5) ............................................................................................................ 29

5 U.S.C.
§ 8902(f) ............................................................................................................. 28

5 U.S.C.
§ 8903 ............................................................................................................ 28, 29

# TABLE OF AUTHORITIES
*(Continued)*

**Page(s)**

5 U.S.C.
   § 8904 ...................................................................................................... 29

28 U.S.C.
   § 530D ...................................................................................................... 1

28 U.S.C.
   § 1257(2) .................................................................................................. 5

5 C.F.R.
   § 890.302(a)(1) ...................................................................................... 29

Don't Ask Don't Tell Repeal Act of 2010, P.L. No. 111-321, 124 Stat. 3515 ............................ 14

Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, P.L. No. 111-84, 123 Stat. 2190 ............................................................................. 14

Title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963 .................................... 12

S. Rep. No. 86-468 (1959) ........................................................................................... 22

H.R. Rep. No. 104-664 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905, 2906-07 ........................... 2

H. R. Rep. No. 86-957 (1959) ...................................................................................... 29

142 CONG. REC.
   H7275 (daily ed. July 11, 1996) ........................................................................ 3
   H7444 (daily ed. July 11, 1996) ........................................................................ 3
   H7486 (daily ed. July 12, 1996) ........................................................................ 3
   H7495 (daily ed. July 12, 1996) ........................................................................ 3
   H7501 (daily ed. July 12, 1996) ........................................................................ 3
   S10068 (daily ed. Sept. 9, 1996) ...................................................................... 3

Cal. Fam. Code
   § 297.5(d) ............................................................................................. 26
   § 9000(b) ............................................................................................. 26

Tennessee Senate Bill 632/House Bill 600 .................................................................. 13

## OTHER AUTHORITIES

American Psychological Association, *Just the Facts About Sexual Orientation & Youth: A Primer for Principals, Educators and School Personnel* (2008), *available at* www.apa.org/pi/lgbt/resources/just-the-facts.pdf ............................................. 15

**TABLE OF AUTHORITIES**
(*Continued*)

**Page(s)**

Charles Hoskinson, *'Don't ask' amendment coming in new defense bill* (May 10, 2011),
    *available at* www.politico.com/news/stories/0511/54644.html. .............................................. 14

Child Welfare League of America, *Position Statement on Parenting of Children by Lesbian, Gay, and Bisexual Adults*,
    http://www.cwla.org/programs/culture/glbtqposition.html ...................................... 25

Courtney A. Powers, *Finding LGBTs a Suspect Class: Assessing the Political Power of LGBTs as a Basis for the Court's Application of Heightened Scrutiny*, 17 Duke J.
    Gender L. & Pol'y 385, 395 (2010) ...................................................................... 13

Dent, *The Defense of Traditional Marriage*, 15 J.L. & Pol. 581, 595 (1999)............................... 25

Gallagher, *What is Marriage For?*, 62 La. L. Rev. 773 (2002) ...................................................... 25

Gary J. Gates, The Williams Institute, *How many people are lesbian, gay, bisexual, and transgender?* Executive Summary (April 2011), *available at*
    http://www3.law.ucla.edu/ williamsinstitute/pdf/How-many-people-are-LGBT-Final.pdf ................................................................................................................ 13

Human Rights Campaign, *Statewide Marriage Prohibitions* (2009), *available at*
    http://www.hrc.org/documents/marriage_prohibitions_2009.pdf. ............................................ 14

Kerry Eleveld, *Cicilline Becomes Fourth Gay Rep*, Advocate.com (Nov. 2, 2010),
    *available at* www.advocate.com/News/Daily_News/ ................................................................ 13

Lisa Keen, *Gay Federal Appeals Nominee: 11 Months and Still Waiting for Hearing*,
    Keen News Service (Mar. 7, 2011), *available at* www.keennews
    service.com/2011/03/07/gay-federal-appeals-nominee-11-months-and-still-waiting-for-hearing ......................................................................................................................... 25

Report from Attorney General to Speaker of House of Representatives, February 23, 2011,
    *available at* www.justice.gov/opa/pr/2011/February/11-ag-223.html.......................................2

Schwarzer, Tashima & Wagstaffe, *California Practice Guide: Federal Civil Procedure Before Trial* § 9:253 (2011)............................................................................................... 11

Wardle, *Multiply and Replenish*, 24 Harv. J.L. & Pub. Pol'y 771 (2001) .................................... 25

# SUMMARY OF ARGUMENT

The federal government has no legitimate interest in compensating Karen Golinski less than her similarly situated colleagues based on her sexual orientation or sex, characteristics that have nothing to do with her job performance.  Yet in refusing to permit Ms. Golinski to enroll her spouse in the family health care coverage for which she pays, as her colleagues are permitted to do, the government does just that.  As several federal courts have now held, and as the Obama Administration has concluded, Section 3 of the Defense of Marriage Act ("DOMA") — the basis for the government's position — "violates core constitutional principles of equal protection."[1]

Though BLAG makes much of a Supreme Court case and a Ninth Circuit case *predating* DOMA, neither addressed the federal interests at issue here, and neither precludes application of heightened scrutiny.  Indeed, under governing case law, DOMA bears all the classic hallmarks of a law subject to heightened scrutiny because it denies equal treatment based on a characteristic — sexual orientation — irrelevant to any legitimate state interest.  DOMA is also subject to heightened scrutiny because it discriminates on the basis of sex and burdens the fundamental interest in maintaining family relationships.

DOMA, however, cannot survive even rational basis review, let alone heightened scrutiny.  Though BLAG characterizes DOMA as maintaining the "historical" status quo, DOMA radically *departs* from the federal government's longstanding adherence to state definitions of marriage in every respect other than when it comes to the sex of the spouses.  BLAG identifies nothing that justifies singling out marriages of same-sex couples for such disapprobation.

But even if DOMA could withstand constitutional scrutiny, nothing in DOMA or the Federal Employee Health Benefits Act ("FEHBA") bars spousal health coverage here.  Indeed, to the contrary, FEHBA *prohibits* excluding persons from coverage based on sex.

---

[1]  *Gill v. Office of Pers. Mgmt.*, 699 F. Supp. 2d 374, 387 (D. Mass. 2010); *see also Dragovich v. United States Dep't of Treasury*, 2011 U.S. Dist. LEXIS 4859 (N.D. Cal. Jan. 18, 2011); *In re Balas*, 2011 Bankr. LEXIS 2157, at *29 (C.D. Cal. Bankr. Jun. 13, 2011); Report from Attorney General to Speaker of House of Representatives, February 23, 2011 ("Attorney General Report") (issued pursuant to 28 U.S.C. § 530D) at 2, available at www.justice.gov/opa/pr/2011/February/11-ag-223.html.

1

**BACKGROUND**

2

### A.        The Passage of DOMA in 1996

3

        Section 3 of DOMA, hastily enacted in 1996 in anticipation of potential marriage rights

4

for same-sex couples in Hawaii, sweepingly excludes same-sex couples from the definition of

5

marriage for all federal purposes:

6
7
8
9

> In determining the meaning of any Act of Congress, or of any ruling,
> regulation, or interpretation of the various administrative bureaus and
> agencies of the United States, the word "marriage" means only a legal
> union between one man and one woman as husband and wife, and the word
> "spouse" refers only to a person of the opposite sex who is a husband or a
> wife.

10

1 U.S.C. § 7.  In enacting that provision, Congress conducted virtually no fact-finding.  Despite

11

the Act's blunderbuss impact on hundreds of federal rights dependent on marital status, "the

12

relevant committees did not engage in a meaningful examination of the scope or effect of the

13

law." *Gill*, 699 F. Supp. 2d at 379.  "Congress did not hear testimony from agency heads

14

regarding how DOMA would affect federal programs.  Nor was there testimony from historians,

15

economists, or specialists in family or child welfare." *Id.*

16

        Instead, Congress set out to demonstrate its "moral disapproval of homosexuality, and a

17

moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian)

18

morality."  H.R. Rep. No. 104-664 at 16 (1996) (footnote omitted), *reprinted in* 1996

19

U.S.C.C.A.N. 2905, 2906-07.  The House Judiciary Committee's Report on DOMA described the

20

potential recognition of marriage for same-sex couples in Hawaii as part of an "orchestrated legal

21

assault being waged against traditional heterosexual marriage."  H.R. Rep. No. 104-664 at 2-3.

22

The Report acknowledged that "[t]he determination of who may marry in the United States is

23

uniquely a function of state law."  *Id.* at 3.  Nonetheless, the Report announced Congress's intent

24

to "defend the institution of traditional heterosexual marriage," *id.* at 12 , emphasizing that

25

"same-sex marriage, if sanctified by the law, if approved by the law, legitimates a public union, a

26

legal status that most people . . . feel ought to be illegitimate." *id.* at 16.  Rep. Henry Hyde, then-

27

Chairman of the House Judiciary Committee, stated:  "Most people do not approve of

28

homosexual conduct . . . and they express their disapprobation through the law. . . . It is . . . the

1   only way possible to express this disapprobation." 142 CONG. REC. H7501 (daily ed. July 12,

2   1996). In the floor debate, legislators referred to homosexuality as "immoral," "depraved,"

3   "unnatural," "based on perversion" and "an attack upon God's principles." 142 CONG. REC.

4   H7444 (daily ed. July 11, 1996) (statement of Rep. Coburn); 142 CONG. REC. H7486 (daily ed.

5   July 12, 1996) (statement of Rep. Buyer); *id*. at H7494 (statement of Rep. Smith).

6        Numerous members of Congress argued that marriage by lesbians and gay men would

7   "demean" and "trivialize" marriage for heterosexuals. *Id*. at H7494 (statement of Rep. Smith);

8   *see also* 142 CONG. REC. S10068 (daily ed. Sept. 9, 1996) (statement of Sen. Helms) ("[Those

9   opposed to DOMA] are demanding that homosexuality be considered as just another lifestyle —

10  these are the people who seek to force their agenda upon the vast majority of Americans who

11  reject the homosexual lifestyle . . . . Homosexuals and lesbians boast that they are close to

12  realizing their goal — legitimizing their behavior . . . . At the heart of this debate is the moral and

13  spiritual survival of this Nation."); 142 CONG. REC. H7275 (daily ed. July 11, 1996) (statement

14  of Rep. Barr) (marriage is "under direct assault by the homosexual extremists all across this

15  country"). Marriage by gays and lesbians was described as possibly "the final blow to the

16  American family." *Id*. at H7276 (statement of Rep. Largent); *see also* 142 CONG. REC. H7495

17  (daily ed. July 12, 1996) (statement of Rep. Lipinski) ("Allowing for gay marriages would be the

18  final straw, it would devalue the love between a man and a woman and weaken us as a Nation.").

19          **B.      Ms. Golinski's Attempt to Enroll Her Spouse in Her Health Plan.**

20       Ms. Golinski is a Staff Attorney in the Motions Unit of the Ninth Circuit, where she has

21  been employed for 19 years. (Second Am. Compl. ("SAC") ¶ 18.) Ms. Golinski and

22  Ms. Cunninghis have been partners for 21 years. (*Id.* ¶ 15.) They met in the fall of 1989 and

23  have been in a committed relationship ever since. (*Id.*) They have been registered domestic

24  partners with the City and County of San Francisco since 1995 and with the State of California

25  since 2003. (*Id.*) They were legally married under the laws of the State of California on

26  August 21, 2008. (*Id.* ¶ 17.) They have an eight-year-old son. (*Id.* ¶ 15.)

27       On September 2, 2008, shortly after the couple's marriage, Ms. Golinski attempted to add

28  Ms. Cunninghis to her existing Blue Cross/Blue Shield family coverage health insurance plan,

1   which at the time covered Ms. Golinski and their son.  (*Id.* ¶ 22.)  Her request was refused, on the

2   sole basis that Ms. Cunninghis is of the same sex as Ms. Golinski.  (*Id.* ¶¶ 23-25.)  Consequently,

3   although Ms. Golinski pays the full rate for self and family coverage from Blue Cross/Blue

4   Shield, she receives coverage only for herself and her son, not for her entire family.  (*Id.* ¶ 22.)

5        As a result of the denial, Ms. Golinski is receiving significantly less compensation, in

6   terms of her employment benefits, than her similarly situated colleagues who have different-sex

7   spouses.  If Ms. Golinski were a man, she would have been able to add Ms. Cunninghis to her

8   existing family health plan at no additional cost to herself or her employer.  (*Id.* ¶ 25.)

9        Because Ms. Golinski has been blocked from obtaining equal health coverage for her

10  spouse, her family has had to purchase separate individual health insurance for Ms. Cunninghis.

11  (*Id.* ¶ 27.)  That separate health insurance plan provides coverage significantly inferior to

12  Ms. Golinski's Blue Cross/Blue Shield plan.  (*Id.*)  Ms. Cunninghis has been unable to obtain

13  individual coverage of similar quality to that offered through Ms. Golinski's employee health

14  plan because no equivalent individual coverage is available for purchase on the market.  (*Id.*)

15             **C.      The Ninth Circuit's Employment Dispute Resolution Process.**

16       Ms. Golinski filed a complaint under the Ninth Circuit's Employment Dispute Resolution

17  ("EDR") Plan on October 2, 2008.  (*Id.* ¶ 7, 48.)  By Orders dated November 24, 2008, and

18  January 13, 2009, Chief Judge Kozinski found that Ms. Golinski had indeed suffered unlawful

19  discrimination by being denied coverage for her spouse provided as a matter of course to

20  similarly-situated different-sex couples.  *See In the Matter of Karen Golinski*, 587 F.3d 901, 902

21  (9th Cir. EDR 2009).  The Chief Judge held that FEHBA, as amended by DOMA, did not require

22  the discrimination suffered by Ms. Golinski.  FEHBA authorizes the United States Office of

23  Personnel Management ("OPM") to contract for plans covering certain family members, but does

24  not expressly *preclude* OPM from contracting for broader coverage.  *Id.* at 902-03.  FEHBA

25  could therefore be read as setting only the "minimum requirements" for coverage, not a ceiling on

26  coverage.  *Id.*  Chief Judge Kozinski concluded that principles of constitutional avoidance

27  required him to adopt this broader construction of FEHBA.  *Id.* at 903.  He emphasized that it was

28  "doubtful" that the exclusion of same-sex spouses "furthers a legitimate governmental end" and

1    that it was a "hard question" whether DOMA "reflects no more than an invidious design to

2    stigmatize and disadvantage same-sex couples." *Id.*

3    Chief Judge Kozinski thus ordered the Administrative Office of the United States Courts

4    (the "AO") to forward Ms. Golinski's enrollment forms to her insurer. *Id.* at 904. Although the

5    AO complied, OPM moved to block the provision of coverage, directing the AO and Blue

6    Cross/Blue Shield not to process Ms. Golinski's forms. *In the Matter of Karen Golinski et ux.*,

7    587 F.3d 956, 958 (9th Cir. EDR 2009). Chief Judge Kozinski ordered OPM to cease and desist

8    its interference. *Id.* at 963-64. After OPM refused, Ms. Golinski filed this suit. (SAC ¶ 56.)

9    Meanwhile, the Chief Judge ordered back pay to compensate Ms. Golinski on an ongoing

10   basis for her purchase of separate individual insurance for her spouse, until her spouse could be

11   enrolled in Ms. Golinski's plan. *Id.* at 960. He expressly noted that this award would not

12   adequately remedy the ongoing discriminatory harm suffered by Ms. Golinski. *Id.*

13   Ms. Golinski's suit seeks injunctive and declaratory relief to remedy that inequality and obtain

14   equal access to the health coverage provided to her heterosexual coworkers as a matter of course.

15                                              **ARGUMENT**

16   **I.      NEITHER *BAKER V. NELSON* NOR *ADAMS V. HOWERTON*, DECIDED
             MANY YEARS BEFORE DOMA WAS ENACTED, PRE-DETERMINED
17           WHETHER DOMA WOULD PASS CONSTITUTIONAL SCRUTINY.**

18   Contrary to BLAG's contention, neither *Baker v. Nelson*, 409 U.S. 810 (1972), nor

19   *Adams v. Howerton*, 673 F.2d 1036 (9th Cir. 1982), controls the issue before this Court.

20   ***Baker v. Nelson***:  BLAG mistakenly asserts that the Supreme Court's 1972 summary

21   dismissal in *Baker* precludes this Court from addressing the constitutionality of DOMA. But, as

22   BLAG concedes, *Baker* involved same-sex partners claiming the "constitutional right to marry

23   each other" (Dkt. 119-1 at 10) — a right Ms. Golinski already has exercised and not the issue

24   before this Court. A summary dismissal under the Supreme Court's previously mandatory

25   appellate jurisdiction[2] is controlling only on the specific issues presented to the Court, and *Baker*

26

27           [2] The mandatory appellate jurisdiction applicable to the Supreme Court under former
     28 U.S.C. § 1257(2) was repealed in 1988.

28

1   is irrelevant to the question presented here:  whether the federal government has adequate

2   justification for disrespecting the marriages of one minority group among a state's validly married

3   residents.  A summary dismissal binds lower courts only with respect to "the *specific* challenges

4   presented in the statement of jurisdiction," and extends only to "prevent lower courts from

5   coming to opposite conclusions on the *precise* issues presented and *necessarily decided* by those

6   actions."  *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam) (emphasis added).  The

7   *Baker* appellants' 1972 Jurisdictional Statement presented questions solely regarding Minnesota's

8   "refusal to sanctify appellants' marriage."  (Dkt. 119-1, Ex. 1, at 3.)  The claims presented in this

9   case, regarding whether a 1996 statute withdrawing all federal recognition to marriages already

10  conferred under state law, plainly were not raised, or even imagined, in *Baker*.

11         Moreover, BLAG's suggestion that the reasoning of the underlying Minnesota Supreme

12  Court decision must be attributed to the U.S. Supreme Court by virtue of *Baker's* summary

13  dismissal (Dkt. 119-1 at 11-13) is wrong as a matter of Supreme Court doctrine.  A summary

14  dismissal without an opinion, such as in *Baker*, "is an affirmance of the judgment only," and "the

15  rationale of the affirmance may not be gleaned solely from the opinion below."  *Mandel*, 432 U.S.

16  at 176 (lower court erred in assuming that a summary dismissal "adopted the reasoning as well as

17  the judgment" of an underlying opinion).  *See also Washington v. Confederated Bands & Tribes*,

18  439 U.S. 463, 476 n.20 (1979) (summary dismissals do not "have the same precedential value

19  here as does an opinion of this Court after briefing and oral argument on the merits");

20  *Richardson v. Ramirez*, 418 U.S. 24, 83 n.27 (1974) ("summary affirmances are obviously not of

21  the same precedential value as would be an opinion of this Court treating the question on the

22  merits").

23         Even if *Baker* were relevant to the question before this Court, subsequent developments in

24  the law have so diminished its weight as to render it nugatory.  "[W]hen doctrinal developments

25  indicate," a summary dismissal even on the same precise question carries diminished precedential

26

27

28

value. *Hicks v. Miranda*, 422 U.S. 332, 344-45 (1975) (internal quotation marks omitted).[3]  In the nearly 40 years since the Supreme Court summarily dismissed the *Baker* appeal, landmark equal protection and due process developments have vastly changed the constitutional landscape.  The dismissal in *Baker* occurred before the Supreme Court recognized that sex-based classifications require heightened scrutiny, before it held that a bare desire to harm gay people cannot constitute a legitimate government interest, and before it established that lesbian and gay individuals have the same liberty interest in private family relationships as heterosexuals.  *Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (plurality opinion); *Romer v. Evans*, 517 U.S. 620, 634-35 (1996); *Lawrence v. Texas*, 539 U.S. 558, 578 (2003).

   **Adams v. Howerton**, predating DOMA by a decade and a half, is similarly inapposite.  In *Adams*, a bi-national same-sex couple living in Colorado attempted to adjust the non-citizen partner's immigration status by seeking recognition as spouses under federal immigration law. 673 F.2d at 1038.  Although Colorado had no law allowing same-sex couples to enter into civil marriage, the couple managed to obtain a marriage license from a county clerk and have a minister perform the ceremony.  *Id.*  As a threshold matter, Ms. Golinski and her spouse are undeniably validly married under state law, in contrast to the uncertain marital status of the Colorado couple.  Thus, unlike here, *Adams* did not "involve[] the displacement of a state marital status determination by a federal one . . . . Because [it] was decided before any state openly and officially recognized marriages between individuals of the same sex, . . . *Adams* carries little weight."  *Commonwealth of Mass. v. U.S. Dep't of Health & Human Servs.*, 698 F. Supp. 2d 234, 251 n.152 (D. Mass. 2011) (noting *Adams*'s irrelevance to a present day challenge to DOMA).

   Second, *Adams* exercised only a highly deferential and limited form of review, not applicable here, grounded in the court's view of Congress's plenary immigration power.  673 F.2d at 1041.  In contrast to the statute considered in *Adams*, DOMA was not an exercise of

---

   [3]  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989), *Tenet v. Doe*, 544 U.S. 1 (2005), and *Agostini v. Felton*, 521 U.S. 203 (1997), cited by BLAG (Dkt. 119-1, at 13), did not involve summary dismissals.  In any event, *Hicks* confirms that a summary dismissal is not binding if doctrinal developments have undermined its authority.  *Hicks*, 422 U.S. at 344.

immigration power but rather a sweeping, indiscriminate enactment stripping same-sex spouses of their marital status for *all* federal purposes. *Gill*, 699 F. Supp. 2d at 394-96. *Adams* also relied on irrational justifications for the law's exclusion of same-sex spouses, addressed in Part IV below, that are manifestly untrue and inconsistent with contemporary federal jurisprudence. *Adams* held that Congress might bar lesbians and gay men from adjusting a same-sex spouse's status "because homosexual marriages never produce offspring, because they are not recognized in most, if in any, of the states, or because they violate traditional and often prevailing societal mores." 673 F.2d at 1042-43.

## II.      DOMA IS SUBJECT TO HEIGHTENED SCRUTINY.

Although denial of equal spousal health coverage to Ms. Golinski fails any level of scrutiny, the discrimination here warrants heightened scrutiny.

### A.      The Courts Should Carefully Scrutinize Discrimination Based on Sexual Orientation Classifications.

Contrary to BLAG's claims, the appropriate level of scrutiny for sexual orientation classifications remains unsettled under Ninth Circuit and Supreme Court jurisprudence. Although the Supreme Court has not yet ruled that sexual orientation classifications are suspect (Dkt. 119-1 at 20), that is because the Supreme Court has not yet found it necessary to resolve the question. *Romer*, 517 U.S. 620, did not decide the issue, finding it unnecessary to look beyond rational basis review both because the state's attempt to strip gay people of all antidiscrimination protections was a "denial of equal protection in the most literal sense," and because it "confound[ed]" and "defie[d]" rational basis review. *Id.* at 632, 633.

Nor did the Ninth Circuit decide the issue in *Witt v. Department of Air Force*, 527 F.3d 806 (9th Cir. 2008), challenging discharge under the military's "Don't Ask, Don't Tell" ("DADT") policy. Instead, the court merely noted in a single sentence — in the context of the military, where judicial deference "is at its apogee" — that, if rational basis review were applied, DADT would survive that inquiry. *Id.* at 821. *See also id.* at 824 (Canby, J., concurring in part, dissenting in part).

While *High Tech Gays v. Defense Industry Security Clearance Office*, 895 F.2d 563, 571

(9th Cir. 1990), did address the issue, that precedent can no longer be considered sound.  The

court relied on the since overruled *Bowers v. Hardwick*, 478 U.S. 186 (1986), and concluded that

laws classifying lesbians and gay men for adverse treatment are not subject to heightened scrutiny

"because homosexual conduct can . . . be criminalized."  895 F.2d at 571.  *Lawrence* renounced

that premise ("*Bowers* was not correct when it was decided, and it is not correct today.").

539 U.S. at 578.[4]  *High Tech Gays* also relied on the mistaken assumption — now authoritatively

rejected by the Supreme Court — that sexual orientation is merely "behavioral," rather than the

sort of deeply rooted, immutable characteristic that would warrant heightened protection from

discrimination.  *High Tech Gays*, 895 F.2d at 573-74 (holding that the behavior of a group is

"irrelevant to their identification").  The Supreme Court has rejected this artificial distinction,

noting that its "decisions have declined to distinguish between status and conduct in th[e]

context" of sexual orientation.  *Christian Legal Soc'y  v. Martinez,* 130 S. Ct. 2971, 2990 (2010).

The Supreme Court's rejection of the legal foundations on which *High Tech Gays* rested renders

that decision and its progeny no longer controlling and the appropriate level of scrutiny an open

question.  *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (where an

intervening decision of a higher court is clearly irreconcilable with a Ninth Circuit decision,

"district courts should consider themselves bound by the intervening higher authority and reject

---

[4]  The now discredited *Bowers* decision was likewise the basis for other inapposite Circuit Court decisions BLAG relies on in claiming heightened scrutiny is inappropriate.  *See Steffan v. Perry*, 41 F.3d 677, 684-85 n.3 (D.C. Cir. 1994) (holding that "if the government can criminalize homosexual conduct, a group that is defined by reference to that conduct cannot constitute a 'suspect class.'"); *Ben-Shalom v. Marsh*, 881 F.2d 454, 464-65 (7th Cir. 1989) (same); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989) (same).

In other Circuit Court decisions relied on by BLAG, the courts either mistakenly concluded that *Romer* had decided that rational basis is the governing test, *Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008), *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006), and *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002); rested on the fact that the Supreme Court had not yet held a higher level of scrutiny is required, *Citizens for Equal Protection v. Bruning*, 455 F.3d 859, 866 (8th Cir. 2006); uncritically followed other cases that had made these errors with no independent consideration of the appropriate level of scrutiny, *Johnson v. Johnson*, 385 F.3d 503 (5th Cir. 2004), *Lofton v. Sec'y of Dep't of Children & Fam. Servs.*, 358 F.3d 804, 818 (11th Cir. 2004); performed no analysis of the issue, *Rich v. Sec'y of the Army*, 735 F.2d 1220, 1229 (10th Cir. 1984); or were not presented with a claim to heightened scrutiny, *Able v. United States* 155 F.3d 628, 632 (2d Cir. 1988).

1    the prior opinion of [the Ninth Circuit] as having been effectively overruled").[5]

2          This Court instead should be guided by the traditional considerations determining whether

3    heightened scrutiny is warranted, which call for elevated scrutiny for sexual orientation-based

4    classifications.  *See, e.g.*, *Watkins v. United States Army*, 875 F.2d 699, 724-28 (9th Cir. 1989)

5    (Norris, J., concurring); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921 (N.D. Cal. 2010) (appeal

6    pending); *Varnum v. Brien*, 763 N.W.2d 862, 885-96 (Iowa 2009); *In re Marriage Cases*, 43 Cal.

7    4th 757, 841-44 (Cal. 2008); *Kerrigan v. Comm'r of Pub. Health*, 289 Conn. 135, 175-227 (Conn.

8    2008).  As the Department of Justice and the President have concluded, courts should be

9    "suspicious of classifications based on sexual orientation."  Attorney General Report at 2.

10                **1.    Lesbians and Gay Men Have Experienced a History of**
                         **Discrimination.**
11

12          BLAG does not deny that lesbians and gay men have experienced a history of purposeful

13   unequal treatment.  The Ninth Circuit has recognized for at least two decades that "homosexuals

14   have suffered a history of discrimination."  *High Tech Gays*, 895 F.2d at 573; *Perry v.*

15   *Proposition 8 Official Proponents*, 587 F.3d 947, 954 (9th Cir. 2009) (observing that defendants

16   would be "hard pressed to deny that gays and lesbians have experienced discrimination in the past

17   in light of the Ninth Circuit's ruling in *High Tech Gays*"); *Watkins*, 875 F.2d at 724 (Norris, J.,

18   concurring); *Rowland v. Mad River Local Sch. Dist.*, 470 U.S. 1009, 1014 (1985) (Brennan, J.,

19   and Marshall, J., dissenting from denial of certiorari); *Perry*, 704 F. Supp. 2d at 981; Attorney

20   General Report at 2.  Moreover, plaintiff's complaint specifically alleges that "[l]esbians and gay

21   men have suffered a long history of public and private discrimination."  (SAC. ¶ 40; *see also*

22   Declaration of George Chauncey ("Chauncey Decl."), filed herewith, ¶¶ 6-103 (detailing that

23   _____

24          [5]  BLAG incorrectly asserts that the Ninth Circuit has reaffirmed rational basis as the
     proper level of review in *Flores v. Morgan Hill Unified School Dist.*, 324 F.3d 1130 (9th Cir.
     2003), *Holmes v. California Army National Guard*, 124 F.3d 1126 (9th Cir. 1997), and *Philips v.*
25   *Perry*, 106 F.3d 1420 (9th Cir. 1997).  (Dkt. 119-1, at 21.)  *Flores*, issued a few months before
     *Lawrence* was decided, merely recites the now unsound holding of *High Tech Gays* in a different
26   discussion about whether a gay student's right to be protected from peer harassment was clearly
     established at a particular point in time (it was).  *Flores*, 324 F.3d at 1136-37.  *Holmes* and
27   *Philips*, shaped by the judiciary's extremely deferential review of military affairs, were decided
     six years before *Lawrence*.  *Holmes*, 124 F.3d at 1133; *Philips*, 106 F.3d at 1425.
28

history).)[6]   In considering a motion to dismiss for failure to state a claim, the court must accept as true the allegations of the complaint in question, construe the pleading in the light most favorable to the party opposing the motion, and resolve all doubts in the pleader's favor.  *Hebbe v. Pliler*, 611 F.3d 1202, 1204 (9th Cir. 2010).  To the extent that BLAG contests this issue, which it does not appear to, that attempt to challenge to the veracity of the complaint's allegations cannot serve as a basis for dismissal.

### 2.   Sexual Orientation Is Unrelated to the Ability to Contribute to Society.

Rather than resting on "meaningful considerations," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985), laws that discriminate based on sexual orientation, like laws that discriminate based on race, national origin or sex, target a characteristic that "bears no relation to ability to perform or contribute to society."  *Id.*  "[B]y every available metric . . . as partners, parents and citizens, opposite-sex couples and same-sex couples are equal."  *Perry*, 704 F. Supp. 2d at 1002.  *See also High Tech Gays v. Def. Indus. Sec. Clearance Office*, 668 F. Supp. 1361, 1374 (N.D. Cal. 1987) (quoting the American Psychological Association for the proposition that homosexuality "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities"), *rev'd in part on other grounds*, 895 F.2d 563 (9th Cir. 1990); *Watkins*, 875 F.2d at 725 (internal quotations omitted) ("Sexual orientation plainly has no relevance to a person's ability to perform or contribute to society.") (Norris, J., concurring); *Perry*, 704 F. Supp. 2d at 967 ("Same-sex couples are identical to opposite-sex couples in the characteristics relevant to the ability to form successful marital unions.").  In the words of the Attorney General, sexual

---

[6]  Plaintiff submits expert declarations herewith only to provide further confirmation that this case cannot be decided on the pleadings alone.  The Court may rely solely on the allegations of the complaint, and need not rely on those declarations, in order to deny BLAG's motion to dismiss.  Plaintiff merely submits those declarations in order to show that, to the extent that BLAG raises factual challenges to the allegations of the complaint, there is substantial evidence supporting those allegations if the case is permitted to proceed beyond the pleadings stage.  *See* Schwarzer, Tashima & Wagstaffe, *California Practice Guide:  Federal Civil Procedure Before Trial* § 9:253 (2011) ("The opposition to a motion to dismiss may include any evidence upon which plaintiff relies (declarations, discovery materials, etc.).").  Moreover, though plaintiff does not believe it should be required, she could easily amend her complaint to incorporate the facts detailed in those expert declarations.

1   orientation is "not a characteristic that generally bears on legitimate policy objectives."  Attorney

2   General Report at 3.  (*See also* SAC ¶ 40 (same).)[7]

3                    **3.    Lesbians and Gay Men Remain a Politically Vulnerable**
                            **Minority.**
4

5          Lesbians and gay men "have limited political power and 'ability to attract the [favorable]

6   attention of the lawmakers.'"  Attorney General Report at 3 (citing *Cleburne*, 473 U.S. at 445);

7   SAC ¶ 40 (noting the long history of discrimination based on sexual orientation); Declaration of

8   Gary Segura, filed herewith, ("Segura Decl.") ¶¶ 9-85 (detailing ongoing political powerlessness

9   of lesbians and gay men).  This prong of the analysis examines relative political powerlessness:

10  whether the "discrimination is unlikely to be soon rectified by legislative means."  *Cleburne*, 473

11  U.S. at 440.  BLAG incorrectly approaches the inquiry — as did the majority opinion in *High*

12  *Tech Gays* — as one of absolute, rather than relative, political powerlessness, fatally "skew[ing]

13  equal protection analysis as ordained by the Supreme Court."  *High Tech Gays* v. *Defense Indus.*

14  *Sec. Clearance Office*, 909 F.2d 375, 376 (9th Cir. 1990) (Canby, J., dissenting from denial of

15  rehearing en banc).

16         Had the Supreme Court applied such a standard to race and sex at the time it was

17  considering whether to subject those classifications to heightened scrutiny, neither would have

18  received more than rational basis review.  When *Korematsu v. United States*, 323 U.S. 214

19  (1944), was decided, race discrimination was prohibited by three federal constitutional

20  amendments and federal civil rights enactments dating back to 1866.  *High Tech Gays*, 909 F.2d

21  at 378.  When the Supreme Court applied heightened review to sex-based discrimination in

22  *Frontiero v. Richardson*, 411 U.S. 677 (1973), Congress had "manifested an increasing sensitivity

23  to sex-based classifications" by enacting protections under Title VII of the Civil Rights Act of

24  1964 and the Equal Pay Act of 1963, and by approving the federal Equal Rights Amendment for

25
            [7] *See* Declaration of Letitia Anne Peplau, submitted herewith ("Peplau Decl.") ¶¶ 11
26  ("homosexuality is a normal expression of human sexuality"); ¶ 31 ("[l]esbians and gay men are
    as able to form loving, committed relationships" as heterosexuals); ¶¶ 29-33.  *See also* Section
27  IV.B.2 (describing overwhelming consensus that same-sex parents raise children equally likely to
    be well-adjusted as different-sex parents).
28

ratification by the states.  *Id.* at 685, 686 n.17, 687.  Moreover, the relevant inquiry is not just about the degree of current political powerlessness; as women, racial and religious minorities have achieved greater measures of equality, the constitutional scrutiny of such classifications has become no less searching.  *See In re Marriage Cases*, 43 Cal. 4th 757, 843 (2008).

As was true for women at the time of *Frontiero*, lesbians and gay men remain "vastly under-represented in this Nation's decisionmaking councils."  *Frontiero*, 411 U.S. at 686 n.17 (noting that there never has been a female President, member of the U.S. Supreme Court or U.S. Senate; only 14 women held seats in the U.S. House of Representatives; and underrepresentation is present throughout all levels of state and federal government).  Congress has only four openly gay members.[8]  No openly gay person has ever served as President, on the U.S. Supreme Court, in the U.S. Senate or on any federal Court of Appeals.[9]  Several systemic barriers contribute to this marked disparity, including gay peoples' invisibility, their targeting for hostility, powerful and well-funded opposition, and relatively small minority numbers.[10]

Rather than affording lesbians and gay men effective means to protect themselves from discrimination, the legislative process has in some ways uniquely disadvantaged them.  Lesbians and gay men persistently have been stripped of basic antidiscrimination and family protections through the legislative and initiative process.  *See, e.g.*, Tennessee Senate Bill 632/House Bill 600 (statute signed into law on May 23, 2011, nullifying local laws prohibiting discrimination based on sexual orientation). Ballot initiatives in no fewer than three-fifths of the states have sought to eliminate their right to marry, and eleven additional states expressly deny that right through

---

[8]  *See* Kerry Eleveld, *Cicilline Becomes Fourth Gay Rep*, Advocate.com (Nov. 2, 2010), *available at* www.advocate.com/News/Daily_News/ 2010/11/02/ Gay_Mayor_Cicilline_Elected_to_Congress.

[9]  *See* Courtney A. Powers, *Finding LGBTs a Suspect Class:  Assessing the Political Power of LGBTs as a Basis for the Court's Application of Heightened Scrutiny*, 17 Duke J. Gender L. & Pol'y 385, 395 (2010); Lisa Keen, *Gay Federal Appeals Nominee: 11 Months and Still Waiting for Hearing*, Keen News Service (Mar. 7, 2011), *available at* www.keennews service.com/2011/03/07/gay-federal-appeals-nominee-11-months-and-still-waiting-for-hearing.

[10]  *See, e.g.*, Gary J. Gates, The Williams Institute, *How many people are lesbian, gay, bisexual, and transgender?*, Executive Summary, at 1 (April 2011), *available at* http://www3.law.ucla.edu/ williamsinstitute/pdf/How-many-people-are-LGBT-Final.pdf; *see also* Segura Decl. ¶ 49.

statute.[11]  The unprecedented nature of DOMA itself provides another example.  Never before has the federal government singled out a minority group by refusing all recognition of their valid state marriages for any and all federal purposes.  *See Romer*, 517 U.S. at 633 ("discriminations of an unusual character especially suggest careful consideration").  To this day, lesbians and gay men remain unprotected in a majority of states against discrimination in the most basic transactions of ordinary life, including in private employment, housing and public accommodations.  Likewise, almost four decades after the first federal sexual orientation antidiscrimination legislation was introduced, no such federal legislation has succeeded in passing.

BLAG's only response is to point to the enactment of the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, P.L. No. 111-84, §§ 4701-13, 123 Stat. 2190, 2835-44, and the Don't Ask Don't Tell ("DADT") Repeal Act of 2010, P.L. No. 111-321, §§ 1-2, 124 Stat. 3515-16.  Strict scrutiny does not become superfluous, however, simply because Congress has recognized that lesbians and gay men should have the right to be free from hate-motivated violence and brutalization.  In fact, the adoption of this law was necessary only because hate crimes against lesbians and gay men are so prevalent.  *See* Matthew Shepard Act, § 4702 (finding that the "incidence of violence motivated by . . . sexual orientation . . . poses a serious national problem").  Likewise, it took until 2010 for Congress to take initial steps to repeal DADT, and even then the repeal legislation faced strong opposition, and remains subject to attempts to delay or block it.[12]

### 4.   Sexual Orientation Is a Defining and Immutable Characteristic.

Although the federal equal protection doctrine has never treated immutability of a personal trait as a prerequisite for determining whether a classification warrants strict scrutiny,[13]

---

[11]  *See* Human Rights Campaign, *Statewide Marriage Prohibitions* (2009), *available at* http://www.hrc.org/documents/marriage_prohibitions_2009.pdf.

[12]  *See* Charles Hoskinson, *'Don't ask' amendment coming in new defense bill* (May 10, 2011), Politico.com, *available at* www.politico.com/news/stories/0511/54644.html.

[13]  Laws that classify based on religion, alienage and legitimacy all are subject to some form of heightened scrutiny, despite the fact that religious people may convert, undocumented people may naturalize, and illegitimate children may be adopted.  *See also Watkins*, 875 F.2d at

*[Footnote continued on following page.]*

1 the Ninth Circuit already has recognized and reaffirmed that sexual orientation is immutable —

2 an understanding that conforms with the settled consensus of the major professional

3 psychological and mental health organizations. *See, e.g.*, *Hernandez-Montiel v. INS*, 225 F.3d

4 1084, 1093 (9th Cir. 2000) ("Sexual orientation and sexual identity are immutable; they are so

5 fundamental to one's identity that a person should not be required to abandon them."), *overruled*

6 *on other grounds, Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005); *see also* Peplau Decl.,

7 ¶ 21; Attorney General Report at 3.

8      Courts have considered a trait "immutable" when altering it would "involve great

9 difficulty, such as requiring a major physical change or a traumatic change of identity," or when

10 the trait is "so central to a person's identity that it would be abhorrent for government to penalize

11 a person for refusing to change [it]." *Watkins*, 875 F.2d at 726 (Norris, J., concurring); *Perry*,

12 704 F. Supp. 2d at 966 ("No credible evidence supports a finding that an individual may . . .

13 change his or her sexual orientation").[14] Sexual orientation classifications thus violate the

14 fundamental principle that burdens should not be distributed — by a majority that would not

15 inflict them upon itself — "upon groups disfavored by virtue of circumstances beyond their

16 control." *Plyler v. Doe*, 457 U.S. 202, 217-18 n.14 (1982).[15]

17             **B.**     **DOMA's Discrimination Based on Ms. Golinski's Sex Requires**
                    **Heightened Scrutiny.**

18

19      DOMA's application to preclude equal spousal coverage requires heightened scrutiny for

20 an additional reason:  it denies Ms. Golinski equal protection based on her sex in relation to the

21

*[Footnote continued from previous page.]*

22 725 (Norris, J., concurring) (the "Supreme Court has never held that only classes with immutable
traits can be deemed suspect").

23

24    [14] Indeed, in light of the disproportionate number of lesbian and gay youth who take their
own lives, presumably because they are simultaneously unable to cope with the harassment they
face and unable to change their sexual orientation to escape it, courts have recognized that

25 reducing antigay bias "may involve the protection of life itself." *Colin v. Orange Unified Sch.
Dist.*, 83 F. Supp. 2d 1135, 1151 (C.D. Cal. 2000).

26    [15] *See* American Psychological Association, *Just the Facts About Sexual Orientation &
Youth: A Primer for Principals, Educators and School Personnel* (2008) (the notion that lesbians'

27 and gay men's sexual orientation can be changed or cured "has been rejected by all the major
mental health professions"), *available at* www.apa.org/pi/lgbt/resources/just-the-facts.pdf.

28

sex of her spouse.  Applying Judge Reinhardt's reasoning in *Levenson*, if Ms. Golinski were a man, she could secure health coverage for her spouse.  Simply because she is a woman, DOMA has denied her this important component of her compensation.  *In re Levenson*, 560 F.3d 1145, 1147 (9th Cir. EDR Op. 2009).  Such sex-based classifications require heightened scrutiny.  *See United States v. Virginia*, 518 U.S. 515, 524 (1996).

Discrimination against gay people because they form a life partnership with a same-sex rather than a different-sex partner is sex discrimination.  *See Baehr v. Lewin*, 852 P.2d 44, 67-68 (Haw. 1993); *In re Levenson*, 560 F.3d at  1147; *In re Marriage Cases*, 43 Cal. 4th at 853-54.  Sex and sexual orientation "are necessarily interrelated, as an individual's choice of romantic or intimate partner based on sex is a large part of what defines an individual's sexual orientation." *Perry*, 704 F. Supp. 2d at 996.  A restriction arising because a person has a same-sex life partner thus constitutes "discrimination based on sex," as well as based on sexual orientation.  *Id.*

Contrary to BLAG's contention, DOMA's sex-based distinction is no less invidious because it equally denies men and women eligibility for a same-sex spouse's insurance coverage. (Dkt. 119-1 at 21-22 n.3.)  *Loving v. Virginia*, 388 U.S. 1 (1967), discarded "the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations."  *Id.* at 8; *see also McLaughlin v. Florida*, 379 U.S. 184, 191 (1964) (equal protection analysis "does not end with a showing of equal application among the members of the class defined by the legislation") *and J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127 (1994) (government may not strike jurors based on sex, even though such a practice, as a whole, does not favor one sex over the other).  Nor was the context of race central to *Loving's* holding, which found that, even if race discrimination had not been at play and the Court presumed "an even-handed state purpose to protect the integrity of all races," Virginia's antimiscegenation statute still was "repugnant to the Fourteenth Amendment."   388 U.S. at 12 n.11.

### C.    DOMA Burdens Ms. Golinski's Fundamental Liberty to Sustain an Intimate Family Relationship, Triggering Heightened Scrutiny on That Basis as Well.

DOMA deprives Ms. Golinski of substantive due process by burdening her constitutional

liberty to build a family life with her same-sex partner and by unconstitutionally conditioning equal treatment on the exercise of that liberty interest in a government-favored heterosexual manner.[16]

Family relationships enjoy constitutional protection because they permit "the ability independently to define one's identity that is central to any concept of liberty." *Roberts v. United States Jaycees*, 468 U.S. 609, 619 (1984). *See also Moore v. City of E. Cleveland*, 431 U.S. 494, 506 (1977) (holding unconstitutional a zoning ordinance requiring family members "to live in certain narrowly defined family patterns"). *Lawrence* reaffirmed "that our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education." 539 U.S. at 573-74. The Court found inconsistent with those protections a statute that not only prohibited certain private sexual conduct, but also sought to penalize "personal relationship[s]" between same-sex couples that are "within the liberty of persons to choose." *Id.* at 567. Laws cannot withstand constitutional scrutiny when they place a government-imposed "stigma" — "state-sponsored condemnation" — on such private relationships and in so doing constitute "an invitation to subject homosexual persons to discrimination both in the public and in the private spheres." *Id.* at 575-76. DOMA's denial of equal federal treatment does just that. *See Gill*, 699 F. Supp. 2d at 378-79.

DOMA penalizes Ms. Golinski for having exercised, in a manner condemned by the 1996 Congress, her fundamental liberty interest in a private family relationship, thus triggering heightened scrutiny. *See Witt*, 527 F.3d at 819 (government intrusion on "personal and private lives of homosexuals" by placing them in jeopardy of military discharge under "Don't Ask Don't Tell" policy triggers heightened scrutiny). Heightened scrutiny is appropriate even if the State

---

[16] BLAG repeatedly mischaracterizes the right at issue here as the right to marry. (Dkt. 119-1, at 15-19, 23.) The question is not whether Ms. Golinski has the right to marry Ms. Cunninghis — the couple already is married — but whether DOMA unconstitutionally burdens Ms. Golinski's protected right to form and maintain an intimate family relationship with a person of the same sex. Moreover, BLAG's assertion that "every federal and state court to consider the question has held that same-sex marriage is not a fundamental right deeply rooted in American law and history" is simply wrong. *Id. See*, *e.g.*, *In re Marriage Cases*, 43 Cal. 4th at 820 (2008); *Perry*, 704 F. Supp. 2d at 994-95.

has not criminally prohibited exercise of a right, as in *Lawrence*, or if the penalty imposed for

exercise of a right is denial of a privilege or benefit that itself is not constitutionally guaranteed.

"[E]ven though a person has no 'right' to a valuable governmental benefit and even though the

government may deny him the benefit for any number of reasons, there are some reasons upon

which the government may not rely.  It may not deny a benefit to a person on a basis that

infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597

(1972).  *See also, e.g.*, *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 640 (1974) (fundamental

reproductive rights violated by conditioning public employment on foregoing pregnancy);

*Shapiro v. Thompson*, 394 U.S. 618, 634 (1969) (fundamental right to travel violated by

conditioning welfare benefits on duration of residency).

### III.   DOMA FAILS HEIGHTENED SCRUTINY.

A law survives strict scrutiny only if the government can "demonstrate that its

classification has been precisely tailored to serve a compelling governmental interest." *Plyler*,

457 U.S. at 216-17.  When heightened scrutiny (whether strict or intermediate) applies, "[t]he

justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."

*United States v. Virginia*, 518 U.S. at 533.  BLAG does not argue that DOMA could survive

heightened scrutiny, and, indeed, DOMA cannot satisfy even rational basis review.

### IV.   EVEN IF ONLY RATIONAL BASIS REVIEW APPLIED, DOMA WOULD FAIL THAT LEVEL OF SCRUTINY AS WELL.

#### A.   This Case Would Warrant Particularly Careful and Searching Rational Basis Review.

Rational basis scrutiny requires that classifications be "rationally related to a legitimate

government purpose." *Cleburne*, 473 U.S. at 446; *United States Dep't of Agric. v. Moreno*,

413 U.S. 528, 533 (1973).  BLAG emphasizes the "presumption" in favor of the constitutionality

of statutes.  (Dkt. 119-1 at 9-10.)  Of course, "laws such as economic or tax legislation . . .

normally pass constitutional muster, since 'the Constitution presumes that even improvident

decisions will eventually be rectified by the democratic processes.'" *Lawrence*, 539 U.S. at 579-

80 (O'Connor, J., concurring).  But, that presumption does not apply where, as here, a law targets

"a politically unpopular group" or "inhibits personal relationships." *Id.*  Under those

circumstances, the courts "have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause." *Id.* (collecting cases).[17]  DOMA, with its legislative history containing repeated attacks on the "morality" of lesbian and gay families, and its singling out for the first time a category of valid state-sanctioned marriages for federal non-recognition, is precisely the type of law warranting a searching examination.

In these circumstances, courts go beyond the mere labels used for the purposes said to be advanced by a classification to make sure the classification in fact aims to advance a legitimate state interest.[18]  In other words, courts look at the *actual* purpose of a classification and demand a rational explanation of how the classification might be thought to advance its intended purposes. *See*, *e.g.*, *Moreno*, 413 U.S. at 533-38 (carefully considering whether an exclusion of unmarried persons really could be thought to prevent fraud); *Heller v. Doe*, 509 U.S. 312, 321-30 (1993) (taking pains to see if it really was possible to think that differences between mentally ill and mentally retarded persons could justify different standards of proof in commitment proceedings).

## B.    The Interests Asserted by Congress Cannot Support DOMA.

DOMA cannot withstand even the most deferential form of rational basis review, let alone the searching review required.  Congress claimed to advance four interests through DOMA:  (1) "defending and nurturing the institution of traditional heterosexual marriage," (2) "encouraging responsible procreation and child-bearing," (3) "defending traditional notions of morality," and

---

[17]   *See also Romer*, 517 U.S. at 633 ("By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group."); *Kelo v. City of New London*, 545 U.S. 469, 490-91 (2005) (Kennedy, J., concurring) (distinguishing the analysis applied to "economic *regulation*" from that applied to classifications intended to injure a particular group); *Eisenstadt v. Baird,* 405 U.S. 438, 446-55 (1972) (closely analyzing and ultimately rejecting under rational basis review rationales offered for Massachusetts's ban on purchase of contraceptives by unmarried individuals); *Moreno*, 413 U.S. at 533-38 (closely analyzing and ultimately rejecting on rational basis review rationales offered for federal ban on food stamps for households containing multiple unmarried adults).

[18]   *See Moreno*, 413 U.S. at 534 (reviewing legislative history to determine purpose behind challenged statute); *Cleburne*, 473 U.S. at 447-50 (reviewing city council records to determine purpose behind challenged statute); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16 (1975) ("This Court need not in equal protection cases accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose could not have been a goal of the legislation.") (internal citations omitted).

1    (4) "preserving scarce resources." *Gill*, 699 F. Supp. 2d at 388 (citing H.R. Rep. No. 104-664, at

2    12-18 (1996)).  (*See also* Dkt. 119-1 at 23-27.)  Each of those purported justifications either

3    constitutes an illegitimate interest or bears no rational relationship to DOMA, or both.

4         The district court in *Gill* found DOMA unconstitutional because, after examining the

5    interests advanced by the government and the evidence submitted by both sides, it was

6    "convinced that 'there exists no fairly conceivable set of facts that could ground a rational

7    relationship' between DOMA and a legitimate government objective."  699 F. Supp. 2d at 387.

8    The court reached the same conclusion in *Dragovich*, as did twenty judges in *In re Balas*.  *See*

9    *Dragovich v. United States Dep't of Treasury*, 2011 U.S. Dist. LEXIS 4859, at *35 (N.D. Cal.

10   Jan. 18, 2011) ("DOMA bears no rational relationship to a legitimate government interest"); *In re*

11   *Balas*, 2011 Bankr. LEXIS 2157, at *28 ("none of these interests [behind DOMA] stands up to

12   any level of scrutiny").  The same result should apply here.

13         **1.    DOMA Does Not Promote Heterosexual Marriage.**

14         **a.    DOMA Does Not Increase the Likelihood that**
15             **Ms. Golinski or Anyone Else Will Enter into a**
               **Heterosexual Marriage.**

16         Congress's stated interest in defending or promoting the institution of "traditional

17   heterosexual marriage" cannot support DOMA.  The denial of health coverage to Ms. Golinski's

18   spouse bears no conceivable relationship to the likelihood that Ms. Golinski, or anyone else, will

19   enter or remain in a "heterosexual marriage."  As the court in *Gill* held, "this court cannot discern

20   a means by which the federal government's denial of benefits to same-sex spouses might

21   encourage homosexual people to marry members of the opposite sex."  699 F. Supp. 2d at 389;

22   *accord Levenson*, 560 F.3d at 1150.  Furthermore, "denying marriage-based benefits to same-sex

23   spouses certainly bears no reasonable relation to any interest the government might have in

24   making heterosexual marriages more secure."  *Gill*, 699 F. Supp. 2d at 389.  (*See* SAC ¶ 39.)

25   "What remains, therefore, is the possibility that Congress sought to deny recognition to same-sex

26   marriages in order to make heterosexual marriage appear more valuable or desirable.  But to the

27   extent that this was the goal, Congress has achieved it 'only by punishing same-sex couples who

28   exercise their rights under state law.'  And this the Constitution does not permit."  *Id.*; *see also In*

*re Levenson*, 587 F.3d 925, 932 (9th Cir. 2009) ("denying married same-sex spouses health coverage is far too attenuated a means of achieving the objective"); *In re Balas*, 2011 Bankr. LEXIS 2157, at \*28 ("It would not appear to be fair or rational for the court to conclude that allowing the Debtors to file a joint bankruptcy petition [in contravention of DOMA] will in any way harm any marriage of heterosexual persons."); *Moreno*, 413 U.S. at 534.

### b.   Congress Has No Valid Interest in Advancing Its Own Definition of Marriage Here.

Congress's putative interest in promoting heterosexual marriage is unavailing for another reason:  the federal government has no valid interest in advancing its own definition of marriage separate from state law.  To be "legitimate" under rational basis review, a claimed government interest must be "properly cognizable" by the governmental body at issue, *Cleburne*, 473 U.S. at 448, and "relevant to interests" the classifying body "has the authority to implement." *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 (2001).  Under well-accepted concepts of federalism, "[t]he whole subject of the domestic relations . . . belongs to the laws of the States and not to the laws of the United States." *Elk Grove United Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (citation omitted); *see also Sosna v. Iowa*, 419 U.S. 393, 404 (1975) ("domestic relations" have "long been regarded as a virtually exclusive province of the States," and "[t]he State . . . has absolute right" to regulate marriage); *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992); *id.* at 716 ("declarations of status, *e.g.* marriage, annulment, divorce, custody, and paternity," lie at the "core" of domestic relations law reserved to states) (Blackmun, J., concurring).  "The scope of a federal right is, of course, a federal question, but that does not mean that its content is not to be determined by state, rather than federal law.  This is especially true where a statute deals with a familiar relationship [because] there is no federal law of domestic relations." *DeSylva v. Ballentine*, 351 U.S. 570, 580 (1956) (internal citation omitted); *see also United States v. Morrison*, 529 U.S. 598, 618 (2000) (regulation of marriage touches on the police power that has been "denied the National Government and reposed in the States"); *United States v. Lopez*, 514 U.S. 549, 564 (1995) (rejecting reading of Commerce Clause that could lead to federal regulation of "family law (including marriage, divorce, and child custody)," an area "where States

1    historically have been Sovereign"); *Commonwealth of Mass. v. U.S. Dep't of Health & Human*

2    *Servs*, 698 F. Supp. 2d 234 (D. Mass. 2010) (holding that DOMA violates the Tenth Amendment

3    by intruding on matters reserved to the states).

   c.      **DOMA Cannot Be Defended as Maintaining the Historical**
4                  **Status Quo.**
5

6        BLAG recasts Congress's interest in "traditional heterosexual marriage" as just an effort

7    to maintain the historical status quo.  (Dkt. 119-1 at 23.)  BLAG claims that DOMA can be

8    defended as "merely codif[ying] and confirm[ing] what Congress always meant" by the word

9    "spouse."  (*Id.* at 1:19-21.)

10       This argument mischaracterizes the historical status quo.  Far from maintaining the status

11   quo, DOMA radically departed from the federal government's longstanding practice of following

12   evolving and varied state law marriage determinations.  Prior to the enactment of DOMA in 1996,

13   federal law had long remained neutral as to marriages between same-sex couples and permitted

14   *equal* recognition of all marriages entered under state law.  *Gill*, 699 F. Supp. 2d at 393.  DOMA

15   "mark[ed] the *first* time that the federal government has ever attempted to legislatively mandate a

16   uniform federal definition of marriage — or any other core concept of domestic relations, for that

17   matter."  *Id.* at 392 (emphasis in original); *see also Dragovich*, 2011 U.S. Dist. LEXIS 4859, at

18   *31 ("[S]ection three of DOMA was a preemptive strike to bar federal legal recognition of same-

19   sex marriages should certain states decide to allow them, rather than a law that furthered the

20   status quo, which gave the states authority to define marriage for themselves.").[19]

21       Prior to DOMA, the federal government had never attempted to craft its own independent

22   definition of marriage, "notwithstanding the occurrence of other similarly politically-charged,

23   protracted, and fluid debates at the state level as to who should be permitted to marry."  *Gill*,

24   _____

25       [19]  Though BLAG insists that Congress always intended various laws to refer only to a
     different-sex married couple, BLAG pointedly ignores the legislative history of FEHBA, the
26   statute at issue here, not to mention a wide swath of other federal spousal rights intended to track
     evolving state law.  (Dkt. 119-1 at 1:20-2:9.)  Nothing in the text or legislative history of FEHBA
27   suggests that the term "spouse" was intended to do anything other than follow evolving state law.
     To the contrary, FEHBA's legislative history describes an intention that benefits "evolv[e]" to
28   keep pace with private employers.  *See* S. Rep. No. 86-468 at 4, 9-10 (1959).

699 F. Supp. 2d at 392.  Marriage eligibility requirements have long varied over time and across state lines concerning common law marriage, age requirements, inter-racial marriage, first-cousin marriage and divorce law.  (SAC ¶ 39; Declaration of Nancy Cott, filed herewith, ¶¶ 24-64.) Nonetheless, until DOMA, the federal government had never found such inconsistencies to be a problem, and it continues to tolerate inconsistencies in every respect but this one.

Moreover, Congress's asserted goal to "adhere to the historical definition of marriage" as between a man and woman (Dkt. 119-1 at 23) cannot suffice as a legitimate government end in itself.  This purported justification is nothing but a tautology.  At best, it merely describes what the law does, not a reason for doing it.  "Staying the course is not an end in and of itself, but rather a means to an end."  *Gill*, 699 F. Supp. 2d at 390-94.

Alternatively, BLAG might be understood to argue that the government can enshrine discriminatory burdens upon lesbians and gay men in federal law simply because gay people historically have suffered similar discrimination under state law.  This, however, is not a valid justification for legislation either.  The "ancient lineage" of a classification does not make it rational.  *Heller*, 509 U.S. at 326; *see also Williams v. Illinois*, 399 U.S. 235, 239 (1970) (law failed rational basis scrutiny even though the "custom . . . dates back to medieval England and has long been practiced in this country").  The Supreme Court has not hesitated to strike down laws discriminating against lesbians and gay men, regardless of the laws' "ancient roots."  *Lawrence*, 539 U.S. at 594 (Scalia, J., dissenting).  The Court has recognized that "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress."  *id*. at 578-79.  The history of discrimination is a basis for striking down DOMA, not for upholding it.[20]

BLAG additionally asserts that the "historical" definition of marriage has the practical benefit of ensuring that "eligibility for federal benefits should not vary depending on how a state

---

[20]  BLAG concedes that "historical [practices] cannot justify contemporary violations of constitutional guarantees," but insists that "there is far more here than simply historical patterns." (Dkt. # 119-1 at 24:2-4.)  BLAG fails, though, to identify what "more" there is.  Instead, BLAG simply reiterates its tautological assertion that Congress had an interest in the "historic definition of marriage."  (*Id.* at 24:4-17.)

might choose to define marriage." (Dkt. 119-1 at 5; *see also id.* at 24.) Far from creating

uniformity, DOMA preserves inconsistent state law treatment of marriages in every way other

than those based on the sex and sexual orientation of the couple. DOMA takes the previously

unitary class of all those married under state law and divides it into two — those also recognized

as married for federal purposes and those not — thereby creating an *in*consistency in the

allocation of benefits among married couples. *Gill*, 699 F. Supp. 2d at 394.

## 2. DOMA Does Not Encourage Responsible Procreation and Child-Rearing.

*Gill* "readily dispos[ed]" of the claim that DOMA was intended to "encourag[e]

responsible procreation and child-bearing." *Gill*, 699 F. Supp. 2d at 378, 388. The court reached

the same conclusion in *Dragovich*, as did twenty bankruptcy judges in *In re Balas*. *See*

*Dragovich*, 2011 U.S. Dist. LEXIS 4859, at \*32-33; *In re Balas*, 2011 Bankr. LEXIS 2157, at

\*29; *cf. Perry*, 704 F. Supp. 2d at 999-1000 (holding that "same-sex parents and opposite-sex

parents are of equal quality" and denying recognition to marriages of same-sex couples "does not

make it more likely that opposite-sex couples will marry and raise offspring biologically related

to both parents"). That conclusion applies with equal force here.

There is no support for the notion that same-sex married couples are anything less than

equally capable parents. "Since the enactment of DOMA, a consensus has developed among the

medical, psychological, and social welfare communities that children raised by gay and lesbian

parents are just as likely to be well-adjusted as those raised by heterosexual parents." *Gill*, 699 F.

Supp. 2d at 388; *see also Perry*, 704 F. Supp. 2d at 1000 ("The evidence does not support a

finding that California has an interest in preferring opposite-sex parents over same-sex parents.

Indeed, the evidence shows beyond any doubt that parents' genders are irrelevant to children's

developmental outcomes."); *Varnum v. Brien*, 763 N.W. 2d 862, 899 n.26 (Iowa 2009) ("The

research appears to strongly support the conclusion that same-sex couples foster the same

wholesome environment as opposite-sex couples and suggests that the traditional notion that

children need a mother and a father to be raised into healthy, well-adjusted adults is based more

on stereotype than anything else."). The leading authorities on pediatrics, psychology and child

1  welfare have issued numerous policy statements and publications confirming this conclusion.[21]

2       BLAG nonetheless insists that "[l]ogically," Congress could rationally prefer opposite-sex

3  married parents because children raised by a same-sex married couple may have a "different"

4  experience and the "two sexes are not fungible" (Dkt. 119-1 at 26-27).[22]  That assertion

5  contradicts not only the overwhelming scientific consensus but also the allegations of the

6  complaint, construed in the light most favorable to plaintiff.  (SAC ¶ 40 ("sexual orientation bears

7  no relation whatsoever to an individual's ability to participate in or contribute to society")).)

8  Those factual allegations must be treated as true for purposes of BLAG's motion.  *See, e.g.*, *Lazy*

9  *Y Ranch LTD v. Behrens*, 546 F.3d 580, 592 (9th Cir. 2008) (where government moved to dismiss

10  an equal protection claim on the basis that the classification was rationally based on

11  administrative costs, denying that motion because plaintiff had alleged that defendants would not

12  actually have incurred costs at all but used costs as a ruse to justify biased conduct); *High Tech*

13  *Gays*, 895 F.2d at 574-578 (treating the rationality of the Army's homosexual security clearance

---

14       [21]  *See Gill,* 699 F. Supp. 2d at 389 n.106 (citing American Academy of Pediatrics,

15  Committee on Psychosocial Aspects of Child and Family Health, *Coparent or second-parent adoption by same-sex parents*, 109 PEDIATRICS 339 (2002), *available at*

16  http://aappolicy.aappublications.org/cgi/ content/full/pediatrics; American Psychological Association, *Policy Statement on Lesbian and Gay Parents*,

17  http://www.apa.org/about/governance/council/policy/parenting.aspx; American Academy of Child & Adolescent Psychiatry, *Gay, Lesbian, Bisexual, or Transgender Parents Policy*

18  *Statement*, http://www.aacap.org/cs/root/policy_statements/gay_lesbian_
transgender_and_bisexual_parents_ policy_statement; American Medical Association, *AMA*

19  *Policy Regarding Sexual Orientation*, http://www.ama-assn.org/ama/pub/about-ama/our-people/member-groups-sections/glbt-advisory-committee/ama-policy-regarding-sexual-

20  orientation.shtml; Child Welfare League of America, *Position Statement on Parenting of Children by Lesbian, Gay, and Bisexual Adults*, http://www.cwla.org/programs/culture/

21  glbtqposition.html.)  *See also* Declaration of Michael Lamb, filed herewith, ("Lamb Decl.")
¶¶ 29-32 (describing thirty years of scholarship, including more than 50 peer-reviewed empirical

22  reports).

23       [22]  None of the publications relied upon by BLAG, however, contradict the scientific consensus, as those publications focus on studies regarding absent fathers or one-parent families,

24  which are not comparable to families headed by married same-sex couples.  *See* Popenoe, Life Without Father (1996) (discussing the effect of "absent fathers" in one-parent households); Dent,

25  *The Defense of Traditional Marriage*, 15 J.L. & Pol. 581, 595 (1999) (discussing studies regarding "[t]he father's absence from the home" in one-parent households); Gallagher, *What is*

26  *Marriage For?*, 62 La. L. Rev. 773 (2002) (same); Gallagher, The Case for Marriage (2000) (same); Wardle, Multiply and Replenish, 24 Harv. J.L. & Pub. Pol'y 771 (2001) (discussing

27  studies about children in "one parent, never married families").  *See also* Lamb Decl. ¶¶ 22-23 (noting that the results in one-parent families are typically driven by reduced resources available

28  to single parents and the disruptive effects of parental separation).

---

1    policy as a factual question to be resolved based on the parties' burdens under Rule 56).

2        Indeed, the notion that DOMA was enacted for the "encouragement of procreation" is

3    further belied by the fact that "the ability to procreate is not now, nor has it ever been, a

4    precondition to marriage in any state in the country." *Gill*, 699 F. Supp. 2d at 389. Indeed, as

5    Justice Scalia observed in his dissent in *Lawrence*, "[W]hat justification could there possibly be

6    for denying the benefits of marriage to homosexual couples? . . . Surely not the encouragement

7    of procreation, since the sterile and the elderly are allowed to marry." *Lawrence,* 539 U.S. at 605

8    (Scalia, J., dissenting); *see also Dragovich*, 2011 U.S. Dist. LEXIS 4859, at \*32-33 (same).

9        Furthermore, even if it were the case that different-sex married parents were somehow

10   superior to same-sex married parents, DOMA is not rationally related to this concern. DOMA

11   has no effect on who can or should become a parent under any law, state or federal. Following

12   DOMA's passage, state law can — and does, in Ms. Golinski's home state, California —

13   continue to treat same-sex and different-sex couples identically for purposes of adoption and

14   child-rearing. *See, e.g.*, Cal. Fam. Code §§ 297.5(d), 9000(b) (authorizing adoption by same-sex

15   couples). DOMA does not change that.

16        Nor does BLAG explain how DOMA's non-recognition of marriages between same-sex

17   couples would do anything to encourage heterosexuals to raise children within married

18   relationships. *See Dragovich*, 2011 U.S. Dist. LEXIS 4859, at \*33 ("The exclusion of same-sex

19   couples from the federal definition of marriage does not encourage heterosexual marriage");

20   *Perry*, 704 F. Supp. 2d at 972 ("Permitting same-sex couples to marry will not affect the number

21   of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or

22   otherwise affect the stability of opposite-sex marriages."). As the court explained in *Gill*:

23                 a desire to encourage heterosexual couples to procreate and rear
                 their own children more responsibly would not provide a rational
24                 basis for denying federal recognition to same-sex marriages. Such
                 denial does nothing to promote stability in heterosexual parenting.
25                 Rather, it "prevent[s] children of same-sex couples from enjoying
                 the immeasurable advantages that flow from the assurance of a
26                 stable family structure," when afforded equal recognition under
                 federal law.

27

28   699 F. Supp. 2d at 388-89. (*See also* SAC ¶ 39.)

1       This case is a perfect illustration of that.  Ms. Golinski and her spouse already have a

2   child.  DOMA serves only to punish their child by forcing the family to spend more resources for

3   medical insurance and care than would a similarly situated heterosexual married family.

4       BLAG protests that classifications permissibly may be underinclusive and overinclusive.

5   (Dkt. 119-1 at 27-28.)  But under rational basis review, though the fit between the classification

6   and the stated government interest need not be perfect, the classification must be "narrow enough

7   in scope and grounded in sufficient factual context . . . to ascertain some relation between the

8   classification and the purpose it serve[s]."  *Romer*, 517 U.S. at 632-33.  Rational basis review

9   invalidates a measure whose "sheer breadth" is "discontinuous with the reasons offered for it

10  . . . ."  517 U.S. at 632, 635 (rejecting justifications where "[t]he breadth of the [measure] is so far

11  removed from these particular justifications that we find it impossible to credit them");

12  *Eisenstadt*, 405 U.S. at 449 (law discriminating between married and unmarried persons in access

13  to contraceptives was "so riddled with exceptions" that the interest claimed by the government

14  "cannot reasonably be regarded as its aim").  Here, Congress's stated goal of "encouraging

15  responsible procreation and child-bearing" bears no rational relationship to DOMA's sweeping

16  burdens on marriages lawfully entered by same-sex couples.

17              **3.      BLAG Does Not Defend DOMA as Advancing an Interest in
                        "Traditional Notions of Morality" or Preserving Resources.**
18

19      BLAG abandons the argument, foreclosed by *Lawrence*, 539 U.S. at 577, that DOMA

20  preserves "traditional notions of morality."  Nor does BLAG argue that DOMA preserves scarce

21  resources.  That is because "a concern for the preservation of resources standing alone can hardly

22  justify the classification used in allocating those resources."  *Plyler*, 457 U.S. at 227; *see also*

23  *Dragovich*, 2011 U.S. Dist. LEXIS 4859, at *33 ("preservation of resources does not justify

24  barring some arbitrarily chosen group of individuals from a government program").  In the end,

25  BLAG identifies no rational basis for the denial of equal health coverage here.

26          **V.      ASSESSING WHETHER A STATUTE UNCONSTITUTIONALLY
                     DISCRIMINATES AGAINST A VULNERABLE MINORITY GROUP IS
27                   AT THE CORE OF THE JUDICIAL FUNCTION.**

28      BLAG suggests this Court does not have a proper role in determining whether DOMA

1  passes constitutional scrutiny.  (Dkt. 119-1 at 29-30.)  That is dead wrong.  In our system of

2  separation of powers, the judiciary plays a critical role in carefully reviewing such high-risk

3  classifications to ensure that "the democratic majority . . . accept[s] for themselves and their loved

4  ones what they impose on you and me."  *Cruzan by Cruzan v. Dir., Mo. Dep't of Health*,

5  497 U.S. 261, 300 (1990) (Scalia, J., concurring).  When the democratic majority refuses to do so,

6  "[i]t is emphatically the province and duty of the judicial department to say what the law is" and

7  declare the legislation unconstitutional.  *Marbury v. Madison*, 1 Cranch 137, 177 (1803).  "The

8  irreplaceable value of the power articulated by Mr. Chief Justice Marshall [in *Marbury*] lies in the

9  protection it has afforded the constitutional rights and liberties of individual citizens and minority

10  groups against oppressive or discriminatory government action."  *United States v. Richardson*,

11  418 U.S. 166, 192 (1974) (Powell, J., concurring); *see also Carolene Prods.*, 304 U.S. at 153 n.4

12  ("more searching scrutiny" applies where a classification may seek improperly to oppress a

13  vulnerable group).  That protection is exactly what Ms. Golinski seeks here.

### VI.   OPM VIOLATES FEHBA BY BLOCKING EQUAL ACCESS TO SPOUSAL HEALTH COVERAGE.

16        In addition to violating her constitutional rights, denying Ms. Golinski equal access to

17  spousal health coverage also violates FEHBA's statutory prohibition against excluding

18  individuals from coverage based on sex.  "A contract may not be made or a plan approved which

19  excludes an individual because of . . . sex. . . ."  5 U.S.C. § 8902(f).  Had Ms. Golinski been a

20  man, her spouse would be covered.  This is precisely a prohibited exclusion from coverage

21  "because of . . . sex."  (*See* Part II.B, *supra*.)

22        OPM contends that, despite this prohibition, other provisions of FEHBA required it to

23  contract for discriminatory coverage.  That is incorrect.  FEHBA provides that OPM "*may*"

24  approve plans that provide coverage for different-sex spouses, but it does not *prohibit* approval of

25  more broad-reaching plans.  Section 8903 of FEHBA specifically provides:

> The Office of Personnel Management *may* contract for or approve the following health benefits plans:
>
> (1) Service benefit plan.  One Government-wide plan . . . under which payment is made by a carrier under contracts with

physicians, hospitals, or other providers of health services for benefits of the types described by section 8904(1) of this title given to employees, annuitants, *members of their families*, former spouses, or persons having continued coverage under section 8905a of this title . . . .

5 U.S.C. § 8903 (emphasis added).  Under section 8901, the term "member of family" is defined as "the spouse of an employee" or "an unmarried dependent child under 22 years of age."  5 U.S.C. § 8901(5).  DOMA then defines the word "spouse" to be limited to "a person of the opposite sex who is a husband or a wife."  1 U.S.C. § 7.  That language sets a floor, not a ceiling, on the coverage for federal employees.  "The word 'may' customarily connotes discretion."  *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 346 (2005).  As Chief Judge Kozinski held, section 8903 simply lays out a "set of general guidelines for medical benefit plans, as well as a number of minimum requirements that such plans must satisfy."  (SAC Ex. B, at 3.)

The legislative history of FEHBA reinforces this point.  Both the House and Senate Reports described the definition of "member of family" as intended "to include" the individuals enumerated in Section 8901, rather than describing that term as limited to those persons.  H. R. Rep. No. 86-957, at 6 (1959); S. Rep. No. 86-468, at 20 (1959).[23]  The Senate Report further emphasized that "*no maximum* amount of benefits are specified in the bill" because "the committee believes it unwise for the legislation to freeze the pattern of benefits so that future contracts could not rapidly adapt to new developments."  *Id.* (emphasis added).  Although those comments pertain to which benefits could be provided under section 8904 rather than which family members could be enrolled under section 8903, FEHBA employs the same permissive language in setting forth OPM's authority to contract for particular types of benefits.  *See* 5 U.S.C. § 8904 ("The benefits to be provided under the plans described by section 8903 of this title *may* be of the following types . . . .") (emphasis added).

OPM protests that the maxim of "expressio unius est exclusion alterius" justifies its

---

[23]  OPM's regulations confirm this point, providing that "an enrollment [in the Federal Employees Health Benefits Program] for self and family *includes* all family members who are eligible to be covered."  5 C.F.R. § 890.302(a)(1) (emphasis added).

1    position.  That canon, however, "is an aid to construction, not a rule of law."  *Carver v. Lehman*,

2    558 F.3d 869, 876 n.13 (9th Cir. 2009).  It cannot override the express language in section

3    8902(f)'s prohibition on excluding individuals from coverage based on sex.  *See Mutschler v.*

4    *Peoples Nat'l Bank*, 607 F.2d 274, 276 (9th Cir. 1979) (statute must be interpreted as "consistent

5    rather than conflicting").  Moreover, "expressio unius" applies "only in the absence of evidence

6    to the contrary."  *Carver*, 558 F.3d at 876 n.13. Here, the statute's text and history are clear.  *See*

7    *id.* (declining to apply expressio unius maxim because the use of the term "may" "make[s] clear

8    the permissive intent of the statute"); *In re Mark Anthony Constr.*, 886 F.2d 1101, 1106 (9th Cir.

9    1989) ("statute's use of 'including' renders the expressio unius rule inapplicable").

10       The doctrine of constitutional avoidance further confirms that FEHBA requires, rather

11   than forbids, equal access to spousal health coverage.  "Expressio unius" applies only to statutes

12   that are ambiguous.  *See Wells Fargo Bank N.A. v. Boutris*, 419 F.3d 949, 959 (9th Cir. 2005).  If

13   FEHBA is ambiguous, constitutional avoidance mandates the interpretation raising fewer

14   constitutional problems.  *See Ramadan v. Gonzales*, 479 F.3d 646, 654 (9th Cir. 2007).  As

15   explained above, reading FEHBA as requiring denial of equal benefits would raise grave

16   constitutional concerns.  As such, the Act should be read as permitting rather than forbidding

17   Ms. Golinski's equal access to spousal health coverage.

**CONCLUSION**

18

19       For the foregoing reasons, defendants' and BLAG's motions to dismiss should be denied.

20

21   Dated: _June 24, 2011                      MORRISON & FOERSTER LLP

22                                              LAMBDA LEGAL DEFENSE AND
                                                EDUCATION FUND, INC.
23

24

                                               By:  _____/s/ Rita F. Lin_____
25                                                           RITA F. LIN

26                                             Attorneys for Plaintiff
                                               KAREN GOLINSKI
27

28