1  MICHAEL F. HERTZ
   Deputy Assistant Attorney General
2  MELINDA HAAG
   United States Attorney
3  ARTHUR R. GOLDBERG
   Assistant Branch Director
4  CHRISTOPHER R. HALL
   Trial Attorney
5  United States Department of Justice
   Civil Division, Federal Programs Branch
6
   P.O. Box 883
7  Washington, D.C. 20044
   Telephone: (202) 514-4778
8  Facsimile: (202) 616-8470
   Email: Christopher.Hall@usdoj.gov
9
   Attorneys for Defendants
10
                   UNITED STATES DISTRICT COURT
11
                 NORTHERN DISTRICT OF CALIFORNIA
12
                     SAN FRANCISCO DIVISION
13
   KAREN GOLINSKI                    )
14                                   )   No. C 3:10-00257-JSW
             Plaintiff,              )
15                                   )
       v.                            )   **DEFENDANTS' BRIEF IN OPPOSITION**
16                                   )   **TO MOTIONS TO DISMISS**
   THE UNITED STATES OFFICE OF       )
17 PERSONNEL MANAGEMENT, et al.      )
                                     )
18           Defendants.            )
                                     )
19 _____)

20

21

22

23

24

25

26

27

28

*Defendants' Brief in Opposition to Motions to Dismiss*
*3:10cv257-JSW*

1

**TABLE OF CONTENTS**

2  TABLE OF AUTHORITIES .................................................... -ii-

3  SUMMARY OF ARGUMENT .................................................. -vi-

4  INTRODUCTION AND BACKGROUND ......................................... 1

5  STANDARD OF REVIEW ..................................................... 2

6  ARGUMENT .............................................................. 2

7  I.      DOMA Violates Equal Protection. ......................................... 2

8          A.      Plaintiffs' Equal Protection Challenge to DOMA Is Subject to Heightened
                   Scrutiny under Supreme Court Precedent. ............................... 3

9

10                 1.      Gays and Lesbians Are a Quasi-Suspect or Suspect Class under the
                           Relevant Factors Identified by the Supreme Court. .................. 6

11                         i.      Gays and Lesbians Have Been Subject to a History of
                                   Discrimination. ................................................ 6

12

13                                 Discrimination by the Federal Government ................. 6

14                                 Discrimination by State and Local Governments ............. 9

15                                 Discrimination by Private Parties ....................... 12

16                         ii.     Gays and Lesbians Exhibit Immutable Characteristics that
                                   Distinguish Them as a Group. ............................ 12

17                         iii.    Gays and Lesbians Are Minorities with Limited Political Power. 14

18                         iv.     Sexual Orientation Bears No Relation to Legitimate Policy
                                   Objectives or Ability to Perform or Contribute to Society. ...... 16

19

20          B.      DOMA Fails Heightened Scrutiny. ..................................... 18

21  CONCLUSION ........................................................... 24

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

## CASES

3

*Able v. United States,*
  968 F. Supp. 850 (E.D.N.Y. 1997), *rev'd,* 155 F.3d 628 (2d Cir. 1998) .................. 14, 15

*Ashcroft v. Iqbal,* —U.S. —,
  129 S. Ct. 1937 (2009) ..................................................................................... 2

*Baker v. Nelson,*
  191 N.W.2d 185 (Minn. 1971) ......................................................................... 3

*Baker v. Nelson,*
  409 U.S. 810 (1972) ........................................................................................ 3

*Baker v. Wade,*
  553 F. Supp. 1121 (N.D. Tex. 1982) *rev'd,* 769 F.2d 289 (5th Cir. 1985) ........................ 9

*Bd. of Educ. v. Calderon,*
  110 Cal. Rptr. 916 (1973) ............................................................................... 9

*Bell Atlantic v. Twombly,*
  550 U.S. 544 (2007) ........................................................................................ 2

*Ben-Shalom v. Marsh,*
  881 F.2d 454 (7th Cir. 1989) ...................................................................... 5, 6

*Bolling v. Sharpe,*
  347 U.S. 497 (1954) ........................................................................................ 2

*Bottoms v. Bottoms,*
  457 S.E.2d 102 (Va. 1995) ............................................................................ 10

*Boutilier v. INS,*
  387 U.S. 118 (1967) .................................................................................. 8, 9

*Bowen v. Bowen,*
  688 So. 2d 1374 (Miss. 1997) ....................................................................... 10

*Bowen v. Gilliard,*
  483 U.S. 587 (1987) ........................................................................................ 4

*Bowers v. Hardwick,*
  478 U.S. 186 (1986) ................................................................................ *passim*

*Burton v. Cascade Sch. Dist. Union High Sch., No.5,*
  512 F.2d 850 (9th Cir. 1975) ......................................................................... 9

26

27

28

*Calhoun v. Pennington,*
   No. 09-3286 (N.D. Ga.) ................................................................................. 11

*Dep't of Agriculture v. Moreno,*
   413 U.S. 528 (1973) ....................................................................................... 19

*Childers v. Dallas Police Dep't,*
   513 F. Supp. 134 (N.D. Tex. 1981), *aff'd without opinion,* 669 F.2d 732 (5th
   Cir. 1982) ........................................................................................................... 9

*City of Cleburne v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985) ................................................................................. *passim*

*City of Dallas v. England,*
   846 S.W.2d 957 (Tex. App. 1993) ............................................................... 9, 10

*Clark v. Jeter,*
   586 U.S. 456 (1988) ................................................................................... 3, 18

*Cook v. Gates,*
   528 F.3d 42 (1st Cir. 2008) ............................................................................. 5

*Dep't of Agriculture v. Moreno,*
   413 U.S. 528 (1973) ....................................................................................... 19

*Equality Found. v. City of Cincinnati,*
   54 F.3d 261 (6th Cir. 1995) ................................................................. 5, 12, 15

*Frontiero v. Richardson,*
   411 U.S. 677 (1973) ................................................................................. 12, 16

*Gaylord v. Tacoma Sch. Dist. No. 10,*
   559 P.2d 1340 (Wash. 1977) ........................................................................... 9

*Graham v. Richardson,*
   403 U.S. 365 (1971) ....................................................................................... 22

*Ex parte H.H.,*
   830 So. 2d 21 (Ala. 2002) .............................................................................. 10

*Hernandez-Montiel v. INS,*
   225 F.3d 1084 (9th Cir. 2000) ....................................................................... 13

*High Tech Gays v. Defense Industrial Security Clearance Office,*
   895 F.2d 563 (9th Cir. 1990) ................................................................. *passim*

*Irvis v. Scott,*
   318 F. Supp. 1246 (M.D. Pa. 1970) ............................................................... 10

*Lawrence v. Texas,*
   539 U.S. 558 (2003) ................................................................................. *passim*

*Lesbian/Gay Freedom Day Comm., Inc. v. INS,*
541 F. Supp. 569 (N.D. Cal. 1982) ......................................................................................... 8

*Lofton v. Sec'y of the Dep't of Children & Family Servs.,*
358 F.3d 804 (11th Cir. 2004) ............................................................................................... 5

*In re Marriage Cases,*
183 P.3d 384 (Cal. 2008) ...................................................................................................... 15

*Mathews v. Lucas,*
427 U.S. 495 (1976) ............................................................................................................... 14

*Mass. Bd. of Retirement v. Murgia,*
427 U.S. 307 (1976) ............................................................................................................... 17

*Nat'l Gay Task Force v. Board of Education,*
729 F.2d 1270 (10th Cir. 1984) .............................................................................................. 5

*Pryor v. Mun. Court,*
599 P.2d 636 (Cal. 1979) ...................................................................................................... 11

*Pulliam v. Smith,*
501 S.E.2d 898 (N.C. 1998) .................................................................................................. 10

*Richenberg v. Perry,*
97 F.3d 256 (8th Cir. 1996) ..................................................................................................... 5

*Richmond v. J.A. Croson Co.,*
488 U.S. 469 (1989) ................................................................................................................. 3

*Roe v. Roe,*
324 S.E.2d 691 (Va. 1985) .................................................................................................... 10

*Romer v. Evans,*
517 U.S. 620 (1996) ....................................................................................................... passim

*Rostker v. Goldberg,*
453 U.S. 57 (1981) ................................................................................................................... 4

*Baker v. Wade,*
553 F. Supp. 1121 (N.D. Tex. 1982) *rev'd,* 769 F.2d 289 (5th Cir. 1985) ........................ 9

*Shahar v. Bowers,*
114 F.3d 1097 (11th Cir. 1997) .............................................................................................. 9

*St. Paul Citizens for Human Rights v. City Council of the City of St. Paul,*
289 N.W.2d 402 (Minn. 1979) (St. Paul, Minnesota in 1978) ........................................ 11

*Steffan v. Perry,*
41 F.3d 677 (D.C. Cir. 1994) .................................................................................................. 5

*Strauss v. Horton,*

207 P.3d 48 (Cal. 2009) .............................................................................................. 16

*Thomasson v. Perry,*
80 F.3d 915 (4th Cir. 1996) .................................................................................. 4, 5

*United States v. Virginia,*
518 U.S. 515 (1996) ...................................................................................... 3, 18, 20

*Watkins v. U.S. Army,*
875 F.2d 699 (9th Cir. 1989) ...................................................................................... 14

*Woodard v. United States,*
871 F.2d 1068 (Fed. Cir. 1989) ...................................................................................... 5

## STATUTES

H.R. Rep. No. 104-664, at 15 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905 ..................... *passim*

H.R. Rep. 111-86, at 10 (2009) ............................................................................. 12

S. Res. 280 (81st Congress) ......................................................................................... 6

Ch. 29, § 3, 39 Stat. 874 (1917) ................................................................................. 8

Pub. L. No. 101-649, 104 Stat. 4978 (1990) ............................................................. 8

1 U.S.C. § 7 ........................................................................................................... *passim*

5 U.S.C. §§ 2105(a)(2) ............................................................................................. 1

5 U.S.C. § 8901 *et seq* ............................................................................................. 1

1

## SUMMARY OF ARGUMENT

2       Section 3 of the Defense of Marriage Act, 1 U.S.C. § 7 ("DOMA"), unconstitutionally

3   discriminates. It treats same-sex couples who are legally married under their states' laws

4   differently than similarly situated opposite-sex couples, denying them the status, recognition, and

5   significant federal benefits otherwise available to married persons. Under well-established

6   factors set forth by the Supreme Court, discrimination based on sexual orientation is subject to

7   heightened scrutiny. Under that standard of review, Section 3 of DOMA is unconstitutional.

8       The Supreme Court has yet to rule on the appropriate level of scrutiny for classifications

9   based on sexual orientation, but it has established and repeatedly confirmed a set of factors that

10  guides the determination whether heightened scrutiny applies: (1) whether the group in question

11  has suffered a history of discrimination; (2) whether members of the group "exhibit obvious,

12  immutable, or distinguishing characteristics that define them as a group"; (3) whether the group

13  is a minority or is politically powerless; and (4) whether the characteristics distinguishing the

14  group have little relation to legitimate policy objectives or to an individual's "ability to perform

15  or contribute to society." *Bowen v. Gilliard*, 483 U.S. 587, 602-03 (1987); *City of Cleburne v.

16  Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Careful consideration of those factors

17  demonstrates that sexual orientation classifications should be subject to heightened scrutiny.

18      Although binding authority of this circuit holds that rational basis review applies to

19  sexual orientation classifications, *see, e.g.*, *High Tech Gays v. Defense Industrial Security

20  Clearance Office*, 895 F.2d 563, 570 (9th Cir. 1990), we respectfully submit that this decision no

21  longer withstands scrutiny. To the extent *High Tech Gays* rested on inferences drawn from the

22  Supreme Court's decision in *Bowers v. Hardwick*, 478 U.S. 186 (1986), that rationale does not

23  survive the Supreme Court's subsequent overruling of *Bowers* in *Lawrence v. Texas*, 539 U.S.

24  558 (2003). To the extent *High Tech Gays* considered the factors the Supreme Court has

25  identified as relevant to the inquiry, we respectfully submit that its consideration was incomplete

26  and ultimately incorrect.

27      Heightened scrutiny should be applied, and Section 3 of DOMA is unconstitutional under

28  that level of review.

**INTRODUCTION AND BACKGROUND**

Plaintiff Karen Golinski, a staff attorney with the U.S. Court of Appeals for the Ninth Circuit, is enrolled in the Federal Employees Health Benefits Plan ("FEHBP"). 2d Am. Compl. ¶¶ 18-19.[1] Since August 2008, Plaintiff has been married under the laws of California to a spouse who, like Plaintiff, is a woman. *Id.* ¶ 17. After becoming married, Plaintiff sought to have her wife enrolled as an additional beneficiary under her FEHBP plan. *Id.* ¶ 22. Plaintiff's efforts to have her wife enrolled as an additional beneficiary were ultimately unsuccessful, as the FEHBA, 5 U.S.C. §§ 8901-8914, when read in light of Section 3 of the Defense of Marriage Act, 1 U.S.C. § 7 ("DOMA"), prohibits the extension of FEHBP coverage to same-sex spouses. In pertinent part, DOMA provides:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or wife.

1 U.S.C. § 7.

After the completion of an administrative hearing process under the Ninth Circuit's Employee Dispute Resolution ("EDR") Plan, Plaintiff brought the instant action on January 20, 2010.[2] Plaintiff's First Amended Complaint was dismissed by this Court on March 16, 2011. ECF No. 98. On April 14, 2011, Plaintiff filed her Second Amended Complaint, ECF No. 102,

---

[1] The FEHBP was established pursuant to the Federal Employees Health Benefits Act, 5 U.S.C. §§ 8901 *et seq.* ("FEHBA"), which created the FEHBP as a comprehensive health insurance program for federal civilian employees, their family members, and others. FEHBA confers broad authority on the United States Office of Personnel Management ("OPM") to administer the program and to promulgate regulations necessary to carry out the statute's objectives, including regulations prescribing "the manner and conditions under which an employee is eligible to enroll." 5 U.S.C. § 8913. FEHBA grants OPM authority to contract with "qualified carriers" offering health insurance plans. 5 U.S.C. §§ 8902, 8903, 8906. The "employees" who may participate in the FEHBP include employees of the Judiciary. 5 U.S.C. §§ 2105(a)(2), 8901(1)(A).

[2] A more detailed recitation of the factual and procedural history of this case is set forth in this Court's Order Granting Motion to Dismiss and Denying Motion for Preliminary Injunction of March 16, 2011, at 2-5 and *passim.* ECF No. 98.

*Defendants' Brief in Opposition to Motions to Dismiss*
*3:10cv257-JSW*                                                                    1

1  which now asserts that DOMA is unconstitutional as applied to her. It is to that constitutional

2  argument that this brief is addressed. Plaintiff also appears to assert that the Defendants

3  incorrectly or unreasonably read FEHBA to deny Plaintiff's request for the enrollment of her

4  wife as an additional beneficiary under the plan. As set forth in the memorandum in support of

5  Defendants' motion to dismiss, ECF No. 118-1, such claim should be dismissed to the extent it is

6  adequately asserted in the first instance.

7      Plaintiff's wife remains uncovered by Plaintiff's FEHBP plan.

8

9                              **STANDARD OF REVIEW**

10     To withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint "must

11  contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

12  face.'" *Ashcroft v. Iqbal*, — U.S. —, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic v.*

13  *Twombly*, 550 U.S. 544, 570 (2007)). Under *Iqbal* and *Twombly*, "[a] claim has facial

14  plausibility when the pleaded factual content allows the court to draw the reasonable inference

15  that the defendant is liable for the misconduct alleged." *Id.*

16                                  **ARGUMENT**

**I.    DOMA VIOLATES EQUAL PROTECTION.**

17     The Constitution's guarantee of equal protection of the laws, applicable to the federal

18  government through the Due Process Clause of the Fifth Amendment, *see Bolling v. Sharpe*, 347

19  U.S. 497, 500 (1954), embodies a fundamental requirement that "all persons similarly situated

20  should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

21  DOMA Section 3 is inconsistent with that principle of equality, as it denies legally married same-

22  sex couples federal benefits that are available to similarly situated opposite-sex couples.

23     For the reasons set forth below, heightened scrutiny, rather than rational basis review, is

24  the appropriate standard of review for classifications based on sexual orientation. Under that

25  more rigorous standard, Section 3 of DOMA cannot withstand constitutional muster.

26

27

28

1

2

**A.   PLAINTIFFS' EQUAL PROTECTION CHALLENGE TO DOMA IS SUBJECT TO HEIGHTENED SCRUTINY UNDER SUPREME COURT PRECEDENT.**

3    As a general rule, legislation challenged under equal protection principles is presumed

4  valid and sustained as long as the "classification drawn by the statute is rationally related to a

5  legitimate state interest." *Cleburne,* 473 U.S. at 440. "[W]here individuals in the group affected

6  by a law have distinguishing characteristics relevant to interests the [government] has authority

7  to implement," courts will not "closely scrutinize legislative choices as to whether, how, and to

8  what extent those interests should be pursued." *Id.* at 441. Where, however, legislation classifies

9  on the basis of a factor that "generally provides no sensible ground for differential treatment,"

10  such as race or gender, the law demands more searching review and imposes a greater burden on

11  the government to justify the classification. *Id.* at 440–41.

12    Such suspect or quasi-suspect classifications are reviewed under a standard of heightened

13  scrutiny, under which the government must show, at a minimum, that a law is "substantially

14  related to an important government objective." *Clark v. Jeter*, 586 U.S. 456, 461 (1988). This

15  more searching review enables courts to ascertain whether the government has employed the

16  classification for a significant and proper purpose, and serves to prevent implementation of

17  classifications that are the product of impermissible prejudice or stereotypes. *See, e.g.,*

18  *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion); *United States v.*

19  *Virginia ("VMI")*, 518 U.S. 515, 533 (1996).

20    The Supreme Court has yet to rule on the appropriate level of scrutiny for classifications

21  based on sexual orientation.[3] It has, however, established and repeatedly confirmed a set of

22

23  ───────────────

[3] In neither *Romer v. Evans*, 517 U.S. 620 (1996), nor *Lawrence v. Texas*, 539 U.S. 558 (2003),

24  did the Supreme Court opine on the applicability of heightened scrutiny to sexual orientation. In both cases, the Court invalidated sexual orientation classifications under a more permissive

25  standard of review without having to decide whether heightened scrutiny applied (*Romer* found that the legislation failed rational basis review, 517 U.S. at 634-35; *Lawrence* found the law

26  invalid under the Due Process Clause, 539 U.S. at 574-75).

27    Nor did the Court decide the question in its one-line per curiam order in *Baker v. Nelson*, 409 U.S. 810 (1972), in which it dismissed an appeal as of right from a state supreme court

28  decision denying marriage status to a same-sex couple, *id.* at 810. *Baker* did not concern the

*Defendants' Brief in Opposition to Motions to Dismiss*
*3:10cv257-JSW*                                                                                          3

1 factors that guide the determination of whether heightened scrutiny applies to a classification that

2 singles out a particular group. These include: (1) whether the group in question has suffered a

3 history of discrimination; (2) whether members of the group "exhibit obvious, immutable, or

4 distinguishing characteristics that define them as a discrete group"; (3) whether the group is a

5 minority or is politically powerless; and (4) whether the characteristics distinguishing the group

6 have little relation to legitimate policy objectives or to an individual's "ability to perform or

7 contribute to society." *See Bowen v. Gilliard*, 483 U.S. 587, 602–03 (1987); *Cleburne*, 473 U.S.

8 at 441–42.

9      Although there is substantial circuit court authority, including binding authority of this

10 circuit, holding that rational basis review generally applies to sexual orientation classifications,

11 *see, e.g.*, *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 570 (9th Cir.

12 1990), most of these decisions fail to give adequate consideration to these enumerated factors.

13 Indeed, the reasoning of this line of case law traces back to circuit court decisions from the late

14 1980s and early 1990s, a time when *Bowers v. Hardwick*, 478 U.S. 186 (1986), was still the law.

15 The Supreme Court subsequently overruled *Bowers* in *Lawrence v. Texas*, 539 U.S. 558 (2003),

16 and the reasoning of these circuit decisions no longer withstands scrutiny.

17      In *High Tech Gays*, for example, the Ninth Circuit considered a constitutional challenge

18 to the Department of Defense's practice of conducting mandatory investigations of security

19 clearance applicants known or suspected to be gay. Without expressly relying on the deference

20 due to military judgments, *cf. Rostker v. Goldberg*, 453 U.S. 57, 70 (1981), the court concluded

21

22

23 constitutionality of a federal law, like DOMA Section 3, that distinguishes among couples who

24 are already legally married in their own states, and was motivated by animus toward gay and

    lesbian people. *See* Part I.B, *infra*. Moreover, neither the Minnesota Supreme Court decision,

25 *Baker v. Nelson*, 191 N.W.2d 185, 187 (Minn. 1971), nor the questions presented in the

    plaintiffs' jurisdictional statement raised whether classifications based on sexual orientation are

26 subject to heightened scrutiny, *see Baker v. Nelson*, Jurisdictional Statement, No. 71-1027 (Sup.

27 Ct.), at 2; *see also id.* at 13 (repeatedly describing equal protection challenge as based on the

    "arbitrary" nature of the state law). There is no indication in the Court's order that the Court

28 nevertheless considered, much less resolved, that question.

1   that the challenged classification was subject only to rational basis review.[4] To the extent that

2   conclusion rested on inferences drawn from the Supreme Court's decision in *Bowers*, *see High*

3   *Tech Gays*, 895 F.2d at 574, that rationale does not survive the overruling of *Bowers* in

4   *Lawrence*. And to the extent *High Tech Gays* considered the factors the Supreme Court has

5   identified as relevant to the inquiry, *see High Tech Gays*, 895, F.2d at 573–74, we respectfully

6   submit that its consideration was incomplete and ultimately incorrect for the reasons explained

7   below.[5] Careful consideration of those factors demonstrates that classifications based on sexual

8   orientation should be subject to heightened scrutiny.

9

10

11

12

---

13   [4] *High Tech Gays* and a number of cases in other circuits involved challenges to military policy
     on homosexual conduct. *See, e.g.*, *High Tech Gays*, 895 F.2d at 565; *see also Cook v. Gates*, 528
14   F.3d 42, 45 (1st Cir. 2008); *Richenberg v. Perry*, 97 F.3d 256, 258 (8th Cir. 1996); *Thomasson v.*
     *Perry*, 80 F.3d 915, 919 (4th Cir. 1996); *Steffan v. Perry*, 41 F.3d 677, 682 (D.C. Cir. 1994) (en
15   banc); *Woodard v. United States*, 871 F.2d 1068, 1069 (Fed. Cir. 1989); *Ben-Shalom v. Marsh*,
     881 F.2d 454, 456 (7th Cir. 1989). Classifications in the military context, however, present
16   different questions from classifications in the civilian context, *see, e.g.*, *Rostker v. Goldberg*, 453
17   U.S. 57, 66 (1981), and the military is not involved here.

18   [5] As noted above, other courts of appeals have held that classifications on the basis of sexual
19   orientation are not subject to heightened scrutiny, but the reasoning of these courts is similarly
     flawed. Many of those courts relied in part or in whole on *Bowers*. *See Equality Found. v. City*
20   *of Cincinnati*, 54 F.3d 261, 266–67 & n. 2 (6th Cir. 1995); *Steffan*, 41 F.3d at 685; *Woodward*,
     871 F.2d at 1076 (Fed. Cir. 1989); *Ben-Shalom*, 881 F.2d at 464; *see also Richenberg v. Perry*,
21   97 F.3d at 260 (citing to reasoning of prior appellate decision that were based on *Bowers*);
22   *Thomasson*, 80 F.3d at 928 (same). Other courts relied on the fact that the Supreme Court has
     not recognized that gays and lesbians constitute a suspect or quasi-suspect class. *Cook*, 528 F.3d
23   at 61; *Johnson v. Johnson*, 358 F.3d 503, 532 (5th Cir. 2004). Though it is true that the Supreme
     Court thus far has not yet recognized that gays and lesbians constitute a suspect class, *see* Note 3,
24   *supra*, the Supreme Court does not decide a question by failing to opine on it in dicta
25   unnecessary to the resolution of a case. Finally, the remaining courts to address the issue offered
     no pertinent reasoning in so doing. *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358
26   F.3d 804, 818 (11th Cir. 2004); *Nat'l Gay Task Force v. Bd. of Educ.*, 729 F.2d 1270, 1273 (10th
     Cir. 1984).
27

28   *Defendants' Brief in Opposition to Motions to Dismiss*
     *3:10cv257-JSW*                                                                                    5

1        **1.      Gays and Lesbians Are a Quasi-Suspect or Suspect
2                 Class under the Relevant Factors Identified by the
                 Supreme Court.**
3
                **i.      Gays and Lesbians Have Been Subject to
4                        a History of Discrimination.**

5        First, as the Ninth Circuit has previously recognized, gay and lesbian individuals have

6    suffered a long and significant history of purposeful discrimination. *See High Tech Gays*, 895

7    F.2d at 574 ("[W]e do agree that homosexuals have suffered a history of discrimination . . . .");

8    *see also Ben-Shalom v. Marsh*, 881 F.2d 454, 465–66 (7th Cir. 1989) (noting that

9    "[h]omosexuals have suffered a history of discrimination and still do, though possibly now in

10   less degree"). So far as we are aware, no court to consider this question has ever ruled otherwise.

11       Discrimination against gay and lesbian individuals has a long history in this country,

12   *Bowers*, 478 U.S. at 192, from colonial laws ordering the death of "any man [that] shall lie with

13   mankind, as he lieth with womankind" to state laws that, until very recently, have "demean[ed]

14   the[] existence" of gay and lesbian people "by making their private sexual conduct a crime,"

15   *Lawrence*, 539 U.S. at 578. In addition to the discrimination reflected in DOMA itself, as

16   explained below, the federal government, state and local governments, and private parties all

17   have contributed to this long history of discrimination.[6]

18                        Discrimination by the Federal Government

19       The federal government has played a significant and regrettable role in the history of

20   discrimination against gay and lesbian individuals.

21       For years, the federal government deemed gays and lesbians unfit for employment,

---

22   [6]  We do not understand the Supreme Court to have called into question this well-documented
23   history when it said in *Lawrence* that "it was not until the 1970's that any State singled out
     same-sex relations for criminal prosecution," 539 U.S. at 570, and that only nine States had done
24   so by the time of *Lawrence*. The question before the Court in *Lawrence* was whether, as *Bowers*
25   had asserted, same-sex sodomy prohibitions were so deeply rooted in history that they could not
     be understood to contravene the Due Process Clause. That the Court rejected that argument and
26   invalidated Texas's sodomy law on due process grounds casts no doubt on the duration and scope
     of discrimination against gay and lesbian people writ large.
27

1  barring them from federal jobs on the basis of their sexual orientation. *See Employment of*
2  *Homosexuals and Other Sex Perverts in Government*, Interim Report submitted to the Committee
3  by its Subcommittee on Investigations pursuant to S. Res. 280 (81st Congress), December 15,
4  1950 ("Interim Report"), at 9. In 1950, Senate Resolution 280 directed a Senate subcommittee
5  "to make an investigation in the employment by the Government of homosexuals and other
6  sexual perverts." Patricia Cain, *Litigating for Lesbian and Gay Rights: A Legal History*, 79 Va.
7  L. Rev. 1551 , 1565–66 (1993). The Committee found that from 1947 to 1950, "approximately
8  1,700 applicants for federal positions were denied employment because they had a record of
9  homosexuality or other sex perversion." Interim Report at 9.

10      In April 1953, in the wake of the Senate investigation, President Eisenhower issued
11  Executive Order 10450, which officially added "sexual perversion" as a ground for investigation
12  and possible dismissal from federal service. Exec. Order No. 10450, 3 C.F.R. 936, 938 (1953);
13  *see also* 81 Fed. Reg. 2489. The Order expanded the investigations of civilian employees for
14  "sexual perversion" to include every agency and department of the federal government, and thus
15  had the effect of requiring the termination of all gay people from federal employment. *See*
16  General Accounting Office, *Security Clearances: Consideration of Sexual Orientation in the*
17  *Clearance Process*, at 2 (Mar. 1995).

18      The federal government enforced Executive Order 10450 zealously, engaging various
19  agencies in intrusive investigatory techniques to purge gays and lesbians from the federal civilian
20  workforce. The State Department, for example, charged "'skilled' investigators" with
21  "interrogating every potential male applicant to discover if they had any effeminate tendencies or
22  mannerisms," used polygraphs on individuals accused of homosexuality who denied it, and sent
23  inspectors "to every embassy, consulate, and mission" to uncover homosexuality. Edward L.
24  Tulin, Note, *Where Everything Old Is New Again—Enduring Episodic Discrimination Against*
25  *Homosexual Persons*, 84 Tex. L. Rev. 1587, 1602 (2006). In order to identify gays and lesbians
26  in the civil service, the FBI "sought out state and local police officers to supply arrest records on

27

28  *Defendants' Brief in Opposition to Motions to Dismiss*
    *3:10cv257-JSW*                                                                              7

1   morals charges, regardless of whether there were convictions; data on gay bars; lists of other

2   places frequented by homosexuals; and press articles on the largely subterranean gay world."

3   Williams Institute, "Documenting Discrimination on the Basis of Sexual Orientation and Gender

4   Identity in State Employment," ch. 5 at 7, *available at*

5   http://www.law.ucla.edu/williamsinstitute/programs/EmploymentReports_ENDA.html

6   ("Williams Report"). The United States Postal Service ("USPS"), for its part, aided the FBI by

7   establishing "a watch list on the recipients of physique magazines, subscrib[ing] to pen pal clubs,

8   and initiat[ing] correspondence with men whom [it] believed might be homosexual." *Id.* The

9   mail of individuals concluded to be homosexual would then be traced "in order to locate other

10  homosexuals." *Id.* The end result was thousands of men and women forced from their federal

11  jobs based on the suspicion that they were gay or lesbian. It was not until 1975 that the Civil

12  Service Commission prohibited discrimination on the basis of sexual orientation in federal

13  civilian hiring. *See* General Accounting Office, *Security Clearances: Consideration of Sexual*

14  *Orientation in the Clearance Process* (1995) (describing the federal government's restrictions on

15  the employment of gay and lesbian individuals).[7]

16      The history of the federal government's discrimination against gays and lesbians extends

17  beyond the employment context. For decades, gay and lesbian noncitizens were categorically

18  barred from entering the United States, on grounds that they were "persons of constitutional

19  psychopathic inferiority," "mentally defective," or sexually deviant. *Lesbian/Gay Freedom Day*

20  *Comm., Inc. v. INS*, 541 F. Supp. 569, 571–72 (N.D. Cal. 1982) (quoting Ch. 29, § 3, 39 Stat.

21  874 (1917)). As the Supreme Court held in *Boutilier v. INS*, 387 U.S. 118 (1967), "[t]he

22  legislative history of [the Immigration and Nationality Act of 1952] indicates beyond a shadow

23  of a doubt that the Congress intended the phrase 'psychopathic personality' to include

24  _____

25  [7] Open military service by gays and lesbians was prohibited, first by regulation and then by
    statute, 10 U.S.C. § 654 (2007), until the "Don't Ask, Don't Tell" Repeal Act, enacted last year,

26  111 P.L. 321, 124 Stat. 3515 (2010), and remains so pending completion of the repeal process
    mandated by the Act.

27

28  *Defendants' Brief in Opposition to Motions to Dismiss*
    *3:10cv257-JSW*                                                                                  8

1    homosexuals." *Id.* at 120. This exclusion remained in effect until Congress repealed it in 1990.

2    *See* Pub. L. No. 101-649, 104 Stat. 4978 (1990).

3                          Discrimination by State and Local Governments

4            Like the federal government, state and local governments have long discriminated against

5    gays and lesbians in public employment. By the 1950s, many state and local governments had

6    banned gay and lesbian employees, as well as gay and lesbian "employees of state funded schools

7    and colleges, and private individuals in professions requiring state licenses." Williams Report,

8    ch. 5 at 18. Many states and localities began aggressive campaigns to purge gay and lesbian

9    employees from government services as early as the 1940s. *Id.* at 18–34.

10           This employment discrimination was interrelated with longstanding state law prohibitions

11   on sodomy; the discrimination was frequently justified by the assumption that gays and lesbians

12   had engaged in criminalized and immoral sexual conduct. *See, e.g., Childers v. Dallas Police*

13   *Dep't*, 513 F. Supp. 134,138 (N.D. Tex. 1981) (holding that police could refuse to hire gays),

14   *aff'd without opinion*, 669 F.2d 732 (5th Cir. 1982); *Gaylord v. Tacoma Sch. Dist. No. 10*, 559

15   P.2d 1340, 1342 (Wash. 1977) (upholding the dismissal of a openly gay school teacher who was

16   fired based on a local school board policy that allowed removal for "immorality"); *Burton v.*

17   *Cascade Sch. Dist. Union High Sch., No.5*, 512 F.2d 850, 851 (9th Cir. 1975) (upholding the

18   dismissal of a lesbian teacher in Oregon, after adopting a resolution stating that she was being

19   terminated "because of her immorality of being a practicing homosexual"); *Bd. of Educ. v.*

20   *Calderon*, 110 Cal. Rptr. 916, 919 (1973) (holding that state sodomy statute was a valid ground

21   for discrimination against gays as teachers); *see also Baker v. Wade*, 553 F. Supp. 1121, 1128 n.9

22   (N.D. Tex. 1982) ("A school board member testified that [the defendant] would have been fired

23   [from his teaching position] if there had even been a suspicion that he had violated [the Texas

24   sodomy statute].") *rev'd,* 769 F.2d 289 (5th Cir. 1985) (holding that challenged Texas

25   homosexual sodomy law was constitutional). Some of these discriminatory employment policies

26   continued into the 1990s. *See Shahar v. Bowers*, 114 F.3d 1097, 1105 & n.17, 1107–10 (11th

27

28   *Defendants' Brief in Opposition to Motions to Dismiss*
     *3:10cv257-JSW*                                                                                    9

1   Cir. 1997) (en banc) (upholding Georgia Attorney General's Office's rescission of a job offer to

2   plaintiff after she mentioned to co-workers her upcoming wedding to her same-sex partner); *City*

3   *of Dallas v. England*, 846 S.W.2d 957 (Tex. App. 1993) (holding unconstitutional Dallas Police

4   Department policy denying gays and lesbians employment).

5         Based on similar assumptions regarding the criminal sexual conduct of gays and lesbians,

6   states and localities also denied child custody and visitation rights to gay and lesbian parents.

7   *See, e.g.*, *Ex parte H.H.*, 830 So. 2d 21, 26 (Ala. 2002) (Moore, C.J., concurring) (concurring in

8   denial of custody to lesbian mother on ground that "homosexual conduct is . . . abhorrent,

9   immoral, detestable, a crime against nature, and a violation of the laws of nature and of nature's

10  God [and] an inherent evil against which children must be protected."); *Pulliam v. Smith*, 501

11  S.E.2d 898, 903–04 (N.C. 1998) (upholding denial of custody to a gay man who had a same-sex

12  partner; emphasizing that father engaged in sexual acts while unmarried and refused to "counsel

13  the children against such conduct"); *Bowen v. Bowen*, 688 So. 2d 1374, 1381 (Miss. 1997)

14  (holding that a trial court did not err in granting a father custody of his son on the basis that

15  people in town had rumored that the son's mother was involved in a lesbian relationship);

16  *Bottoms v. Bottoms*, 457 S.E.2d 102, 108 (Va. 1995) (noting that, although the Court had

17  previously held "that a lesbian mother is not per se an unfit parent," the "[c]onduct inherent in

18  lesbianism is punishable as a Class 6 felony in the Commonwealth" and therefore "that conduct

19  is another important consideration in determining custody"); *Roe v. Roe*, 324 S.E.2d 691,692,694

20  (Va. 1985) (holding that father, who was in a gay relationship, was "an unfit and improper

21  custodian as a matter of law" because of his "continuous exposure of the child to his immoral

22  and illicit relationship").

23        State and local law also has been used to prevent gay and lesbian people from associating

24  freely. Liquor licensing laws, both on their face and through discriminatory enforcement, were

25  long used to harass and shut down establishments patronized by gays and lesbians. *See* William

26  N. Eskridge, Jr., *Privacy Jurisprudence and the Apartheid of the Closet*, 1946–1961, 24 Fla. St.

27

28  *Defendants' Brief in Opposition to Motions to Dismiss*
    *3:10cv257-JSW*                                                                10

1   U. L. Rev. 703, 762–66 (1997) (describing such efforts in New York, New Jersey, Michigan,

2   California, and Florida); *see also Irvis v. Scott*, 318 F. Supp. 1246, 1249 (M.D. Pa. 1970)

3   (describing such efforts in Pennsylvania). State and local police also relied on laws prohibiting

4   lewdness, vagrancy, and disorderly conduct to harass gays and lesbians, often when gay and

5   lesbian people congregated in public. *See, e.g., Pryor v. Mun. Court*, 599 P.2d 636, 644 (Cal.

6   1979) ("Three studies of law enforcement in Los Angeles County indicate[d] that the

7   overwhelming majority of arrests for violation of [the 'lewd or dissolute' conduct statute]

8   involved male homosexuals."); Steven A. Rosen, *Police Harassment of Homosexual Women and*

9   *Men in New York City*, 1960–1980, 12 Colum. Hum. Rts. L. Rev. 159, 162–63 (1982); Florida

10  State Legislative Investigation Committee (Johns Committee), *Report: Homosexuality and*

11  *Citizenship in Florida*, at 14 (1964) ("Many homosexuals are picked up and prosecuted on

12  vagrancy or similar non-specific charges, fined a moderate amount, and then released."). Similar

13  practices persist to this day. *See, e.g., Calhoun v. Pennington*, No. 09-3286 (N.D. Ga.)

14  (involving September 2009 raid on Atlanta gay bar and police harassment of patrons); *Settlement*

15  *in Gay Bar Raid*, N.Y. Times (Mar. 23, 2011) (involving injuries sustained by gay bar patron

16  during raid by Fort Worth police officers and the Texas Alcoholic Beverage Commission).

17          Efforts to combat discrimination against gays and lesbians also have led to significant

18  political backlash, as evidenced by the long history of successful state and local initiatives

19  repealing laws that protected gays and lesbians from discrimination. *See also* Part I.A.1.iii.,

20  *infra*. A rash of such initiatives succeeded in the late 1970s. *See, e.g.*, Christopher R. Leslie, *The*

21  *Evolution of Academic Discourse on Sexual Orientation and the Law*, 84 Chi. Kent L. Rev. 345,

22  359 (2009) (Boulder, Colorado in 1974); Rebecca Mae Salokar, Note, *Gay and Lesbian*

23  *Parenting in Florida: Family Creation Around the Law*, 4 Fla. Int'l. U. L. Rev. 473, 477 (2009)

24  (Dade County, Florida in 1977); *St. Paul Citizens for Human Rights v. City Council of the City of*

25  *St. Paul*, 289 N.W.2d 402, 404 (Minn. 1979) (St. Paul, Minnesota in 1978); *Gay rights*

26  *referendum in Oregon*, Washington Post, May 11 (1978), at A14 (Wichita, Kansas in 1978); *Why*

27

28  *Defendants' Brief in Opposition to Motions to Dismiss*
    *3:10cv257-JSW*                                                                                      11

1  *tide is turning against homosexuals*, U.S. News & World Report (June 5, 1978), at 29 (Eugene,

2  Oregon in 1978). The laws at issue in *Romer* and in *Equality Foundation v. City of Cincinnati*,

3  54 F.3d 261 (6th Cir. 1995), are just two of a number of more recent examples from the 1990s.

4  In fact, in May 2011, the Tennessee legislature enacted a law stripping counties and

5  municipalities of their ability to pass local non-discrimination ordinances that would prohibit

6  discrimination on the basis of sexual orientation, and repealing the ordinances that had recently

7  been passed by Nashville and other localities.[8] Similar responses have followed states' decisions

8  to recognize same-sex marriages. *See infra* at 15.

9                                          Discrimination by Private Parties

10        Finally, private discrimination against gays and lesbians in employment and other areas

11  has been pervasive and continues to this day.[9] *See, e.g.*, Williams Report, ch. 5 at 8–9

12  (explaining that private companies and organizations independently adopted discriminatory

13  employment policies modeled after the federal government's, and as "federal employers shared

14  police and military records on gay and lesbian individuals with private employers, these same

15  persons who were barred from federal employment on the basis of their sexual orientation were

16  simultaneously blacklisted from employment by many private companies"). The pervasiveness

17  of private animus against gays and lesbians is underscored by statistics showing that gays and

18  lesbians continue to be among the most frequent victims of all reported hate crimes. *See* H.R.

19  Rep. 111-86, at 10 (2009) ("According to 2007 FBI statistics, hate crimes based on the victim's

20  sexual orientation—gay, lesbian, or bisexual—constituted the third highest category

21

22  [8] *See* State of Tennessee, Public Chapter No. 278, *available at*
23  http://state.tn.us/sos/acts/107/pub/pc0278.pdf.

24  [9] Private discrimination, as well as official discrimination, is relevant to whether a group has
25  suffered a history of discrimination for purposes of the heightened scrutiny inquiry. *Frontiero v.
    Richardson*, 411 U.S. 677, 686 (1973) (plurality) ("[W]omen still face pervasive, although at
26  times more subtle, discrimination in our educational institutions, in the job market and, perhaps
    most conspicuously, in the political arena.").

27

1  reported—1,265 incidents, or one-sixth of all reported hate crimes."); Kendall Thomas, *Beyond*

2  *the Privacy Principle*, 92 Colum. L. Rev. 1431, 1464 (1992).

3       In sum, gays and lesbians have suffered a long history of discrimination based on

4  prejudice and stereotypes. That history counsels strongly in favor of heightened scrutiny, giving

5  courts ample reason to question whether sexual orientation classifications are the product of

6  hostility rather than a legitimate government purpose.

7                    **ii.    Gays and Lesbians Exhibit Immutable**
                            **Characteristics that Distinguish Them as**
8                            **a Group.**

9       Over ten years ago, in considering whether gays and lesbians constituted a "particular

10  social group" for asylum purposes, the Ninth Circuit recognized that "[s]exual orientation and

11  sexual identity are immutable," and that "[h]omosexuality is as deeply ingrained as

12  heterosexuality." *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) (internal

13  quotation marks omitted). *But see High Tech Gays*, 895 F.2d at 573 (stating that sexual

14  orientation is not immutable because "it is behavioral"). Sexual orientation, the Ninth Circuit

15  explained, is "fundamental to one's identity," and gay and lesbian individuals "should not be

16  required to abandon" it to gain access to fundamental rights guaranteed to all people.

17  *Hernandez-Montiel*, 225 F.3d at 1093.

18       That conclusion is consistent with the overwhelming consensus in the scientific

19  community that sexual orientation is an immutable characteristic. *See e.g.*, G.M. Herek, et al.

20  *Demographic, Psychological, and Social Characteristics of Self-Identified Lesbian, Gay, and*

21  *Bisexual Adults*, 7, 176–200 (2010), *available at*

22  http://www.springerlink.com/content//fulltext.pdf (noting that in a national survey conducted

23  with a representative sample of more than 650 self-identified lesbian, gay, and bisexual adults, 95

24  percent of the gay men and 83 percent of lesbian women reported that they experienced "no

25  choice at all" or "very little choice" about their sexual orientation). There is also a consensus

26  among the established medical community that efforts to change an individual's sexual

27

28  *Defendants' Brief in Opposition to Motions to Dismiss*
   *3:10cv257-JSW*                                                                    13

1    orientation are generally futile and potentially dangerous to an individual's well-being.[10] *See*

2    Am. Psychological Ass'n, *Report of the American Psychological Association Task Force on*

3    *Appropriate Therapeutic Responses to Sexual Orientation*, at v (2009), *available at*

4    http://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf ("[E]fforts to change

5    sexual orientation are unlikely to be successful and involve some risk of harm."); *see also*

6    Richard A. Posner, Sex and Reason 101 n.35 (1992) (describing "failure of treatment strategies

7    . . . to alter homosexual orientation"); Douglas Haldeman, *The Practice and Ethics of Sexual*

8    *Orientation Conversion Therapy*, 62 J. Consulting & Clinical Psychol. 221, 226 (1994)

9    (describing "lack of empirical support for conversion therapy").

10          Furthermore, sexual orientation need not be a "visible badge" that distinguishes gays and

11   lesbians as a discrete group for the classification to warrant heightened scrutiny. As the Supreme

12   Court has made clear, a classification may be "constitutionally suspect" even if it rests on a

13   characteristic that is not readily visible, such as illegitimacy. *Mathews v. Lucas*, 427 U.S. 495,

14   504 (1976); *see id.* at 506 (noting that "illegitimacy does not carry an obvious badge, as race or

15   sex do," but nonetheless applying heightened scrutiny). Whether or not gays and lesbians could

16   hide their identities in order to avoid discrimination, they are not required to do so. As the Court

17   has recognized, sexual orientation is a core aspect of identity, and its expression is an "integral

18   part of human freedom," *Lawrence*, 539 U.S. at 562, 576–77.

### iii.    Gays and Lesbians Are Minorities with Limited Political Power.

19

20          Third, gays and lesbians are a minority group,[11] *Able v. United States*, 968 F. Supp. 850,

21

22   [10] In fact, every major mental health organization has adopted a policy statement cautioning

23   against the use of so-called "conversion" or "reparative" therapies to change the sexual

24   orientation of gays and lesbians. These policy statements are reproduced in a 2009 publication of
     the American Psychological Association, available at

25   http://www.apa.org/pi/lgbt/resources/just-the-facts.pdf.

26   [11] It is difficult to offer a definitive estimate for the size of the gay and lesbian community in the
     United States. According to an analysis of various data sources published in April 2011 by the

27

*Defendants' Brief in Opposition to Motions to Dismiss*
28   *3:10cv257-JSW*                                                                                          14

1  863 (E.D.N.Y. 1997), *rev'd*, 155 F.3d 628 (2d Cir. 1998), that has historically lacked political

2  power. To be sure, many of the forms of historical discrimination described above have subsided

3  or been repealed. But efforts to combat discrimination have frequently led to successful

4  initiatives to scale back protections afforded to gay and lesbian individuals. *See also* Part

5  I.A.1.i., *supra*. As described above, the adoption of ballot initiatives specifically repealing laws

6  protecting gays and lesbians from discrimination (including the laws at issue in *Romer* and

7  *Equality Foundation v. City of Cincinnati*) are examples of such responses. In fact, "[f]rom 1974

8  to 1993, at least 21 referendums were held on the sole question of whether an existing law or

9  executive order prohibiting sexual orientation discrimination should be repealed or retained. In

10 15 of these 21 cases, a majority voted to repeal the law or executive order." Robert Wintemute,

11 Sexual Orientation and Human Rights 56 (1995).

12  The strong backlash in the 1970s, 1980s, and 1990s to these civil rights ordinances has

13 been followed in the 2000s with similar political backlashes against same-sex marriage. In 1996,

14 at the time DOMA was enacted, only three states had statutes restricting marriage to opposite-sex

15 couples. National Conference of State Legislatures, *Same-Sex Marriage, Civil Unions and*

16 *Domestic Partnerships, available at* http://www.ncsl.org/default.aspx?tabid=16430 (last updated

17 May 2011). Today, thirty-seven states have such statutes, and thirty states have constitutional

18 amendments explicitly restricting marriage to opposite-sex couples. *Id.*

19  California and Iowa are recent examples of such backlash. In May 2008, the California

20 Supreme Court held that the state was constitutionally required to recognize same-sex marriage.

21 *In re Marriage Cases*, 183 P.3d 384, 419 (Cal. 2008). In November 2008, California's voters

22

23 Williams Institute, there appear to be 8 million adults in the United States who are lesbian, gay or
   bisexual, comprising 3.5 percent of the adult population. *See* Gary J. Gates, *How Many People*
24 *Are Lesbian, Gay, Bisexual, and Transgender? available at*
   http://www3.law.ucla.edu/williamsinstitute/pdf/How-many-people-are-LGBT-Final.pdf (last
25 reviewed June 30, 2011). Ascertaining the precise percentage of gays and lesbians in the
26 population, however, is not relevant to the analysis, as it is clear that whatever the data reveal,
   there is no dispute that gays and lesbians constitute a minority in the country.
27

1    passed Proposition 8, which amended the state constitution to restrict marriage to opposite-sex

2    couples. *See Strauss v. Horton*, 207 P.3d 48, 120 (Cal. 2009). In November 2010, when three

3    Iowa state supreme court justices who had been part of a unanimous decision legalizing same-sex

4    marriage were up for reelection, Iowa voters recalled all of them. *See* A.G. Sulzberger, *Ouster of*

5    *Iowa Judges Sends Signal to Bench*, N.Y. Times (Nov. 3, 2010).

6            Beyond these state ballot initiatives, the relatively recent passages of anti-sodomy laws

7    singling out same-sex conduct, such as the Texas law the Supreme Court ultimately invalidated

8    in *Lawrence*, indicate that gays and lesbians lack the consistent "ability to attract the [favorable]

9    attention of the lawmakers." *Cleburne*, 473 U.S. at 445.

10            This is not to say that the political process is closed entirely to gay and lesbian people.

11   But complete foreclosure from meaningful political participation is not the standard by which the

12   Supreme Court has judged "political powerlessness." When the Court ruled in 1973 that gender-

13   based classifications were subject to heightened scrutiny, *Frontiero v. Richardson*, 411 U.S. 677

14   (1973), women already had won major political victories including a constitutional amendment

15   granting the right to vote and protection against employment discrimination under Title VII. As

16   *Frontiero* makes clear, the "political power" factor does not require a complete absence of

17   political protection, and its application is not intended to change with every political success.[12]

18                         iv.    **Sexual Orientation Bears No Relation to**
                                  **Legitimate Policy Objectives or Ability to**
19                                **Perform or Contribute to Society.**

20           Even where other factors might point toward heightened scrutiny, the Court has declined

21   to treat as suspect those classifications that generally bear on "ability to perform or contribute to

22   society." *See Cleburne*, 473 U.S. at 441 (mental disability not a suspect classification) (internal

23

24   [12] In determining that gender classifications warranted heightened scrutiny, the plurality in
25   *Frontiero* noted that "in part because of past discrimination, women are vastly underrepresented
     in this Nation's decision-making councils. There has never been a female President, nor a female
26   member of this court. Not a single woman presently sits in the United States Senate, and only 14
     women hold seats in the House of Representatives." 411 U.S. at 686 n. 17 (plurality opinion).
27

     *Defendants' Brief in Opposition to Motions to Dismiss*
28   *3:10cv257-JSW*                                                                              16

1   quotation omitted); *see also Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 315 (1976) (age

2   not a suspect classification).

3        Sexual orientation is not such a classification. As the history described above makes

4   clear, prior discrimination against gay and lesbian people has been rested not on their ability to

5   contribute to society, but on the basis of invidious and long-discredited views that gays and

6   lesbians are, for example, sexual deviants or mentally ill. *See* Part I.A.1.i., *supra*. As the

7   American Psychiatric Association stated more than 35 years ago, "homosexuality per se implies

8   no impairment in judgment, stability, reliability or general social or vocational capabilities."

9   Resolution of the Am. Psychiatric Ass'n (Dec. 15, 1973); *see also Minutes of the Annual Meeting*

10  *of the Council of Representatives*, 30 Am. Psychologist 620, 633 (1975) (reflecting a similar

11  American Psychological Association statement).

12       Just as a person's gender, race, or religion does not bear an inherent relation to a person's

13  ability or capacity to contribute to society, a person's sexual orientation bears no inherent relation

14  to ability to perform or contribute. President Obama elaborated on this principle in the context of

15  the military when he signed the Don't Ask, Don't Tell Repeal Act of 2010:

16       [S]acrifice, valor and integrity are no more defined by sexual orientation than they are by
         race or gender, religion or creed. . . . There will never be a full accounting of the heroism
17       demonstrated by gay Americans in service to this country; their service has been obscured
         in history. It's been lost to prejudices that have waned in our own lifetimes. But at every
18       turn, every crossroads in our past, we know gay Americans fought just as hard, gave just
         as much to protect this nation and the ideals for which it stands.
19
20  White House, Remarks by the President and Vice President at Signing of the Don't Ask, Don't

21  Tell Repeal Act of 2010 (Dec. 22, 2010), *available at*

22  http://www.whitehouse.gov/the-press-office/2010/12/22/remarks-president-and-vice-president-si

23  gning-don't-ask-don't-tell-repeal-a.

24       The Supreme Court has also recognized that, although opposition to homosexuality,

25  though it may reflect deeply held personal religious and moral views, it is not a legitimate policy

26  objective. *Lawrence*, 539 U.S. at 577 ("[T]he fact that a governing majority in a State has

27  traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law

28  *Defendants' Brief in Opposition to Motions to Dismiss*
    *3:10cv257-JSW*                                                                        17

1  prohibiting the practice."); *Romer*, 517 U.S. at 633 (noting that a law cannot broadly disfavor

2  gays and lesbians because of "personal or religious objections to homosexuality." (internal

3  quotation omitted)). Whether premised on pernicious stereotypes or simple moral disapproval,

4  laws classifying on the basis of sexual orientation rest on a "factor [that] generally provides no

5  sensible ground for differential treatment," *see Cleburne*, 473 U.S. at 441, and thus such laws

6  merit heightened scrutiny.

7      **B.    DOMA FAILS HEIGHTENED SCRUTINY.**

8      For the reasons described above, heightened scrutiny is the appropriate standard by which

9  to review classifications based on sexual orientation, including DOMA Section 3.[13]   In reviewing

10  a legislative classification under heightened scrutiny, the government must establish, at a

11  minimum, that the classification is "substantially related to an important government objective."

12  *Clark*, 586 U.S. at 461.   Moreover, under any form of heightened scrutiny, a statute must be

13  defended by reference to the "actual [governmental] purpose" behind it, not a different

14  "rationalization." *VMI*, 518 U.S. at 535–36.

15      Section 3 fails this analysis.[14]   First, the legislative history demonstrates that the statute

16  was motivated in significant part by animus towards gays and lesbians and their intimate and

17  family relationships.[15]   Among the interests expressly identified by Congress in enacting DOMA

18  _____

19  [13] The government takes no position on whether sexual orientation classifications should be
considered suspect, as opposed to quasi-suspect, and therefore whether DOMA should be subject

20  to intermediate or strict scrutiny.

21  [14] Though the government believes that heightened scrutiny is the appropriate standard of review
for Section 3 of DOMA, if this Court holds that rational basis is the appropriate standard, as the

22  government has previously stated, a reasonable argument for the constitutionality of DOMA

23  Section 3 can be made under that permissive standard.

24  [15] We note that some members of the majority in Congress that enacted DOMA have changed
their views on the law, and the legitimacy of its rationales, since 1996. *See, e.g.*, Bob Barr, *No*

25  *Defending the Defense of Marriage Act*, L.A. Times (Jan. 5, 2009), *available at*

26  http://www.latimes.com/news/politics/newsletter/la-oe-barr5-2009jan05,
0,2810156.story?track=newslettertext.   In reviewing the statute under heightened scrutiny,

27

28  *Defendants' Brief in Opposition to Motions to Dismiss*
*3:10cv257-JSW*                                                                          18

1    was "the government's interest in defending traditional notions of morality." H.R. Rep. No. 104-
2    664, at 15 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905 ("H.R. Rep."). The House Report
3    repeatedly claims that DOMA upholds "traditional notions of morality" by condemning
4    homosexuality and by expressing disapproval of gays and lesbians and their committed
5    relationships. *See, e.g.*, H.R. Rep. at 15–16 ("[J]udgment [opposing same-sex marriage] entails
6    both moral disapproval of homosexuality and a moral conviction that heterosexuality better
7    comports with traditional (especially Judeo-Christian) morality."); *id.* at 16 (stating that same-sex
8    marriage "legitimates a public union, a legal status that most people . . . feel ought to be
9    illegitimate" and "put[s] a stamp of approval . . . on a union that many people . . . think is
10   immoral"); *id.* at 15 ("Civil laws that permit only heterosexual marriage reflect and honor a
11   collective moral judgment about human sexuality"); *id.* at 31 (favorably citing the holding in
12   *Bowers* that an "anti-sodomy law served the rational purpose of expressing the presumed belief .
13   . . that homosexual sodomy is immoral and unacceptable").

14        The House Report also explicitly stated an interest in extending legal preferences to
15   heterosexual couples in various ways to "promote heterosexuality" and discourage
16   homosexuality. H.R. Rep. at 15 n.53 ("Closely related to this interest in protecting traditional
17   marriage is a corresponding interest in promoting heterosexuality. . . . Maintaining a preferred
18   societal status of heterosexual marriage thus will also serve to encourage heterosexuality . . . ").
19   Thus, one of the goals of DOMA was to provide gays and lesbians with an incentive to abandon
20   or at least to hide from view a core aspect of their identities, which legislators regarded as
21   immoral and inferior.

22        This record evidences the kind of animus and stereotype-based thinking that the Equal
23   Protection Clause is designed to guard against. *Cf. Dep't of Agriculture v. Moreno*, 413 U.S.
24   528, 534 (1973) ("If the constitutional conception of 'equal protection of the laws' means

25   _____

26   however, what is relevant are the views of Congress at the time of enactment, as evidenced by
     the legislative record.
27

28   *Defendants' Brief in Opposition to Motions to Dismiss*
     *3:10cv257-JSW*                                                                          19

1   anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular

2   group cannot constitute a legitimate governmental interest."); *see also Lawrence*, 539 U.S. at 580

3   (O'Connor, J., concurring) ("[The Supreme Court] ha[s] consistently held . . . that some

4   objectives, such as a bare desire to harm a politically unpopular group, are not legitimate state

5   interests"). And even if Congress's opposition to gay and lesbian relationships could be

6   understood as reflecting moral or religious objections, that would remain an impermissible basis

7   for sexual-orientation discrimination. *See supra* at 17-18; *Romer*, 517 U.S. at 633 (holding that

8   law cannot broadly disfavor gays and lesbians because of "personal or religious objections to

9   homosexuality"). Discouraging homosexuality, in other words, is not a governmental interest

10   that justifies sexual orientation discrimination.

11          Nor is there some other important governmental interest identified by Congress and

12   substantially advanced by Section 3 of DOMA, as required under heightened scrutiny. In

13   addition to expressing bare hostility to gay and lesbian people and their relationships, in enacting

14   Section 3, the House Report articulated an interest in "defending and nurturing the institution of

15   traditional, heterosexual marriage." H.R. Rep. at 12. That interest does not support Section 3.

16   As an initial matter, reference to tradition, no matter how long established, cannot by itself justify

17   a discriminatory law under equal protection principles. *VMI*, 518 U.S. at 535 (invalidating

18   longstanding tradition of single-sex education at Virginia Military Institute). But even if it were

19   possible to identify a substantive and animus-free interest in protecting "traditional" marriage on

20   this record, there would remain a gap between means and end that would invalidate Section 3

21   under heightened scrutiny. Section 3 of DOMA has no effect on recognition of the same-sex

22   marriages Congress viewed as threatening to "traditional" marriage; it does not purport to defend

23   "traditional, heterosexual marriage" by preventing same-sex marriage or by denying legal

24   recognition to such marriages. Instead, Section 3 denies benefits to couples who are already

25   legally married in their own states, on the basis of their sexual orientation and not their marital

26   status. Thus, there is not the "substantial relationship" required under heightened scrutiny

27

28   *Defendants' Brief in Opposition to Motions to Dismiss*
     *3:10cv257-JSW*                                                                                 20

1   between an end of defending "traditional" marriage and the means employed by Section 3.

2        The same is true of Congress's interest in "promoting responsible procreation and

3   child-rearing," which the House Report identified not as a separate rationale for DOMA Section

4   3, but as the basis for its larger interest in defending "the institution of traditional, heterosexual

5   marriage." *See, e.g.*, H. Rep. at 12–13 ("At bottom, civil society has an interest in maintaining

6   and protecting the institution of heterosexual marriage because it has a deep and abiding interest

7   in encouraging responsible procreation and child-rearing."); *id.* at 14 ("Were it not for the

8   possibility of begetting children inherent in heterosexual unions, *society would have no*

9   *particular interest* in encouraging citizens to come together in a committed relationship.")

10   (emphasis added). Again, even assuming that Congress legislated on the basis of an independent

11   and animus-free interest in promoting responsible procreation and child-rearing, that interest is

12   not materially advanced by Section 3 of DOMA and so cannot justify that provision under

13   heightened scrutiny.

14        First, there is no sound basis for concluding that same-sex couples who have committed

15   to marriages recognized by state law are anything other than fully capable of responsible

16   parenting and child-rearing. To the contrary, many leading medical, psychological, and social

17   welfare organizations have issued policies opposing restrictions on lesbian and gay parenting

18   based on their conclusions, supported by numerous studies, that children raised by gay and

19   lesbian parents are as likely to be well-adjusted as children raised by heterosexual parents. *See,*

20   *e.g.*, American Academy of Pediatrics, Coparent or Second-Parent Adoption by 16 Same-Sex

21   Parents (Feb. 2002), *available at*

22   http://aappolicy.aappublications.org/cgi/content/full/pediatrics;109/2/339; American

23   Psychological Association, Sexual Orientation, Parents, & Children (July 2004), *available at*

24   http://www.apa.org/about/governance/council/policy/parenting.aspx; American Academy of

25   Child and Adolescent Psychiatry, Gay, Lesbian, Bisexual, or Transgender Parents Policy

26   Statement (Oct. 2008), *available at*

27

28   *Defendants' Brief in Opposition to Motions to Dismiss*
  *3:10cv257-JSW*                                       21

1   http://www.aacap.org/cs/root/policy_statements/gay_lesbian_transgender_and_bisexual_parents_

2   policy_statement; American Medical Association, AMA Policy Regarding Sexual Orientation,

3   *available at* http://www.ama-assn.org/ama/ pub/about-ama/our-people/member-groups-

4   sections/glbt-advisorycommittee/ama-policy-regarding-sexual-orientation.shtml; Child Welfare

5   League of America, Position Statement on Parenting of Children by Lesbian, Gay, and Bisexual

6   Adults, *available at* http://www.cwla.org/ programs/culture/glbtqposition.htm. For this reason

7   alone, no penalty or prohibition on same-sex marriage can be "substantially" related to an interest

8   in promoting responsible child-rearing.

9          Second, there is no evidence in the legislative record that denying federal benefits to

10  same-sex couples legally married under state law operates in any way to encourage responsible

11  child-rearing, whether by opposite-sex or same-sex couples, and it is hard to imagine what such

12  evidence would look like. In enacting DOMA, Congress expressed the view that marriage plays

13  an "irreplaceable role" in child-rearing. House Report at 14. But Section 3 does nothing to

14  affect the stability of heterosexual marriages or the child-rearing practices of heterosexual

15  married couples. Instead, it denies the children of same-sex couples what Congress sees as the

16  benefits of the stable home life produced by legally recognized marriage, and therefore, on

17  Congress' own account, undermines rather than advances an interest in promoting child welfare.

18         Finally, as to "responsible procreation," even assuming an important governmental

19  interest in providing benefits only to couples who procreate, Section 3 is not sufficiently tailored

20  to that interest to survive heightened scrutiny. Many state-recognized same-sex marriages

21  involve families with children; many opposite-sex marriages do not. And ability to procreate has

22  never been a requirement of marriage or of eligibility for federal marriage benefits; opposite-sex

23  couples who cannot procreate for reasons related to age or other physical characteristics are

24  permitted to marry and to receive federal marriage benefits. *Cf.* H.R. Rep. at 14 (noting "that

25  society permits heterosexual couples to marry regardless of whether they intend or are even able

26

27

1  to have children" but describing this objection to DOMA as "not a serious argument").[16]

2          In sum, the official legislative record makes plain that DOMA Section 3 was motivated in

3  substantial part by animus toward gay and lesbian individuals and their intimate relationships,

4  and Congress identified no other interest that is materially advanced by Section 3. Section 3 of

5  DOMA is therefore unconstitutional.

---

[16]  The House Report also identifies preservation of scarce government resources as an interest
underlying Section 3's denial of government benefits to same-sex couples married under state
law. *See* H.R. Rep. at 18. In fact, many of the rights and obligations affected by Section 3, such
as spousal evidentiary privileges and nepotism rules, involve no expenditure of federal funds, and
in other cases, exclusion of state-recognized same-sex marriages costs the government money by
preserving eligibility for certain federal benefits. But regardless of whether an interest in
preserving resources could justify Section 3 under rational basis review, it is clear that it will not
suffice under heightened scrutiny; the government may not single out a suspect class for
exclusion from a benefits program solely in the interest of saving money. *See Graham v.
Richardson*, 403 U.S. 365, 374–75 (1971) (holding that state may not advance its "valid interest
in preserving the fiscal integrity of its programs" through alienage-based exclusions).

1

## CONCLUSION

2     For the reasons set forth above, Section 3 of DOMA fails heightened scrutiny, and this

3 Court should deny the motions to dismiss Plaintiff's constitutional claim.

4 Dated: July 1, 2011

5                                                 Respectfully Submitted,

6                                                 MICHAEL F. HERTZ
                                                Deputy Assistant Attorney General

7

8                                                 MELINDA HAAG
                                                United States Attorney

9                                                 ARTHUR R. GOLDBERG
                                                Assistant Branch Director

10

11                                             ***/s/ Christopher R. Hall***
                                            CHRISTOPHER R. HALL
                                            D.C. Bar No. 468827

12                                             Trial Attorney
                                            U.S. Department of Justice

13                                             Civil Division, Federal Programs Branch
                                            P.O. Box 883

14                                             Washington, D.C. 20044
                                            (202) 514-4778 (telephone)

15                                             (202) 616-8470 (fax)

16                                             Attorneys for Defendants

17

18

19

20

21

22

23

24

25

26

27

28