PAUL D. CLEMENT, ESQ. (DC Bar 433215)
pclement@bancroftpllc.com
H. CHRISTOPHER BARTOLOMUCCI, ESQ. (DC Bar 453423)
cbartolomucci@bancroftpllc.com
CONOR B. DUGAN, ESQ. (MI Bar P66901)
cdugan@bancroftpllc.com
NICHOLAS J. NELSON, ESQ. (MD Bar)
nnelson@bancroftpllc.com

BANCROFT PLLC
1919 M Street, NW, Suite 470
Washington, DC 20036
202-234-0090 (phone); 202-234-2806 (fax)

OF COUNSEL:
KERRY W. KIRCHER, GENERAL COUNSEL (DC Bar 386816)
Kerry.Kircher@mail.house.gov
CHRISTINE DAVENPORT, SR. ASS'T COUNSEL (NJ Bar)
Christine.Davenport@mail.house.gov
KATHERINE E. MCCARRON, ASS'T COUNSEL (DC Bar 486335)
Katherine.McCarron@mail.house.gov
WILLIAM PITTARD, ASS'T COUNSEL (DC Bar 482949)
William.Pittard@mail.house.gov
KIRSTEN W. KONAR, ASS'T COUNSEL (DC Bar 979176)
Kirsten.Konar@mail.house.gov

OFFICE OF GENERAL COUNSEL
U.S. House of Representatives
219 Cannon House Office Building
Washington, DC 20515
202-225-9700 (phone); 202-226-1360 (fax)

Counsel for Intervenor-Defendant the Bipartisan Legal
Advisory Group of the U.S. House of Representatives

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| KAREN GOLINSKI, | Case No. 3:10-cv-0257-JSW |
| | Hearing: December 16, 2011, 9:00 a.m. |
| Plaintiff, | |
| | SUPERSEDING OPPOSITION |
| v. | OF THE U.S. HOUSE OF |
| | REPRESENTATIVES TO |

1

UNITED STATES OFFICE OF PERSONNEL ) PLAINTIFF'S MOTION FOR

2 MANAGEMENT, et al.,    ) SUMMARY JUDGMENT
              )
3       Defendants. )
 _____)

4

5        **TABLE OF CONTENTS**

6 SUMMARY OF ARGUMENT ................................................................ix

7 STATEMENT OF ISSUE.......................................................................1

8 STATEMENT OF FACTS .....................................................................1

9 RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS ..........2

10   General Statement .....................................................................2

11   Particularized Responses ............................................................2

12 ARGUMENT ......................................................................................4

13  I. THE CLASSIFICATION IN DOMA IS NOT SUBJECT TO ANY
    HEIGHTENED SCRUTINY .........................................................4

14

15   A. Binding Circuit Precedent Forecloses Application of
     Heightened Scrutiny on the Basis of Sexual Orientation..........4

16   B. Based on the Traditional Criteria Used to Determine Suspect
     or Quasi-Suspect Classes, Homosexuals Clearly Are Not a

17     Suspect or Quasi-Suspect Class .................................................5

18     1. History of Discrimination .............................................6

19     2. Ability to Participate in or Contribute to Society .........7

20     3. Immutability.................................................................7

21     4. Political Powerlessness .................................................11

22   C. DOMA Does Not Discriminate on the Basis of Sex.................17

23

        D.      DOMA Does Not Implicate a Fundamental Right ..................18

II.    DOMA EASILY SURVIVES RATIONAL BASIS SCRUTINY ........................20

        A.      Congress Was Justified in Acting with Caution When Faced with the Unknown Consequences of a Proposed Novel Redefinition of the Foundational Social Institution of Marriage ................................................................................21

        B.      DOMA Promotes Responsible Procreation .............................23

CONCLUSION............................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Andersen v. King Cnty.*,
    138 P.3d 963 (Wash. 2006)...........................................................................18

*Ben-Shalom v. Marsh*,
    881 F.2d 454 (7th Cir. 1989) ......................................................................11

*Citizens for Equal Prot. v. Bruning*,
    455 F.3d 859 (8th Cir. 2006) ......................................................................5

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985).........................................................................7, 11, 16

*Cleveland Bd. of Educ. v. LaFleur*,
    414 U.S. 632 (1974).....................................................................................19

*Conaway v. Deane*,
    932 A.2d 571 (Md. 2007) ...........................................................................17

*Cook v. Gates*,
    528 F.3d 42 (1st Cir. 2008).........................................................................5

*Diaz v. Brewer*,
    No. 10-16797, 2011 WL 3890755 (9th Cir. Sept. 6, 2011) ..........................4

*Disabled Am. Veterans v. U.S. Dept. of Veterans Affairs*,
    962 F.2d 136 (2d. Cir. 1992).....................................................................17

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993).....................................................................................2

*Frontiero v. Richardson*,
    411 U.S. 677 (1973)...............................................................................6, 10

*Gill v. OPM*,
    699 F. Supp. 2d 374 (D. Mass. 2010) ...................................................20, 23

*Heller v. Doe*,
    509 U.S. 312 (1993)...............................................................................2, 17

*Hernandez-Montiel v. INS*,
    225 F.3d 1084 (9th Cir. 2000) ....................................................................8

iii

*High Tech Gays v. Def. Indus. Sec. Clearance Office*,
    895 F.2d 563 (1990) ...........................................................................................4, 6, 8, 11

*In re Golinski*,
    587 F.3d 901 (9th Cir. 2009) ....................................................................1

*In re Golinski*,
    587 F.3d 956 (9th Cir. 2009) ....................................................................1

*In re Golinski*,
    No. 09-80173 (9th Cir.) .............................................................................1

*In re Kandu*,
    315 B.R. 123 (Bankr. W.D. Wash. 2004) ...................................................5, 17

*Johnson v. Robison*,
    415 U.S. 361 (1974) .................................................................................16

*Lawrence v. Texas*,
    539 U.S. 558 (2003) .................................................................................5, 7, 20, 25

*Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*,
    558 F.3d 1301 (11th Cir. 2009) ...............................................................17

*Lofton v. Sec. of Dep't of Children & Fam. Servs.*,
    358 F.3d 804 (11th Cir. 2004) .................................................................5, 24

*Log Cabin Republicans v. United States*,
    Nos. 10–56634, 10–56813,
    2011 WL 4494225 (9th Cir. Sept. 29, 2011) ............................................4, 12

*Loving v. Virginia*,
    388 U.S. 1 (1967) ....................................................................................18

*Lui v. Holder*,
    No. 2:11-cv-01267-SVW (JCGx) (C.D. Cal.) ............................................5

*Lyng v. Castillo*,
    477 U.S. 635 (1986) .................................................................................6, 16

*Moore v. City of E. Cleveland*,
    431 U.S. 494 (1977) .................................................................................19

iv

*Newdow v. Lefevre*,
     598 F.3d 638 (9th Cir. 2010) .......................................................................8

*Pedersen v. OPM*,
     No. 3:10-cv-01750 (D. Conn.) ..................................................................10

*Reynolds v. United States*,
     98 U.S. 145 (1878)....................................................................................21

*Robbins v. Carey*,
     481 F.3d 1143 (9th Cir. 2007) ....................................................................8

*Roberts v. U.S. Jaycees*,
     468 U.S. 609 (1984)..................................................................................19

*Romer v. Evans*,
     517 U.S. 620 (1996)....................................................................................5

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
     411 U.S. 1 (1973)......................................................................................16

*Smelt v. Cnty. of Orange*,
     374 F. Supp. 2d 861 (C.D. Cal. 2005) ...................................................5, 17

*Steffan v. Cheney*,
     780 F. Supp. 1 (D.D.C. 1991) ...................................................................11

*Wilson v. Ake*,
     354 F. Supp. 2d 1298 (M.D. Fla. 2005)....................................................17

*Windsor v. United States*,
     No. 1:10-cv-08435 (S.D.N.Y.)...................................................................10

*Witt v. Dep't of Air Force*,
     527 F.3d 806 (9th Cir. 2008) ....................................................................20

*Woodward v. United States*,
     871 F.2d 1068 (Fed. Cir. 1989)...................................................................8

**Statutes and Legislative Authorities**

1 U.S.C. § 7.....................................................................................................1

28 U.S.C. § 1738...........................................................................................25

SUPERSEDING OPPOSITION OF THE U.S. HOUSE OF REPRESENTATIVES TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, Case No. 3:10-cv-0257-JSW

v

1   Morrill Anti-Bigamy Act, ch. 126, § 1, 12 Stat. 501, 501 (1862) ............................21

2   2011 R.I.H.B. 6103 (July 2, 2011)...............................................................15

3   750 Ill. Comp. Stat. 75/20 (West 2011) .........................................................15

4   Cal. Fam. Code § 297.5 (West 2011).............................................................15

5   Colo. Rev. Stat. § 15-22-105 (West 2011).......................................................15

6   Conn. Gen. Stat. Ann. § 46b-20, § 46b–25 (West 2011).........................................15

7   D.C. Code § 46-401, *et seq.* (2011) ............................................................15

8   Del. Code Ann. tit. 13 § 212 (West 2011) .......................................................15

9   Haw. Rev. Stat. § 572C-1 (2011)................................................................15

10  N.H. Rev. Stat. Ann. § 457:1-a, *et seq.* (2011) ................................................15

11  N.Y. Dom. Rel. § 10-a (McKinney 2011) .......................................................15

12  Nev. Rev. Stat. Ann. § 122A.010, *et seq.* (West 2011) ..........................................15

13  Or. Rev. Stat. § 106.305 (West 2011)...........................................................15

14  Vt. Stat. Ann. tit. 15, §8, *et seq.* (West 2011) .................................................15

15  Wash. Rev. Ann. Code § 26.60.010 (West 2011).................................................15

16  H.R. Rep. No. 104-664 (1996)...................................................................2

17  *A Bill to Define and Protect the Institution of Marriage:  Hearing on S. 1740
        Before the S. Comm. on the Judiciary*, 104th Cong. (1996) .........................3

18

19  *Defense of Marriage Act:  Hearing on H.R. 3396 Before the Subcomm. on the
        Constitution of the H. Comm. on the Judiciary*, 104th Cong. (1996) ............3

20  **Other Authorities**

21  Letter from Eric H. Holder, Jr., Att'y Gen., to John A. Boehner, Speaker, U.S.
        House of Representatives (Feb. 23, 2011) ....................................12

22

23  Human Rights Campaign Lauds 2008 Election Results (Nov. 4, 2008) ..................14

vi

*Joe Biden: 'National Consensus' on Gay Marriage Inevitable*,
    LGBTQ Nation (Dec. 25, 2010) ...................................................16

Press Release, *Victory! Administration Drops DOMA Defense*,
    Human Rights Campaign .......................................................12

Reversal of Fortune, Nat'l J., Nov. 11, 2006 ...........................................14

The Gay & Lesbian Victory Fund and Leadership Institute,
    2008 Annual Report ...........................................................14

The Gay & Lesbian Victory Fund and Leadership Institute,
    2010 Annual Report ...........................................................14

U.S. Census 2010 ...................................................................15

*Gay Histories and Cultures:  An Encyclopedia* 452
    (George E. Haggerty ed., 2000) .................................................9

Abby Goodnough*, Rhode Island Lawmakers Approve Civil Unions*,
    N.Y. Times, June 29, 2011 ....................................................13

Abby Phillip, *Obama to Nominate Fourth Openly Gay Judicial Candidate,*
    Politico, July 20, 2011 ......................................................13

Ann Hulbert, *The Gay Science:  What Do We Know About the Effects of Same-Sex Parenting?*,  Slate (Mar. 12, 2004)..........................................24

Dana Milbank, *In A 'Quiet Moment' Gay Judge Makes History*,
    Wash. Post, July 18, 2011 ....................................................13

Elisabeth Bumiller, *Obama Ends 'Don't Ask, Don't Tell' Policy*,
    N.Y. Times, July 22, 2011 ....................................................13

Frank Newport, *For First Time, Majority of Americans Favor Legal Gay Marriage*,
    Gallup.com (May 20, 2011)....................................................15

George A. Chauncey, *Why Marriage?: The History Shaping Today's Debate Over Gay Equality* (2004)...........................................................6

Janie Lorber, *In Small Steps, Federal Agencies Recognize Gay Marriages*,
    Roll Call, Oct. 3, 2011 ......................................................14

vii

Lisa M. Diamond, *New Paradigms for Research on Heterosexual & Sexual-Minority Development*, 32 J. of Clinical Child & Adolescent Psychol. 492 (2003) ......................................................................................9

Lisa M. Diamond & Ritch C. Savin-Williams, *Explaining Diversity in the Development of Same-Sex Sexuality Among Young Women*, 56 J. of Soc. Issues 301 (2000) ......................................................10

Loren Marks, *Same-Sex Parenting and Children's Outcomes: A Closer Examination of the American Psychological Association's Brief on Lesbian and Gay Parenting* (Oct. 3, 2011) ......................................24

Michael Barbaro, *Behind N.Y. Gay Marriage, an Unlikely Mix of Forces*, N.Y. Times, June 25, 2011 ...........................................................13

Michelle Minkoff et al., *Proposition 8: Who Gave in the Gay Marriage Battle?*, L.A. Times, July 13, 2011...........................................................15

MJ Lee, *Obama Backs Bill To End DOMA*, Politico, July 19, 2011 ........................13

Nigel Dickson et al., *Same Sex Attraction in a Birth Cohort: Prevalence and Persistence in Early Adulthood*, 56 Soc. Sci. & Med. 1607 (2003) .............10

Norval D. Glenn, *The Struggle for Same-Sex Marriage*, 41 Soc'y 25 (2004).....................................................................24

Owen Keehnen, *The Case for Gay Marriage: Talking with Why Marriage? Author George Chauncey*, GLBTQ.com (2004)...........................................6

Phil Reese, *O'Malley Backs 2012 Push for Marriage Equality*, Wash. Blade, July 22, 2011 ...........................................................13

Reid J. Epstein, *John Kerry Backs Gay Marriage*, Politico, July 22, 2011...............13

Susan Page, *Gay Candidates Gain Acceptance*, USA Today, July 19, 2011 ................................................................13, 14

viii

1    **SUMMARY OF ARGUMENT**

2        The question presented in this case is whether Congress may define "marriage" for

3    purposes of federal benefits and burdens as that term was commonly understood for more than

4    200 years—from the Nation's founding through at least the close of the twentieth century—or

5    whether Congress was constitutionally obligated to accept a redefinition by some states that

6    would encompass a form of marriage first legalized in the U.S. in 2004.  The Defense of

7    Marriage Act ("DOMA") defines marriage for purposes of federal law as the legal union of one

8    man and one woman.  *See* 1 U.S.C. § 7.

9        Plaintiff's contention that DOMA should be subject to heightened scrutiny fails.  First,

10   circuit precedent establishes that the proper test under which sexual orientation classifications,

11   like DOMA, should be analyzed is the rational basis test.  Second, even if this Court were

12   writing on a clean slate, sexual orientation does not constitute a suspect or quasi-suspect class

13   under the traditional factors used to determine such classes.  Homosexuality is not immutable as

14   that term has been used in constitutional analysis.  Moreover, homosexuals are far from

15   politically powerless.  In fact, their significant political progress in recent months and years

16   belies their numbers.  DOMA also does not discriminate on the basis of sex nor does it implicate

17   a fundamental right.  Therefore, rational basis scrutiny applies to DOMA.

18       DOMA easily passes the rational basis test.  There are a myriad of rational bases

19   supporting DOMA.  For example, the federal government has a valid interest in a uniform

20   federal definition of marriage for federal law purposes, Congress was justified in acting with

21   caution when facing the unknown consequences of a novel redefinition of marriage and

22   Congress rationally could conclude that DOMA would advance responsible procreation and

23   child-bearing.  Accordingly, this Court should deny Plaintiff's motion for summary judgment.

ix

SUPERSEDING OPPOSITION OF THE U.S. HOUSE OF REPRESENTATIVES TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, Case No. 3:10-cv-0257-JSW

**STATEMENT OF ISSUE**

Whether the Defense of Marriage Act, Pub. L. No. 104-199, § 3, 110 Stat. 2419 (1996),

codified at 1 U.S.C. § 7, violates the equal protection component of the Fifth Amendment's Due

Process Clause.

**STATEMENT OF FACTS**

Plaintiff, an employee of the federal judiciary married to a same-sex spouse, receives

health insurance through the Federal Employees Health Benefits Program ("FEHBP") and has

elected a family health insurance plan to provide coverage for herself and her son. *See* Second

Amended Complaint ¶¶ 4, 19 (Apr. 14, 2011), ECF No. 102 ("Sec. Am. Compl.").  When

Plaintiff requested that her employer enroll her spouse in her family plan, Defendants declined

on the basis of DOMA Section 3.  *Id.* ¶¶ 4–5.

Plaintiff claims injury from her inability to include her spouse under the FEHBP.

According to Chief Judge Kozinski, sitting as an administrative hearing officer, "Golinski pays

out of pocket to purchase additional health insurance for her spouse."  *In re Golinski*, 587 F.3d

901, 904 (9th Cir. 2009) (Kozinski, C.J.).  Chief Judge Kozinski ordered that Golinski be

awarded ongoing back pay to offset these out of pocket expenses.  *In re Golinski*, 587 F.3d 956,

960 (9th Cir. 2009) (Kozinski, C.J.) (Plaintiff is entitled "to an award equal in amount to the

benefits she would have received, but has been denied, under the FEHBP"); Order at 2, *In re

Golinski*, No. 09-80173 (9th Cir. Mar. 5, 2010) (Kozinski, C.J.), ECF No. 40 (awarding Plaintiff

$6,272 in back pay for the period September 2008 to December 2009, plus interest, and ordering

that she is entitled to additional back pay for subsequent periods); Sec. Am. Compl. ¶ 55

(alleging that Chief Judge Kozinski "awarded Ms. Golinski ongoing back pay to reimburse her

for the cost of purchasing separate individual insurance to cover [her spouse]").

1          **RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS**

2                                    **General Statement**

3          The rational basis test applies to Plaintiff's equal protection challenge to DOMA Section

4   3.  *See infra* p. 5 n.2 (citing case law from Ninth Circuit and ten other circuits).  Under that test,

5   Section 3 must be upheld "if there is any reasonably conceivable state of facts that could provide

6   a rational basis for the classification."  *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

7   Furthermore, "it is entirely irrelevant for constitutional purposes whether the conceived reason

8   for the challenged distinction actually motivated the legislature."  *Id.* at 315.  Accordingly, the

9   House "has no obligation to produce evidence to sustain the rationality of a statutory

10  classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993).  "[A] legislative choice is not subject to

11  courtroom fact-finding and may be based on rational speculation unsupported by evidence or

12  empirical data." *Beach Commc'ns*, 508 U.S. at 315.  For these overarching reasons, not a single

13  one of the allegedly undisputed facts identified by Plaintiff is material to this Court's disposition

14  of her constitutional challenge to DOMA Section 3.

15                                 **Particularized Responses**

16         A.       As to Plaintiff's section entitled "The Passage of DOMA in 1996," the House

17  does not dispute that DOMA was enacted in 1996, that Plaintiff correctly has quoted the

18  language of Section 3, that H.R. Rep. No. 104-664 (1996) contains the statements quoted by

19  Plaintiff, or that certain Members of Congress made the floor statements quoted by Plaintiff;

20  otherwise, this section of Plaintiff's statement of *undisputed facts* appears to reflect a

21  misunderstanding of the word "undisputed":  How could Plaintiff otherwise deem "undisputed"

22  (or an issue of "fact" for that matter) that "DOMA's passage marked an unabashed expression of

23  congressional animus towards homosexuality and same-sex relationships," that it is an

SUPERSEDING OPPOSITION OF THE U.S. HOUSE OF REPRESENTATIVES TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, Case No. 3:10-cv-0257-JSW

1   "undisputed fact[]" that DOMA was "hastily enacted," "marked a dramatic departure from the

2   federal government's longstanding deference to state law marriage determinations," and had a

3   "blunderbuss impact," or that it is an "undisputed fact[]" that "Congress conducted virtually no

4   fact-finding" but "set out to demonstrate its moral disapproval."  Plaintiff's Memorandum of

5   Points and Authorities in Support of Plaintiff's Motion for Summary Judgment at 2 (July 1,

6   2011), ECF No. 142 ("Pl.'s Mem. Summ. J.") (quotation marks omitted).  Not only are

7   Plaintiff's assertions disputed (and often not issues of fact), they are flatly wrong.  *See, e.g.*, *infra*

8   pp. 21-25 (explaining rational bases that in fact motivated passage of DOMA), p. 21-22

9   (explaining long-standing federal government role in defining marriage for federal law

10  purposes); *Defense of Marriage Act:  Hearing on H.R. 3396 Before the Subcomm. on the*

11  *Constitution of the H. Comm. on the Judiciary*, 104th Cong. (1996) (congressional hearing,

12  including witness testimony, held during consideration of DOMA—demonstrating level of

13  congressional fact-finding more than appropriate for passage of bill that merely confirmed status

14  quo; i.e., traditional definition of marriage); *A Bill to Define and Protect the Institution of*

15  *Marriage:  Hearing on S. 1740 Before the S. Comm. on the Judiciary*, 104th Cong. (1996)

16  (same); *see also* House Memorandum in Support of Its Motion to Dismiss (June 3, 2011), ECF

17  119-1 ("House Mem. Mot. Dismiss") (making plain—in brief filed twenty-eight (28) days *before*

18  Plaintiff's filing of her statement of "undisputed facts"—that many of Plaintiff's allegedly

19  "undisputed facts" are neither undisputed nor issues of fact).

20          B.      The House does not dispute the content of Plaintiff's section entitled "Ms.

21  Golinski's Attempt to Enroll Her Spouse in Her Health Plan" except insofar as Plaintiff makes

22  the legal assertions of a "discriminatory denial" of certain benefits, that the United States

23  "regards her as unequal," or that she "is receiving significantly less compensation, in terms of

her employment benefits, than her similarly situated colleagues who have different–sex spouses."  Pl.'s Mem. Summ. J. at 3-4.

## ARGUMENT

I.   **THE CLASSIFICATION IN DOMA IS NOT SUBJECT TO ANY HEIGHTENED SCRUTINY.**

   A.   **Binding Circuit Precedent Forecloses Application of Heightened Scrutiny on the Basis of Sexual Orientation.**

   Plaintiff argues that the "level of scrutiny for sexual orientation classifications remains unsettled under Ninth Circuit and Supreme Court jurisprudence."  Pl.'s Mem. Summ. J. at 5. This statement is simply and demonstrably wrong.  As the House argued in its reply in support of its motion to dismiss, the Ninth Circuit unequivocally answered this question in *High Tech Gays v. Defense Industry Security Clearance Office*, 895 F.2d 563 (1990).  *See* House Reply Memorandum in Support of Its Motion to Dismiss at 5-7 (July 15, 2011), ECF No. 150 ("House Reply Mem. Mot. Dismiss").  There, the Ninth Circuit held that "homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny under the equal protection component of the Due Process Clause of the Fifth Amendment."  *High Tech Gays*, 895 F.2d at 574.  Until and unless this precedent is overturned by the en banc Ninth Circuit or the Supreme Court, that ends the inquiry: rational basis scrutiny applies here.[1]  Indeed, a recent

---

   [1]  Recently, a Ninth Circuit panel, in considering an appeal of the grant of a preliminary injunction, applied rational basis review, not heightened scrutiny, to an Arizona statute that ended certain health care benefits for both same-sex and opposite-sex domestic partners of Arizona state employees (after a brief period in which such persons had been eligible for benefits).  *See Diaz v. Brewer*, No. 10-16797, 2011 WL 3890755 (9th Cir. Sept. 6, 2011).  The panel viewed the statute as creating "a classification of [state] employees on the basis of sexual orientation."  *Id*. at *1.  Notably, the State of Arizona did "not seriously" argue on appeal two possible justifications for the statute—cost savings and promotion of marriage.  *Id*. at *4, *5.  In contrast, the House has seriously advanced those and other rational bases for DOMA.  *See also Log Cabin Republicans v. United States*, Nos. 10–56634, 10–56813, 2011 WL 4494225, at *9

(continued ....)

4

1   DOMA case in the Central of District of California recognized precisely this binding authority

2   and demonstrates the proper course for a district court in this Circuit. *See* Order, *Lui v. Holder*,

3   No. 2:11-cv-01267-SVW (JCGx) (C.D. Cal. Sept. 28, 2011), ECF No. 38 (dismissing a

4   challenge to Section 3 as foreclosed by Ninth Circuit precedent), attached as Exhibit A; *see also*

5   *In re Kandu*, 315 B.R. 123, 143 (Bankr. W.D. Wash. 2004) (*Lawrence* did "not eviscerate" Ninth

6   Circuit's holding in *High Tech Gays* that homosexuals do not constitute a suspect or quasi-

7   suspect class); *Smelt v. Cnty. of Orange*, 374 F.Supp.2d 861, 879 (C.D. Cal. 2005) (DOMA

8   "does not make a suspect or quasi-suspect classification"), *vacated in part for lack of standing on*

9   *DOMA Section 3*, 447 F.3d 673, 686 (9th Cir.), *cert. denied*, 549 U.S. 959 (2006).[2]

10   **B.      Based on the Traditional Criteria Used to Determine Suspect or Quasi-Suspect Classes, Homosexuals Clearly Are Not a Suspect or Quasi-Suspect Class.**

11

12   The traditional criteria for determining whether a class is suspect or quasi-suspect are:

13   (1) whether the class has suffered a history of discrimination; (2) whether the classification at

14   _____

15   (9th Cir. Sept. 29, 2011) (O'Scannlain, J., concurring) (rational basis test would apply in substantive due process challenge to "Don't Ask, Don't Tell" statute, if case were not moot).

16   [2]  Sexual orientation never has been viewed as a suspect or quasi-suspect classification by the federal courts.  First, "the Supreme Court has never ruled that sexual orientation is a suspect classification for equal protection purposes."  *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 866 (8th Cir. 2006).  On the contrary, it has applied the rational basis test to equal protection challenges of classifications based on sexual orientation.  *See Lawrence v. Texas*, 539 U.S. 558 (2003); *Romer v. Evans*, 517 U.S. 620 (1996).  Second, every federal Court of Appeals that has addressed the question—and nearly every Circuit has—has concluded that homosexuals are not a suspect or quasi-suspect class.  No fewer than eleven federal circuits, including the Ninth, have held that homosexuals are not a suspect class.  *See, e.g.*, *Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008) ("Absent additional guidance from the Supreme Court, we join our sister circuits in declining to read *Romer* as recognizing homosexuals as a suspect class for equal protection purposes."), *cert. denied sub. nom.*, *Pietrangelo v. Gates*, 129 S. Ct. 2763 (2009); *Citizens for Equal Prot.*, 455 F.3d at 866-67; *Lofton v. Sec. of Dep't of Children & Fam. Servs.*, 358 F.3d 804, 818 & n.16 (11th Cir. 2004) (citing cases from the Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, District of Columbia, and Federal Circuits) ("[A]ll of our sister circuits that have considered the question have declined to treat homosexuals as a suspect class.").

1   issue relates to one's "ability to perform or contribute to society," *Frontiero v. Richardson*, 411

2   U.S. 677, 686 (1973); (3) whether the class demonstrates immutable characteristics; and (4)

3   whether the class at issue is politically powerless.  *See Lyng v. Castillo*, 477 U.S. 635, 638

4   (1986) (holding that "[c]lose relatives are not a 'suspect' or 'quasi-suspect' class" because, "[a]s

5   a historical matter, they have not been subjected to discrimination; they do not exhibit obvious,

6   immutable, or distinguishing characteristics that define them as a discrete group; and they are not

7   a minority or *politically powerless*") (emphasis added).[3]

8          **1.       History of Discrimination.**  Plaintiff first argues that DOMA is subject to strict

9   scrutiny because lesbians and gay men have been subject to a history of discrimination.  While

10  the House does not dispute that homosexuals have been subject to discrimination, it is important

11  to note that even Plaintiff's own expert has admitted that "[a]lthough . . . antigay discrimination

12  is popularly thought to have ancient roots, in fact it is a unique and relatively short-lived product

13  of the twentieth century."  George A. Chauncey, *Why Marriage?  The History Shaping Today's*

14  *Debate Over Gay Equality* 14 (2004).  According to Dr. Chauncey, "most of [the discrimination]

15  was put in place between the 1920s and 1950s, and most [was] dismantled between the 1960s

16  and the 1990s."  Owen Keehnen, *The Case for Gay Marriage:  Talking with* Why Marriage?

17  *Author George Chauncey*, GLBTQ.com (2004),

18  http://www.glbtq.com/sfeatures/interviewgchauncey.html.

19          Plaintiff's expert agrees with the Supreme Court's observation in *Lawrence* that the

20  relatively short history of anti-gay discrimination is a consequence of the fact that

21

22          [3]  The questions of whether a classification involves an immutable characteristic and
    whether the class is politically powerless are essential to the heightened scrutiny analysis.  *See*
23  *Lyng*, 477 U.S. at 638; *High Tech Gays*, 895 F.2d at 573.

1   homosexuality—as a distinct category or class—was not even recognized in the United States

2   until the late nineteenth century.  539 U.S. at 568-69 (relying on scholarly position that "the

3   concept of the homosexual as a distinct category of person did not emerge until the late 19th

4   century"); George A. Chauncey Decl. ¶¶ 10, 20-21, June 24, 2011, ECF No. 134, ("Chauncey

5   Decl."); George A. Chauncey, Ph.D., Dep. 48:24-51:24, July 12, 2011, ("Chauncey Dep."),

6   attached as Exhibit A to Declaration of Conor B. Dugan ("Dugan Decl."), filed herewith.

7        **2.**    **Ability to Participate in or Contribute to Society.**  Plaintiff next argues that

8   DOMA does not "rest[] on 'meaningful considerations,'" but rather "target[s] a characteristic

9   that 'bears no relation to ability to perform or contribute to society.'"  Pl.'s Mem. Summ. J. at 6

10  (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985)).  That is not the

11  case.  The Congress that enacted DOMA, and President Clinton who signed it, obviously thought

12  that defining marriage in the way it has traditionally been defined was relevant and rationally

13  related to several legitimate legislative goals.  *See also* House Mem. Mot. Dismiss at 22-29.

14       **3.**    **Immutability.**  Plaintiff also states that the House cannot "argue there is a triable

15  issue of fact regarding the immutable nature of sexual orientation, given Ninth Circuit authority

16  already addressing this point."  Pl.'s Mem. Summ. J. at 7.  But the Ninth Circuit has said

17  conflicting things on immutability.  In assessing whether homosexuality constitutes a suspect

18  class the Ninth Circuit has held specifically that it is *not* an immutable characteristic:

19  "Homosexuality is not an immutable characteristic; it is behavioral and hence is fundamentally

20  different from traits such as race, gender, or alienage, which define already existing suspect and

21

22

23

7

1   quasi-suspect classes." *High Tech Gays*, 895 F.2d at 573.[4]  It is true that in *Hernandez-Montiel*

2   *v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000), *overruled in part on other grounds*, *Thomas v.*

3   *Gonzales*, 409 F.3d 1177 (9th Cir. 2005), the Ninth Circuit described sexual orientation as

4   immutable.  But the court was not addressing the question whether heightened scrutiny applied.

5   And, even if *Hernandez-Montiel* had addressed the relevant question, one panel of the Ninth

6   Circuit cannot overrule another one, and absent en banc review, the earlier precedent controls.

7   *See Newdow v. Lefevre*, 598 F.3d 638, 644 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 1612 (U.S.

8   2011) (quoting *Robbins v. Carey*, 481 F.3d 1143, 1149 n.3 (9th Cir. 2007)) ("As a general rule,

9   we, as a three-judge panel, are without authority to 'overrule a circuit precedent; that power is

10  reserved to the circuit court sitting en banc.'").

11          Plaintiff further contends that "[t]his understanding conforms with the settled consensus

12  of the major professional psychological and mental health organizations."  Pl.'s Mem. Summ. J.

13  at 7.  Whether a classification is "immutable" for purposes of equal protection jurisprudence is of

14  course a legal conclusion—not a scientific one—and Plaintiff's selective reading of scientific

15  evidence warrants no deference from this Court.

16          Plaintiff's claims also run headlong into the differing definitions of the terms "sexual

17  orientation," "homosexual," "gay," and "lesbian" supplied by her own experts.  *See Letitia Anne*

18  Peplau, Ph.D., Dep. 11:19-13:3, June 17, 2011, ("Peplau Dep."), attached as Exhibit B to Dugan

19  Decl. (declining to use term homosexuality and defining terms "sexual orientation," "gay," and

20

21          [4]  *See also Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989)
    ("Homosexuality, as a definitive trait, differs fundamentally from those defining any of the
22  recognized suspect or quasi-suspect classes.  Members of recognized suspect or quasi-suspect
    classes, *e.g.*, blacks or women, exhibit immutable characteristics, whereas homosexuality is
23  primarily behavioral in nature.").

1    "lesbian"); Gary M. Segura, Ph.D., Dep. 14:17-16:15, July 8, 2011 ("Segura Dep."), attached as

2    Ex. C to Dugan Decl. (defining terms "gay," "lesbian," and "homosexual"); Chauncey Dep.

3    12:15-15:15 (acknowledging that some people distinguish "gay" and "homosexual," but stating

4    that he uses them synonymously; defining terms "gay," "lesbian," "homosexuality," and

5    "homosociality"); *see also* Lisa M. Diamond, *New Paradigms for Research on Heterosexual &*

6    *Sexual-Minority Development*, 32 J. of Clinical Child & Adolescent Psychol. 490, 492 (2003)

7    ("There is currently no scientific or popular consensus on the exact constellation of experiences

8    that definitively 'qualify' an individual as lesbian, gay, or bisexual."); Gay Histories and

9    Cultures:  An Encyclopedia 452 (George E. Haggerty ed., 2000) ("[T]he single word

10   homosexuality has come to condense a variety of mutually conflicting ideas about same-sex

11   sexual attraction and an assortment of conceptual models for understanding it . . . .  [I]t is less

12   useful to insist on any one definition of homosexuality than it is to describe and to account for

13   the conceptual incoherence that now has become inseparable from both the term and the

14   category.").  These differing definitions show that these terms are amorphous and do not

15   adequately describe a particular class.

16        Plaintiff's argument also conflicts with her own expert's admission that homosexuality

17   cannot be determined at birth, *see* Peplau Dep. 25:21-23 ("[L]ooking at a newborn, I would not

18   be able to tell you what that child's sexual orientation is going to be."), and that a significant

19   percentage of gays and lesbians believe they exercised some or a great deal of choice in

20   determining their sexuality, *id*. 36:24-37:24.  Plaintiff's own evidence indicates that more than

21   12% of self-identified gay men and nearly one out of three lesbians reported that they

22   experienced some or much choice about their sexual orientation.  Peplau Dep. Ex. 4 at 186.  This

23   contrasts with actual suspect classes, which involve "immutable characteristic[s]" determinable

9

1   at birth and "determined solely by the accident of birth."  *Frontiero*, 411 U.S. at 686 (plurality).

2        Moreover, according to multiple studies, a not insignificant number of persons

3   experience fluidity in their sexual attraction and even label their sexuality differently at different

4   times.  *See, e.g.*, Lisa M. Diamond & Ritch C. Savin-Williams, *Explaining Diversity in the*

5   *Development of Same-Sex Sexuality Among Young Women*, 56 J. of Soc. Issues 297, 301 (2000)

6   ("50% of the respondents had changed their identity label more than once since first

7   relinquishing their heterosexual identity"); *see also id*. at 300 ("[E]xclusive same-sex attractions

8   are the exception rather than the norm among sexual minority women."); *id*. at 300-01 ("The

9   prevalence of nonexclusivity in sexual-minority women's attractions suggests that other-sex

10  attractions and relationships remain an ever-present possibility for most sexual-minority women,

11  a fact that creates multiple opportunities for discontinuity and inconsistency in the female sexual-

12  minority life course."); *id*. at 302 ("One of the unavoidable implications of nonexclusivity and

13  sexual fluidity is that no heterosexual woman can be unequivocally assured that she will never

14  desire same-sex contact, just as no lesbian woman can be unequivocally assured that she will

15  never desire other-sex contact.");[5] Nigel Dickson et al., *Same Sex Attraction in a Birth Cohort:*

16  *Prevalence and Persistence in Early Adulthood*, 56 Soc. Sci. & Med. 1607, 1611-12 (2003).

17  Even Plaintiff's own expert discusses and recognizes the concept of sexual plasticity and

18

19      [5]  Dr. Diamond does not like the fact that the House has used her findings to support a
    legal conclusion with which she disagrees.  *See* Expert Aff. of Lisa M. Diamond, Ph.D.,
20  *Pedersen v. OPM*, No. 3:10-cv-01750 (D. Conn. Sept. 14, 2011), ECF No. 99; Supplemental
    Decl. of Lisa M. Diamond, Ph.D., *Windsor v. United States*, No. 1:10-cv-08435 (S.D.N.Y. Sept.
21  15, 2011), ECF No. 86.  But the House is merely accurately quoting Dr. Diamond's writings.
    Dr. Diamond, like every other academic, does not have a monopoly over the legal import of her
22  academic observations.  As to whether Dr. Diamond's research ultimately supports the
    immutability prong of the strict scrutiny analysis, that is the province of lawyers and the courts.
23  It demands a legal answer, not a scientific answer.

                                                                                              10

1    fluidity—that "individuals have reported changes in their sexual orientation in midlife."  Letitia

2    Ann Peplau, Ph.D., Decl. ¶ 23, June 24, 2011, ECF No. 137 ("Peplau Decl.").

3        **4.    Political Powerlessness.**  More than twenty years ago, the Ninth Circuit in

4    analyzing whether homosexuals were entitled to heightened scrutiny held that "homosexuals are

5    not without political power; they have the ability to and do 'attract the attention of lawmakers.'"

6    *High Tech Gays*, 895 F.2d at 574 (quoting *City of Cleburne*, 473 U.S. at 445).[6]  That political

7    clout has only increased, and dramatically, in the ensuing two decades.  Despite this binding

8    precedent, Plaintiff cites to the dissent from the denial of rehearing en banc in that case to argue

9    that the House and the Ninth Circuit "approached the inquiry" into political powerlessness

10   incorrectly by considering the question of absolute political powerlessness rather than relative

11   political powerlessness.  Pl.'s Mem. Summ. J. at 8.  This misconstrues the House's argument

12   which, to put it clearly and succinctly, is that homosexuals have a great deal of political power –

13   especially relative to other political constituencies.

14       Plaintiff's claim to the contrary is particularly difficult to understand in light of recent

15   political, legal, and cultural events that have occurred since *High Tech Gays* was decided twenty-

16   one years ago.  Plaintiff cannot maintain that she is a member of a class that faces

17   "discrimination [that] is unlikely to be soon rectified by legislative means."  *City of Cleburne*,

18

19   _____

20       [6] Moreover, case law outside the Ninth Circuit supports the conclusion that homosexuals
     are not politically powerless.  The Seventh Circuit more than twenty years ago stated that "[i]n
     these times homosexuals are proving that they are not without growing political power."  *Ben-
     Shalom v. Marsh*, 881 F.2d 454, 466 (7th Cir. 1989).  The court held that "[i]t cannot be said
21   'they have no ability to attract the attention of the lawmakers'" and that the "political approach is
     open to them."  *Id.* (quoting *City of Cleburne*, 473 U.S. at 445); *see also Steffan v. Cheney*, 780
22   F. Supp. 1, 7-8 (D.D.C. 1991) ("[I]t is still very clear that homosexuals as a class enjoy a good
     deal of political power in our society, not only with respect to themselves, but also with respect
23   to issues of the day that affect them."), *rev'd on other grounds sub nom. Steffan v. Aspin*, 8 F.3d
     57 (D.C. Cir. 1993).

1    473 U.S. at 440.  Given that the Ninth Circuit has just finished wrestling with the consequences

2    of the repeal of "Don't Ask Don't Tell," Plaintiff should not be heard to contend that such issues

3    cannot be rectified through the legislative process.  *Log Cabin Republicans v. United States*, Nos.

4    10–56634, 10–56813, 2011 WL 4494225 (9th Cir. Sept. 29, 2011).  Moreover, Plaintiff appears

5    oblivious to the irony of maintaining that homosexuals have limited political power in a case in

6    which her position is supported by the Department of Justice at the insistence of the President.

7    In light of the Department's longstanding duty to defend the constitutionality of federal statutes,

8    its decision to decline to defend the constitutionality of DOMA—notwithstanding its

9    acknowledgment that reasonable arguments can be advanced in defense of Section 3, that it

10   survives rational basis review, and that eleven Circuit Courts of Appeal, including the Ninth,

11   disagree with its conclusion that heightened scrutiny applies—and instead adopt the very

12   position advocated by Plaintiff, is particularly telling.  *See* Letter from Eric H. Holder, Jr., Att'y

13   Gen., to John A. Boehner, Speaker, U.S. House of Representatives, at 3 (Feb. 23, 2011), ECF

14   No. 93-1.  Indeed, President Obama's decision came after he received a letter from the Human

15   Rights Campaign criticizing his Administration's defense of DOMA.  *See* Segura Dep. Ex. 5.

16   And the Human Rights Campaign rightly believed that it had helped persuade the President to

17   change his mind.  *See* Press Release, *Victory! Administration Drops DOMA Defense*, Human

18   Rights Campaign,

19   https://secure3.convio.net/hrc/site/Advocacy?cmd=display&page=UserAction&id=1045 ("HRC

20   supporters have written tens of thousands of letters to President Obama" and it is "time to thank

21   the president for what he's done.").

22          A spate of recent news stories only confirms the conclusion that homosexuals are far

23   from politically powerless.  A recent poll showed that more than two-thirds of Americans would

12

vote for a "well-qualified gay candidate for president if he or she were nominated by their

party."[7]  In the past several months alone, the first openly gay male federal judge was confirmed

by an overwhelming majority of the Senate;[8] President Obama nominated his fourth openly-gay

candidate for a U.S. District Court judgeship;[9] Rhode Island passed a bill instituting civil unions

for same-sex couples;[10] New York passed a law legalizing gay marriage over the opposition of

the New York Catholic Conference and other groups;[11] President Obama took the final step in

repealing the "Don't Ask, Don't Tell" policy;[12] President Obama announced his support of a

Senate bill to repeal DOMA;[13] and, several weeks ago, it was reported that the "Obama

administration has all but officially recognized gay partnerships as the legal equivalent of

marriage, gradually redefining the concept through a series of changes to regulations governing

---

[7]  Susan Page, *Gay Candidates Gain Acceptance*, USA Today, July 19, 2011, http://www.usatoday.com/news/politics/2011-07-19-gay-candidates-politics_n.htm.

[8]  Dana Milbank, *In A 'Quiet Moment' Gay Judge Makes History*, Wash. Post, July 18, 2011, http://www.washingtonpost.com/opinions/in-a-quiet-moment-gay-judge-makes-history/2011/07/18/gIQAo7PhMI_story.html (stating that final vote was 80-13 and that the "remarkable thing about what happened" vis-à-vis the nomination "was that it was utterly unremarkable").

[9]  Abby Phillip, *Obama to Nominate Fourth Openly Gay Judicial Candidate, Politico*, July 20, 2011, http://www.politico.com/news/stories/0711/59489.html.

[10]  Abby Goodnough, *Rhode Island Lawmakers Approve Civil Unions*, N.Y. Times, June 29, 2011, http://www.nytimes.com/2011/06/30/us/30unions.html.

[11]  Michael Barbaro, *Behind N.Y. Gay Marriage, an Unlikely Mix of Forces*, N.Y. Times, June 25, 2011, http://www.nytimes.com/2011/06/26/nyregion/the-road-to-gay-marriage-in-new-york.html?pagewanted=all.

[12]  Elisabeth Bumiller, *Obama Ends 'Don't Ask, Don't Tell' Policy*, N.Y. Times, July 22, 2011, http://www.nytimes.com/2011/07/23/us/23military.html; *see also* Reid J. Epstein, *Don't Miss It: John Kerry Backs Gay Marriage*, Politico, July 22, 2011, http://www.politico.com/news/stories/0711/59643.html; Phil Reese, *O'Malley Backs 2012 Push for Marriage Equality*, Wash. Blade, July 22, 2011, http://www.washingtonblade.com/2011/07/22/omalley-backs-2012-push-for-marriage-equality/.

[13]  MJ Lee, *Obama Backs Bill To End DOMA*, Politico, July 19, 2011, http://www.politico.com/politico44/perm/0711/all_due_respect_52655160-80d9-4749-a26a-3525888f615a.html.

1   benefits for federal employees."[14]  Accordingly, gays and lesbians cannot be labeled "politically

2   powerless" without draining that phrase of all meaning.

3       The Gay and Lesbian Victory Fund, a group devoted to electing gays and lesbians to

4   office, stated in its 2008 annual report that "[i]t's hard to dispute the statement that 2008 was a

5   watershed year in American politics."[15]  The report details the evidence that supports that

6   conclusion:  The Victory Fund endorsed "80 successful candidates" and "more than 70% of

7   Victory-endorsed candidates won their elections in 2008."[16]  In the 2010 election, more than

8   two-thirds of the Victory Fund-endorsed candidates won election, accounting for 107 electoral

9   positions.[17]  The Victory Fund reports that only four states "have no openly gay elected officials

10  at any level."[18]  The Human Rights Campaign noted that it had been "ranked the second most

11  successful" political organization in the entire country by National Journal.[19]

12      Plaintiff and her experts also attempt to use marriage referenda as evidence of political

13  powerlessness.  Pl.'s Mem. Summ. J. at 9.  This approach would transform the inquiry from a

14  search for "political powerlessness" into a search for a "lack of political omnipotence."  Even—

15  perhaps especially—in the debate over marriage, gay-rights groups have proven to be a major

16

---

17      [14] Janie Lorber, *In Small Steps, Federal Agencies Recognize Gay Marriages*, Roll Call,
    Oct. 3, 2011, http://www.rollcall.com/issues/57_35/In-Small-Steps-Federal-Agencies-
18  Recognize-Gay-Marriages-209092-1.html?pos=hbtxt.
        [15] The Gay & Lesbian Victory Fund and Leadership Institute, 2008 Annual Report at 2,
19  http://www.victoryfund.org/files/victory_annual_08.pdf.
        [16] *Id.*
20      [17] The Gay & Lesbian Victory Fund and Leadership Institute, 2010 Annual Report at 5-
    6, http://www.victoryfund.org/files/victory_annual_10.pdf.
21      [18] Page, *supra* note 7.
22      [19] Human Rights Campaign Lauds 2008 Election Results (Nov. 4, 2008),
    http://www.edgechicago.com/index.php?ch=parties&sc=&sc3=&id=82901 (citing Reversal of
23  Fortune, Nat'l J., Nov. 11, 2006).

14

political force well-equipped to wage and, very often, to win major policy battles—and who have

gained more political ground in less time than just about any other interest group in American

political history.  According to Gallup polling, between 1996 and 2011, the portion of the United

States population that believed that same-sex marriage should be recognized increased from 27%

to 53%.[20]  In the campaign over Proposition 8, California's traditional-marriage constitutional

amendment, pro-homosexual forces outspent the proponents of traditional marriage.[21]  In the

space of only half a decade, this popular and financial support has translated into legislation

recognizing same-sex marriage in Vermont, New York, New Hampshire, Connecticut, and the

District of Columbia,[22] and offering legal rights for same-sex couples substantially equal to those

of marriage in Delaware, Hawaii, Illinois, Rhode Island, Colorado, Oregon, California,

Washington, and Nevada.[23]  When jurisdictions where such rights have been imposed judicially

are added, a full 37% of the United States population now lives in states that substantively treat

same-sex relationships identically to traditional marriages.[24]  As a result, no less a political

---

[20]  Frank Newport, *For First Time, Majority of Americans Favor Legal Gay Marriage*, Gallup.com , May 20, 2011, http://www.gallup.com/poll/147662/First-Time-Majority-Americans-Favor-Legal-Gay-Marriage.aspx.

[21]  Michelle Minkoff et al., *Proposition 8:  Who Gave in the Gay Marriage Battle?*, L.A. Times, July 13, 2011, http://projects.latimes.com/prop8/.

[22]  Vt. Stat. Ann. tit. 15, §8, *et seq.* (West 2011); N.Y. Dom. Rel. § 10-a (McKinney 2011); N.H. Rev. Stat. Ann. § 457:1-a, *et seq.* (2011); Conn. Gen. Stat. Ann. § 46b-20 et seq., § 46b–25 (2011) ("The registrar shall issue a license to *any* two persons eligible to marry under this chapter.") (emphasis added); D.C. Code § 46-401, *et seq.* (2011).

[23]  Del. Code Ann. tit. 13 § 212 (West 2011); Haw. Rev. Stat. § 572C-1 (2011); 750 Ill. Comp. Stat. Ann. 75/20 (West 2011); 2011 R.I.H.B. 6103 (July 2, 2011); Colo. Rev. Stat. Ann. § 15-22-105 (West 2011); Or. Rev. Stat. Ann. § 106.305 (West 2011); Cal. Fam. Code § 297.5 (West 2011); Wash. Rev. Ann. Code § 26.60.010 (West 2011); Nev. Rev. Stat. Ann. § 122A.010, *et seq.* (West 2011).

[24]  Calculated from census data available at U.S. Census 2010, http://2010.census.gov/2010census/data/.

1   personage than the Vice President, Joseph Biden, believes that, far from gays being locked out of

2   marriage as a result of political powerlessness, "a national consensus in support of gay marriage"

3   is "an inevitability."[25]

4        As Plaintiff notes, women already had obtained legal protections through the political

5   process when they were recognized as a protected class.  Pl.'s Mem. Summ. J. at 8.  But, by

6   contrast, the mentally handicapped and the poor have been held not to be politically powerless.

7   *City of Cleburne*, 473 U.S. at 445; *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973).

8   And the very significant gains made by homosexual-rights groups both in legislative terms and in

9   popular opinion—and the phenomenal speed at which these victories have come—demonstrate

10  that they have ample ability to attract the favorable attention of lawmakers.  In addition,

11  Plaintiff's attempts to equate the situation of homosexuals in this regard with that of women

12  ignores the fact that homosexuals make up a much smaller portion of the population than do

13  women.  *See* Peplau Dep. 19:2–19:4 (stating that "between 1 and 2 percent of [American]

14  women identified as lesbian, and somewhere between 2 and 3 percent of [American] men

15  identified as gay").  The ability to make real political gains despite relatively small numbers

16  bespeaks a proportionate political power significantly greater than that of protected classes.

17        Where a group is not lacking in political power, it cannot claim the "extraordinary

18  protection from the majoritarian political process" provided by heightened scrutiny.  *Rodriguez*,

19  411 U.S. at 28.  Political powerlessness and immutability are "traditional indicia of

20  suspectedness."  *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974); *see also Lyng*, 477 U.S. at

21

22        [25]  *Joe Biden: 'National Consensus' on Gay Marriage Inevitable*, LGBTQ Nation, Dec.
    25, 2010, http://www.lgbtqnation.com/2010/12/joe-biden-national-consensus-on-gay-marriage-
23  inevitable-video/.

1    638 (holding that "[c]lose relatives are not a 'suspect' or 'quasi-suspect' class" because, "[a]s a

2    historical matter, they have not been subjected to discrimination; they do not exhibit obvious,

3    immutable, or distinguishing characteristics that define them as a discrete group; *and* they are not

4    a minority or *politically powerless*") (emphasis added).  Homosexuals are not "relegated to such

5    a position of political powerlessness as to command extraordinary protection from the

6    majoritarian process."  *Disabled Am. Veterans v. U.S. Dep't of Veterans Aff.*, 962 F.2d 136, 141

7    (2d. Cir. 1992).  Accordingly, DOMA is not subject to strict or intermediate scrutiny. [26]

8        **C.    DOMA Does Not Discriminate on the Basis of Sex.**

9        Plaintiff makes a half-hearted effort to argue that DOMA is subject to heightened

10   scrutiny because it discriminates on the basis of sex.  Pl.'s Mem. Summ. J. at 10.  DOMA does

11   not discriminate based on sex.  No court ever has concluded to the contrary, and the House is

12   unaware of *any* traditional-marriage provision, state or federal, that ever has been held to classify

13   based on sex within the meaning of the U.S. Constitution.  Instead, every court to have

14   considered the question as a matter of federal law has concluded that DOMA classifies, if at all,

15   on the basis of sexual orientation, not of sex.  *Smelt*, 374 F. Supp. 2d at 877; *Wilson v. Ake*, 354

16   F. Supp. 2d 1298, 1307-08 (M.D. Fla. 2005); *In re Kandu*, 315 B.R. at 143; *see also Conaway v.*

17

18       [26]  As we made clear earlier, DOMA clearly passes the rational basis test.  *See* House
     Mem. in Supp. of Mot. to Dismiss at 22-29.  As explained therein, under that test the government
     "has no obligation to produce evidence to sustain the rationality of a statutory classification,"
19   *Heller*, 509 U.S. at 320, and "[a] statute is presumed constitutional, and the burden is on the one
     attacking the legislative arrangement to negative every conceivable basis that might support it,
     whether or not the basis has a foundation in the record," *id.* at 320-21 (quotation marks, brackets,
20   and citations omitted).  Under rational basis review, a court must accept a legislature's
     generalizations even when there is an imperfect fit between means and ends.  *Leib v.*
21   *Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009) (citing *Heller*,
     509 U.S. at 320).  Moreover, while the House does not concede in the least that any form of
22   heightened scrutiny is applicable to DOMA, even under a more searching standard DOMA's
     classification is constitutional.

23

                                                                                              17

1   *Deane*, 932 A.2d 571, 598 (Md. 2007) (state DOMA did not discriminate based on sex);

2   *Andersen v. King Cnty.*, 138 P.3d 963, 969 (Wash. 2006) (same).

3          This common-sense conclusion is consistent with *Loving v. Virginia*, 388 U.S. 1 (1967),

4   which struck down a Virginia statute prohibiting interracial marriage.  The purpose of the

5   Virginia anti-miscegenation statute was to disadvantage racial minorities and "maintain White

6   Supremacy."  *Id.* at 11.  By contrast, there is not the slightest indication in either history or

7   reason that DOMA was intended to effect or perpetuate any inequality between the sexes.  Nor

8   does it do so: the numbers of men and women in the population are very nearly equal, and in

9   stark contrast to anti-miscegenation statutes, the very nature of traditional-marriage statutes

10  precludes any possibility that they could be intended to prevent members of a supposedly inferior

11  sex from marrying outside their sex.  Instead, and quite obviously, DOMA was intended to

12  distinguish between same-sex and opposite-sex *relationships*.  It therefore does not discriminate

13  on the basis of sex.

14         **D.     DOMA Does Not Implicate a Fundamental Right.**

15         Grasping at straws, Plaintiff argues finally that DOMA is subject to heightened scrutiny

16  because it deprives her of substantive due process by "burdening her constitutional liberty to

17  build a family life with her same-sex partner and by unconstitutionally conditioning equal

18  treatment of that liberty interest in a government-favored heterosexual manner."  Pl.'s Mem.

19  Summ. J. at 10.  Plaintiff cites no case law, but simply references the argument she made in her

20  reply to the House's motion to dismiss.  She argues that DOMA burdens her family relationship

21  and that "[n]o adequate government interest can sustain" such a burden.  *Id.*  In her opposition to

22  the House's motion to dismiss, Plaintiff cited several cases, *see* Plaintiff's. . . Opposition to . . .

23  Motions to Dismiss at 17-18 (June 24, 2011), ECF No. 133 ("Pl.'s Opp'n MTD"), which do not

1    support the conclusion that DOMA is subject to heightened scrutiny.

2        First, she cites *Roberts v. United States Jaycees*, 468 U.S. 609, 619 (1984).  That case

3    involved a claim on behalf of the then all-male Jaycees who precluded women from their ranks

4    and wanted to continue that exclusion.  The Court held that requiring the Jaycees to open their

5    membership to women did not abridge their members' freedom of intimate association or

6    expressive association.  It is hard to see the case's relevance to this case.  Next, she cites *Moore*

7    *v. City of East Cleveland*, 431 U.S. 494, 506 (1977).  The government action at issue there

8    limited dwelling places to single families "[b]ut the ordinance contain[ed] an unusual and

9    complicated definitional section that recognize[d] as a 'family' only a few categories of related

10   individuals."  *Id*. at 495-96.  The petitioner had faced criminal sanction because she lived with

11   her son and grandsons (who were first cousins).  The Supreme Court recognized that "the family

12   is not beyond regulation," *id*. at 499, but concluded that it needed to examine the questioned

13   regulation with special care because it "intrude[d] on choices concerning family living

14   arrangements."  *Id*.

15       DOMA, however, neither intrudes on any family living arrangements, nor prevents any

16   family living arrangements, and thus is nothing like the ordinance at issue in *East Cleveland*.

17   There is nothing intrusive in the least about DOMA.  It is simply a definitional statute that

18   defines, for federal law purposes, "marriage" and "spouse."  Furthermore, *East Cleveland* did not

19   articulate a nebulous right to "build a family life."  Rather, it cited a well-established right of

20   "freedom of personal choice in matters of marriage and family life."  *Id*. (quoting *Cleveland Bd.*

21   *of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974)).  As noted, DOMA does nothing to prohibit

22   Plaintiff from building a family life with her partner.

23       Plaintiff also states that *Lawrence* "reaffirmed 'that our laws and tradition afford

19

1   constitutional protection to personal decisions relating to marriage, procreation, contraception,

2   family relationships, child rearing, and education.'"  Pl.'s Opp'n MTD at 17 (citing 539 U.S. at

3   573-74); *see id.* (also citing *Gill v. OPM*, 699 F. Supp. 2d 374, 387 (D. Mass. 2010)).

4   Unfortunately for Plaintiff, even if the right recognized in *Lawrence* were to be read as

5   expansively as Plaintiff suggests, the *Lawrence* Court pointedly declined to apply heightened

6   scrutiny to invasions of this right.  Additionally, even on Plaintiff's expansive reading of

7   *Lawrence* as creating a right to autonomy in homosexual relationships, it is unclear how DOMA

8   implicates this right.  DOMA neither prevents the formation of same-sex marriages where they

9   are allowed by the States nor breaks them apart once entered, nor does it limit a person's

10  autonomy in any way.  DOMA simply defines "marriage" for the purpose of assigning federal

11  benefits and burdens; it is not the sort of regulation at issue in a case like *Lawrence*—a criminal

12  sanction for homosexual sodomy.  Plaintiff has standing because of a pocket-book injury, not

13  because federal law precludes her from marrying or raising a family.  Such matters are left to the

14  States.  DOMA deals with the limited realm of federal benefits and burdens.  Thus, Plaintiff's

15  invocation of fundamental liberties or suggestions that DOMA subjects her to a "government-

16  imposed 'stigma'" are misplaced.  Pl.'s Reply Mot. Dismiss at 17 (citing *Lawrence*, 539 U.S. at

17  575-76 and *Witt v. Dep't of Air Force*, 527 F.3d 806, 819 (9th Cir. 2008)).

18  **II.   DOMA EASILY SURVIVES RATIONAL BASIS SCRUTINY.**

19        Plaintiff continues to argue that DOMA is subject to a more stringent rational basis

20  analysis.  For all the reasons argued in the House's reply memorandum in support of its motion

21  to dismiss, *see* House Reply Mem. Mot. Dismiss at 17-19, that argument is misplaced as it

22  fundamentally misconstrues the nature of the rational basis test.  Rational basis is rational basis,

23  and a more stringent analysis is called heightened scrutiny and is obviously inapplicable here.

20

SUPERSEDING OPPOSITION OF THE U.S. HOUSE OF REPRESENTATIVES TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, Case No. 3:10-cv-0257-JSW

1   Moreover, Plaintiff's arguments concerning the various interests that fail to support DOMA also

2   are misplaced.

3       **A.      Congress Was Justified in Acting with Caution When Faced with the
              Unknown Consequences of a Proposed Novel Redefinition of the
4             Foundational Social Institution of Marriage.**

5       Just as before, Plaintiff argues that "adhering to a 'historic' definition of marriage is not a

6   legitimate government end in itself, but instead a mere tautology."  Pl.'s Mem. Summ. J. at 12.

7   She also argues that the federal government "has no valid interest in advancing its own definition

8   of marriage separate from state law."  *Id*.  For reasons stated previously, the first of these

9   arguments fails.  *See* House Reply. Mem. Mot. Dismiss at 21-24.  The second argument also

10  fails.

11      Plaintiff's argument seems to be that because the federal government generally has

12  deferred to States' determinations of who is married, it is irrational for it to choose a different

13  path than that dictated by state law.  The argument confuses novelty and irrationality.  It also

14  ignores that DOMA implicates federal burdens and benefits, an area where the federal

15  government's authority to apply its own federal rule is at its zenith.  While it is true that the

16  federal government generally has simply deferred to state law definitions of marriage, that is

17  because up until the eve of DOMA, there was general uniformity in those states' laws—they all

18  adopted the traditional definition.  This is hardly the first time that the federal government has

19  been involved with and injected itself into marriage law when States have deviated from the

20  traditional definition.  Thus, for instance, Congress banned polygamy in the United States

21  territories when faced with widespread plural marriage in the Utah Territory.  *See* Morrill Anti-

22  Bigamy Act, ch. 126, § 1, 12 Stat. 501, 501 (1862) (codified as amended at U.S. Rev. Stat. §

23  5352) (repealed prior to codification in the U.S.C.); *see also Reynolds v. United States*, 98 U.S.

21

1   145, 165-67 (1878).  After the Civil War, during Reconstruction, the U.S. Freedmen's Bureau

2   promoted and supported the marriages of former slaves.  *See* Nancy F. Cott, Ph.D., Decl. ¶ 77,

3   June 24, 2011, ECF No. 135 ("Cott Decl.").  The federal government also worked to support the

4   marriages of American Indians.  *See* Nancy F. Cott, Ph.D., Dep., 17:20-18:1, July 6, 2011 ("Cott

5   Dep."), attached as Ex. D to Dugan Decl. (stating that "in dealing . . . with native Americans

6   through the Bureau of Indian Affairs, the form of marriage observed by these populations was of

7   concern to that federal agency").

8        Furthermore, as Plaintiff's own experts admit, the implicit understanding of marriage

9   through the nineteenth century until at least the 1970s was that marriage was between a man and

10   a woman.  Chauncey Dep. 84:20-23; Cott Dep. 28:20-29:8.  Thus, faced with the possibility of

11   state courts beginning to tinker with the substantive centuries-old definition of marriage,

12   Congress' effort to maintain the traditional definition was consistent with its historical role and

13   not at all unprecedented.  Moreover, with respect to Section 3 in particular, Congress' decision to

14   preserve the same definition of marriage—namely, the traditional one—that prevailed at the time

15   Congress passed innumerable statutes granting benefits and imposing burdens on marriages and

16   spouses is a classic use of federal power to ration federal benefits and burdens.

17        Every federal law involving marriage, spouses, or husbands and wives was written

18   against the unequivocal backdrop of the centuries-old, traditional understanding of marriage.  It

19   is not the federal government that has done the rewriting.  Rather, DOMA was simply a

20   preservative measure to ensure that the will of previous Congresses was respected.  States

21   maintain their power to define marital relationships.  But the federal government certainly was

22   entitled to preserve the definition of marriage that, for federal law purposes, had governed all

23   American law since the country's founding.

1
**B.    DOMA Promotes Responsible Procreation.**

2
Plaintiff states that when "granting summary judgment for the" *Gill* plaintiffs the court

3
"'readily dispos[ed] of the claim that DOMA was intended to 'encourag[e] responsible

4
procreation and child-bearing.'  That conclusion applies with equal force here."  Pl.'s Mem.

5
Summ. J at 12 (quoting *Gill*, 699 F. Supp. 2d at 378, 388) (alteration by Plaintiff).  In support of

6
this contention, Plaintiff asserts that "'[s]ince the enactment of DOMA, a consensus has

7
developed among the medical, psychological, and social welfare communities that children

8
raised by gay and lesbian parents are just as likely to be well-adjusted as those raised by

9
heterosexual parents.'"  *Id.* (quoting *Gill*, 699 F. Supp. 2d at 388-89).

10
Contrary to Plaintiff's claims, as one would expect on such a divisive issue, there is no

11
consensus.  Indeed, the evidence relied upon by Plaintiff's own expert demonstrates that studies

12
comparing gay or lesbian parents to heterosexual parents have serious flaws.  *See* Michael E.

13
Lamb, Ph.D., Dep., Ex. 6 at 327, June 24, 2011 ("Lamb Dep."), attached as Ex. E to Dugan Decl.

14
("Studies of children raised by same-sex parents have almost exclusively focused on families

15
headed by lesbian mothers rather than gay fathers."); *id.*, Ex. 8 at 526 ("We still have relatively

16
few studies of adolescent offspring of lesbian or gay parents, however, and some have advised

17
caution when generalizing the results of research conducted with young children to

18
adolescents."); *id.*, Ex. 9 at 254 ("Future research on gay and lesbian couples needs to address

19
several key issues.  One is sampling.  Because most studies have used convenience samples of

20
mostly white and well-educated partners, the extent to which findings generalize to the larger

21
population of gay and lesbian couples is unknown. . . .  Most studies on gay and lesbian couples

22
have used self-report surveys.  Future work could address some of the biases associated with

23
self-report data . . . .").  Numerous sources have pointed to methodological flaws in those studies

1   comparing heterosexual and homosexual parents.  *See Lofton*, 358 F.3d at 825 nn. 24-25 (listing

2   studies demonstrating serious methodological problems in gay parenting studies); Norval D.

3   Glenn, *The Struggle for Same-Sex Marriage*, 41 Soc'y 25, 26-27 (Sept./Oct. 2004) (stating that

4   studies of same-sex parenting are flawed in large part because "the studies [of same-sex parents]

5   have not used large and carefully matched comparison groups of parents and children in intact

6   heterosexual families"); *id*. at 27 (stating that "research that would provide relevant evidence" of

7   similarities or differences between same-sex and opposite-sex parents "has not been done, and,

8   because it would be expensive and difficult, is not likely soon to be done"); *see also* Ann

9   Hulbert, *The Gay Science:  What Do We Know About the Effects of Same-Sex Parenting?*, Slate

10  (Mar. 12, 2004), http://www.slate.com/id/2097048/ (stating that both camps in gay marriage

11  debate "have converged lately on a very basic point:  The existing science is methodologically

12  flawed and ideologically skewed").

13          Moreover, a recent study by Professor Loren Marks calls into question the very studies

14  upon which Plaintiff relies.  *See* Loren Marks, *Same-Sex Parenting and Children's Outcomes:  A*

15  *Closer Examination of the American Psychological Association's Brief on Lesbian and Gay*

16  *Parenting* (Oct. 3, 2011), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1937762, attached

17  as Exhibit B hereto.  In that study Dr. Marks cautions that same-sex parenting studies cannot

18  support a binary claim that same-sex parented families are either as good as or worse than intact

19  heterosexual families and any such statement would not be "grounded in science."  *Id*. at 22.  At

20  the very least, this suggests that Congress had an eminently rational basis for enacting DOMA.

21  When dealing with an institution as important as marriage and a definition as long-established as

22  the traditional definition of marriage, it is eminently rational to move slowly and allow states to

23  experiment with new definitions before those definitions are either transferred by force of law to

SUPERSEDING OPPOSITION OF THE U.S. HOUSE OF REPRESENTATIVES TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, Case No. 3:10-cv-0257-JSW

1    other states, *see* DOMA § 2, 28 U.S.C. § 1738C, or adopted as the federal definition, *see* DOMA

2    § 3.  *See also Lawrence*, 539 U.S. at 585 (O'Connor, J., concurring) ("preserving the traditional

3    institution of marriage" is legitimate state interest).

4        Contrary to Plaintiff's argument, DOMA furthers the government interest in maintaining

5    the link between marriage and children.  In response, Plaintiff offers a glaring non sequitur:

6    Neither "DOMA, [n]or indeed any state law . . . require the ability to procreate as a precondition

7    to marriage."  Pl.'s Mem. Summ. J. at 14.  Plaintiff's argument relies on the invalid assumption

8    that it is impossible for the government to foster the link between marriage and childbearing

9    except by prohibiting marriage to anyone who cannot or will not have children.  Rational basis

10   does not demand that kind of narrow tailoring.  Plaintiff gives no reason why the government

11   cannot also reinforce the importance of children to marriage by recognizing that marriage must

12   be defined with reference to the likelihood that marital relationships will involve children.

13       Plaintiff also asserts that "DOMA's non-recognition of marriages between same-sex

14   couples does not in any conceivable way encourage *heterosexuals* to raise children within

15   married relationships."  *Id*.  Plaintiff, however, offers no reason why a fundamental and entirely

16   novel change in the definition of the institution of marriage would not be expected to affect

17   peoples' opinions regarding that institution.[27]

18                              **CONCLUSION**

19       For the foregoing reasons, Plaintiff's motion for summary judgment should be denied.

20

21   _____

22   [27]  Plaintiff also claims that the refusal to provide spousal health coverage violates the
     Federal Employee Health Benefits Act because it discriminates on the basis of sex.  *See* Pl.'s

23   Mem. Summ. J. at 15-16.  For the same reasons that DOMA does not discriminate on the basis of
     sex, *supra* pp. 17-18, this argument also fails.

25

Superseding Opposition of the U.S. House of Representatives to Plaintiff's Motion for Summary Judgment, Case No. 3:10-cv-0257-JSW

1                                       Respectfully submitted,

2                                         BANCROFT PLLC

3                                         */s/ Paul D. Clement*
                                        Paul D. Clement, Esq.[28]

4                                         H. Christopher Bartolomucci, Esq.
                                        Conor B. Dugan, Esq.

5                                         Nicholas J. Nelson, Esq.

6

7                                         Counsel for the Bipartisan Legal Advisory
                                        Group of the U.S. House of Representatives[29]

8 October 14, 2011

9

10

11

12

13

14

15

16

17

---

18 [28]   Kerry W. Kircher, Esq., as the ECF filer of this document, attests that concurrence in the
filing of the document has been obtained from signatories Paul D. Clement, Esq., H. Christopher
19 Bartolomucci, Esq., Conor B. Dugan,. Esq., and Nicholas J. Nelson, Esq.

20 [29]   The Bipartisan Legal Advisory Group currently is comprised of the Honorable John A.
Boehner, Speaker of the House, the Honorable Eric Cantor, Majority Leader, the Honorable
21 Kevin McCarthy, Majority Whip, the Honorable Nancy Pelosi, Democratic Leader, and the
Honorable Steny H. Hoyer, Democratic Whip. The Democratic Leader and the Democratic Whip
22 decline to support the filing of this Superseding Opposition of the U.S. House of Representatives
to Plaintiff's Motion for Summary Judgment.

23

SUPERSEDING OPPOSITION OF THE U.S. HOUSE OF REPRESENTATIVES TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, Case No. 3:10-cv-0257-JSW